1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

John W. Sigler
13129 Stern Ave
La Mirada, California 90638
Telephone: (714) 697-8576
Email:  JSIGLER@SWS-LLC.COM
**Plaintiff In Propria Persona**



F I L E D
CLERK, U.S. DISTRICT COURT

10/9/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DTA _____ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

JOHN W. SIGLER,

       Plaintiff,

vs.

Jorge Gonzalez, USAA Casualty Insurance Company,  Interinsurance Exchange of Automobile Club, Imperial Body Shop, Inc., Pablo Galvez, Greg Taylor, Melissa Ordell, Danelle Bushnell, Amber Peterson (aka Amber Peterson Forrest, aka Amber J. Schneider), Kevin Karapogosian, James Syring, Randy Termeer, John Boyle and DOEs 1 to 99, inclusive;

       Defendants.

Case No.  **8:22-cv-2325-CJC-JDE**

## FIRST AMENDED COMPLAINT FOR DAMAGES

1) Negligence
2) Fraud / Intentional Misrepresentation. Calif. Civil Code 1710(1).
3) Actionable Deceit. Calif. Civil Code 1709.
4) Civil RICO. 18 U.S.C. 1962(c).
5) Wire Fraud.   18 U.S.C. 1343.
6) Mail Fraud.   18 U.S.C. 1341.
7) Extortion.  18 U.S.C. 1951 (a).
8) Tampering with a witness, victim, or an informant. 18 U.S.C. 1512 (c) (1).
9) Punitive Damages.  Calif. Civil code 3294(a).
10) Clayton Act, Section 4

**Judge:   Cormac J. Carney**

**INDEX**

| **Topic** | **Page** |
|---|---|
| Abstract | 3 |
| Parties | 5 |
| Venue And Jurisdiction | 8 |
| Statute Of Limitations | 9 |
| Standing And Plaintiff's Right To Relief | 9 |
| Arbitration | 10 |
| Factual Background | 11 |
| First Cause Of Action – Negligence - Gonzalez | 46 |
| Second Cause Of Action -  Intentional Misrepresentation:  - USAA, IBS, Galvez, Bushnell, Ordell | 47 |
| Third Cause Of Action Intentional Misrepresentation:  THE EXCHANGE, IBS, Taylor, Peterson | 54 |
| Fourth Cause Of Action Intentional Misrepresentation  - THE EXCHANGE, IBS, Peterson, Taylor | 61 |
| Fifth Cause Of Action – Clayton Act – THE EXCHANGE, Peterson, USAA, Bushnell, Taylor | 69 |
| Sixth Cause Of Action - Rico Act - Prohibited Activities – USAA, THE EXCHANGE, IBS, Termeer, Karapogosian, Boyle | 75 |
| Seventh Cause Of Action – Conspiracy to violate 1962(c) - Galvez | 92 |
| Eighth Cause Of Action - Conspiracy to violate 1962(c) – Greg Taylor | 93 |
| Ninth Cause Of Action - Conspiracy to violate 1962(c) - Peterson | 94 |
| Tenth Cause Of Action – Conspiracy to violate 1962(c) - Bushnell | 95 |
| Eleventh Cause Of Action – Conspiracy to violate 1962(c) - Ordell | 96 |
| Twelfth Cause Of Action – Conspiracy to violate 1962(c) - Gonzalez | 97 |

Plaintiff   John W. Sigler:                                                    8:22-cv-2325-CJC-JDE
FIRST AMENDED COMPLAINT

| Thirteenth Cause Of Action - Conspiracy to violate 1962(c) - IBS | 98 |
|---|---|
| Fourteenth Cause Of Action – Conspiracy to violate 1962(c) - Karapogosian | 99 |
| Prayer | 100 |

## **ABSTRACT**

1.    On February 28, 2020 Defendant Gonzalez rear-ended the Plaintiff's vehicle which was being driven by the Plaintiff's son, Alexander Sigler.

2.    To date the Defendants Gonzalez, Interinsurance Exchange of the Automobile Club (THE EXCHANGE) (Gonzalez's liability insurer), and USAA (Sigler's underinsured insurer) have settled personal injury claims with the Plaintiff's son, and in all cases the Defendants freely admitted that Defendant Gonzalez was 100% responsible for all the damages.

3.    The goal of this lawsuit is to recover non-personal injury damages that include: 1) property damages to the Plaintiff's vehicle deemed a total loss, 2) consequential damages of ""Loss of Use"" of said vehicle, 3) consequential damages of storage costs for the damaged vehicle, and 4) the consequential damages of "lost business productivity" suffered by the Plaintiff in having to take time off work to deal with the aftermath of this accident arising out of acts of Intentional Misrepresentation (Fraud), and violations of the RICO and Clayton Acts.

4.    Both insurance companies, their employees, as well as their mutual subcontractor Imperial Body Shop (IBS) and IBS's employees, engaged in acts of insurance fraud, wire fraud, mail fraud, extortion, and witness tampering with the common goal to avoiding payment of legitimate damages resulting from said auto accident, as well as deceiving the Plaintiff into believing his vehicle was non repairable and a total loss.

5.     Evidence obtained through discovery shows that not only was there collusion between USAA and IBS to produce fraudulent appraisals to reduce USAA's liability, and collusion between THE EXCHANGE and IBS to produce fraudulent appraisal to reduce THE EXCHANGE's liability, but discovered records show USAA and THE EXCHANGE colluded together, with the assistance of IBS, to engage in a "price fix" scheme relating to their valuation offers for compensation to the Plaintiff for his totaled vehicle.  Defendants USAA and IBS engaged in acts of extortion to threaten or cause financial harm to the Plaintiff in two separate schemes to force the Plaintiff to accept dishonest offers. Defendants THE EXCHANGE and IBS also engaged in acts of witness tampering to conceal or destroy evidence, and THE EXCHANGE conspired with Gonzalez to engage in an act to impede the due administration of justice.

6.     The Plaintiff is asking for punitive damages and damages under both the Clayton Act and the Civil RICO Act as the only way to hold accountable the Defendants who engaged in these acts of fraud, extortion, witness tampering, and racketeering.  The corporations need to be held accountable for their business practices of engaging in fraud and other predicate Acts, but these acts will never stop until the appraisers, their employer, and the individual claims adjusters are also held accountable.  This suit intends to shine a light on the fraud that has become standard practice within the insurance industry, and how insurers who should be looking out for their clients are instead teaming with the opposition insurer with the goal of conspiring to minimize the liability of their people (i.e. insurance companies) over the well being and a fair settlement for policyholders and accident claimants.

**Plaintiff alleges as follows:**

## PARTIES

7.   As used in this Complaint, the term **"Plaintiff"** shall mean **JOHN SIGLER**, the owner of said vehicle, a 2013 Chevrolet Impala, VIN No. 2G1WC5E3XD1155837, which was rear-ended by the Defendant Jorge Gonzalez while said vehicle was being driven by Plaintiff's son, Alexander Sigler, on Victoria Blvd. in the City of Costa Mesa, on February 28, 2020 at approximately 7am.  Mr. Sigler is a resident of the State of California, County of Los Angeles.

8.   **Jorge Gonzalez** is an individual who resides in Santa Ana, California and was the owner and operator of the "at fault" vehicle at the time his vehicle rear-ended and- damaged the Plaintiff's vehicle.  Mr. Gonzalez has also conspired to impede the due administration of justice for his own personal gaining of an advantage in this lawsuit.

9.   **Defendant USAA Casualty Insurance Company**, herein referred to as USAA, is a corporation organized and in existence under the laws of the State of Texas with Headquarters located in San Antonio, Texas; and registered with the California Department of Corporations to conduct business in California.  At all relevant times herein, USAA was engaged in the business of auto insurance and provided auto insurance coverage for the Plaintiff.  USAA conspired with their sub-contractor Imperial Body Shop to create fraudulent Vehicle Valuation Reports and repair estimates to deceive the Plaintiff into believing his vehicle was a total loss and to deceive the Plaintiff into accepting unreasonably low compensation under the collision section of the Plaintiff's auto insurance policy.  In addition, USAA engaged in acts of price fixing / bid rigging in concert with THE EXCHANGE to deny the Plaintiff the opportunity to receive a competitive settlement offer from the other insurer, as well as engaged in acts of extortion that force policyholders to accept unfair settlement offers or suffer further financial damage.

10. **Interinsurance Exchange of Automobile Club,** herein referred to as THE EXCHANGE Insurance, or simply EXCHANGE, is at all times relevant herein a company that conducts business in California with headquarters in Costa Mesa, California.  At all relevant times herein, THE EXCHANGE was engaged in the business of auto insurance and provided auto insurance coverage in the State of California to Defendant Jorge Gonzalez.  THE EXCHANGE conspired with their sub-contractor Imperial Body Shop to create fraudulent Vehicle Valuation Reports and repair estimates to deceive the Plaintiff into believing his vehicle was non repairable and a total loss, and to deceive the Plaintiff into accepting an unreasonably low settlement offer.  In addition, THE EXCHANGE engaged in acts of price fixing / bid rigging in concert with USAA to deny the Plaintiff the opportunity to receive a competitive settlement offer, as well as engaged in acts of Obstruction of Justice and Witness Tampering to destroy evidence of their fraud, as well as to impede the administration of justice during pretrial activities.

11. **Imperial Body Shop, Inc.,** referred to as IBS, at all times relevant herein is a corporation organized and in existence under the laws of California, and registered with the California Department of Corporations to conduct business in California and located in La Habra, California.  IBS is a member of both USAA's and THE EXCHANGE's Direct Repair Program (DRP) which directs accident repairs to IBS's facility in exchange for considerations favorable to the insurers.  At all relevant times herein, Imperial Body Shop was engaged in the business of auto repair and vehicle appraisals.  IBS, through their employees, engaged in deliberate acts of falsifying appraisal and repair estimates in multiple schemes to deceive the Plaintiff into believing his vehicle was a total loss.  IBS also engage in Acts of Witness Tampering to conceal evidence of their falsification of appraisals and repair estimates in support of fraudulent activities to mislead the Plaintiff into believing his vehicle was totaled.

Plaintiff   John W. Sigler:                                                8:22-cv-2325-CJC-JDE
FIRST AMENDED COMPLAINT

12. **Pablo Galvez,** was an individual employed by Imperial Body Shop in La Habra, California, to perform appraisals and repair estimates and falsified said valuations and estimates in support of USAA's misrepresentation that Plaintiff's vehicle was totaled. Defendant's current whereabouts are unknown.

13. **Greg Taylor,** was an individual employed by Imperial Body Shop in La Habra, California and believed to reside in Brea, CA. At all relevant times, Mr. Taylor was employed by Imperial Body Shop to perform appraisals and repair estimates and falsified said valuations and estimates in support of THE EXCHANGE's misrepresentation that Plaintiff's vehicle was totaled.

14. **Amber Peterson,** is an individual who at all relevant times was employed by THE EXCHANGE as a claims adjuster and was the primary claims adjuster who handled the Plaintiff's auto accident claim with THE EXCHANGE. Peterson a) engaged in the criminal act of price fixing with USAA employee Danelle Bushnell, b) committed fraud relating to falsely representing that the Plaintiff's vehicle was total, c) falsely represented to the Plaintiff, through his son, that AAA would provide fair and honest settlement offer while planning to commit fraud and price fixing, and d) intentionally falsified "Loss of Use" offers to the Plaintiff. Amber Peterson is also known as Amber Peterson Forrest, and Amber J. Schneider, and is believed to reside in Centerton, AR.

15. **Melissa Ordell**, is an individual who at all relevant times was employed by USAA in their claims department, interfaced with the Plaintiff, reinforced USAA's misrepresentation that the Plaintiff's vehicle was totaled, and engaged in the manufacturing of false evidence through wire fraud by reopening a total loss claim three years after it was closed and continuing to claim the Plaintiff's vehicle was totaled. Defendant is believed to reside in Flagstaff, AZ.

16. **Danelle Bushnell** is an individual who at all relevant times was employed by USAA in their claims department, interfaced with the Plaintiff, reinforced

USAA's misrepresentation that the Plaintiff's vehicle was totaled, and conspired with claims adjuster Amber Peterson at THE EXCHANGE in a scheme of "price fixing" the valuation of the Plaintiff's vehicle.  Defendant is believed to reside in Fountain Hills, AZ.

17.   **Randy Termeer** who serves as President of the Defendant USAA Property and Casualty Insurance Group and under 18 USC 1962 (c) (Civil RICO Act) is liable for conducting the affairs of racketeering enterprise member USAA through a pattern of racketeering activity.  Termeer directly or indirectly oversaw and directed USAA employees Melissa Ordell and Danelle Bushnell who committed predicate acts of fraud.  Defendant is believed to reside in Boerne, TX.

18.   **Kevin Karapogosian** who at all relevant times is the CEO of Imperial Body Shop and under 18 USC 1962 (c) (Civil RICO Act) is liable for conducting the affairs of racketeering enterprise member Imperial Body Shop through a pattern of racketeering activity, and directly or indirectly oversaw and directed IBS employees Pablo Galvez and Greg Taylor who committed predicate acts of fraud.  Defendant is believed to reside in Seal Beach, CA.

19.   **John Boyle** is the CEO of Automobile Club of Southern California and under 18 USC 1962 (c) (Civil RICO Act) is liable for conducting the affairs of racketeering enterprise member THE EXCHANGE through a pattern of racketeering activity, and who directly or indirectly was the top level manager supervising Ms. Amber Peterson who committed predicate acts of fraud. Defendant is believed to reside in Trabuco Canyon, CA.

## VENUE AND JURISDICTION

20.   **Diversity Jurisdiction**.  This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1332, and is a civil action

between citizens of different states with a matter in controversy that exceeds $75,000, exclusive of interest and costs.

21.   **Subject Matter Jurisdiction**.  This action is a civil action including right of actions under Federal Statutes 15 U.S.C. 1962 (RICO Act) and 15 U.S.C. 15, (Clayton Act) establishing subject matter jurisdiction in a federal court.

22.   **Venue** is proper in the CENTRAL DISTRICT OF CALIFORNIA because defendants, THE EXCHANGE, Imperial Body Shop, Greg Taylor, Jorge Gonzalez reside or have their businesses located in Orange County, and Defendant USAA conducts business in Orange County.  The vehicular accident, which was the origin of this civil action, occurred in the City of Costa Mesa.

## STATUTE OF LIMITATIONS

23.   This civil action was filed well within the statute of limitations as defined under California Code of Civil Procedures 338.(c)(1) which provides a statute of limitations of three years for "An action for taking, detaining, or injuring goods or chattels, including an action for the specific recovery of personal property".  The original accident occurred on February 28, 2020 and the original complaint was filed within the three year limit.  The statue of limitations on claims under the Civil RICO Act and under the Clayton Act are four years and this action was filed well within that limit.

## STANDING AND PLAINTIFF'S RIGHT TO RELIEF

24.   The Plaintiff is the registered owner of the vehicle which was damaged by the "at fault" driver so the Plaintiff has standing for seeking relief for said damages.  The Plaintiff had to use his own resources to provide replacement vehicular transportation to his son who used this vehicle full time for transportation for the past six years.  Plaintiff has also suffered damages in the

form of having to provide storage for the "totaled" vehicle in order to maintain the availability of key physical evidence.

25.   The Plaintiff has the right to relief for: 1) the damage done to his vehicle or fair compensation for the value of his "totaled" vehicle, 2) the reasonable cost of providing a replacement vehicle during the time that the Defendants have refused to provide fair compensation for the Plaintiff's damaged vehicle, 3) compensation for the fair market valuation for vehicular storage that the Plaintiff has had to provide during the time that the Defendants refused to provide fair compensation for the Plaintiff's damaged vehicle, and 4) the Plaintiff has the right to relief for damage to his business resulting from not being able to work his business as a result of having to respond to the Defendants' violation of both the RICO and Clayton Acts.

## **ARBITRATION**

26.   On July 3, 2023 the court dismissed all claims against USAA citing the Plaintiff's failure to participate in Appraisal Arbitration according to USAA Auto Policy Clauses: Part D – PHYSICAL DAMAGE COVERAGE, - APPRAISAL, "*If we and you do not agree on the amount of loss, either may demand an appraisal. In this event, each party will select a competent appraiser. The two appraisers will select an umpire. The appraisers will state separately the actual cash value and the amount of loss. If they fail to agree they will submit their differences to the Empire.  A decision agreed to by any two will be binding. Each party will pay its chosen appraiser and share the expense of the Empire equally. Neither we nor you waive any rights under this policy by agreeing to an appraisal.*" and Part E – GENERAL PROVISIONS, - LEGAL ACTION AGAINST US, Paragraph A.  "*No legal action may be brought against us until there has been full compliance with all the terms of this policy*".

_____10_____

27.   Due to new evidence obtained during discovery, (that the Plaintiff's vehicle was not totaled) and the fact that when the Plaintiff attempted to participate in Appraisal Arbitration USAA continued to change and redefine the terms contained within their Part D – Physical Damage Coverage - Appraisal clause, the Plaintiff has determined that disputing "the amount of loss" cited in USAA's last Loss Statement received on March 31, 2020 is no longer productive or necessary to the Plaintiff's goals.  As such, the Plaintiff will no longer disagree with USAA last "amount of loss" figure; since with the discovery of evidence that the Plaintiff's vehicle was not a total loss based upon USAA's final valuation, Appraisal Arbitration is a moot point.  Thereby, Plaintiff will agree with USAA's last "amount of loss" valuation, which proves the Plaintiff's vehicle was not totaled, and with no disagreement, USAA's Appraisal Arbitration Clause in Part D – Physical Damage Coverage, is no longer applicable.  The Plaintiff is now in full compliance with all the terms of the policy which cancels out USAA's Part E – General Provisions – Legal Action Against Us clause.  As a result of the above decision by the Plaintiff, Appraisal Arbitration is a moot point as well as USAA's Part E General Provision clause concerning legal action; allowing the Plaintiff to resume legal action against USAA in this amended Complaint.  A copy of the letter notifying USAA of this position change regarding Appraisal Arbitration is contained in Exhibit A.

## FACTUAL BACKGROUND

28.   **Plaintiff vehicle was damaged by the negligent actions of Jorge Gonzalez.**  On the morning of February 28, 2020, Plaintiff's son, Alexander Sigler, was driving Plaintiff's car near the 700 block on Victoria Blvd in Costa Mesa, CA; when Alexander Sigler was required to reduce speed due to traffic ahead.  The speed limit in this section of Victoria Blvd is posted at 40 mph.

Alexander Sigler estimated that due to traffic slowing down, he was required by safe driving considerations to reduce his speed to a range of 1 - 7 mph.  As Alexander Sigler began to resume normal traffic speed when it was safe, his vehicle was struck from behind by a vehicle driven by Defendant Jorge Gonzalez; causing property damage to the Plaintiff's vehicle and personal injury to the Plaintiff's son, Alexander Sigler.  At the time of the accident all safety equipment on the Plaintiff's vehicle was fully functional, including all rearward facing brake lights.   Both the Plaintiff's insurer, USAA, and the at-Fault driver Jorge Gonzalez's insurer, THE EXCHANGE, have determined that the accident was 100% the fault of Mr. Gonzalez.

29.  **USAA fraudulently created a Total Loss Claim for the Plaintiff's vehicle.**  At the time of the accident, the Plaintiff's vehicle was insured by USAA, including coverage for liability, collision, and uninsured / under-insured drivers.  On February 29, 2020 the driver, Alexander Sigler, reported the accident to the Plaintiff (his father's) insurance company USAA.   At the time of calling, Alexander made no decision as to any claim regarding the repairing of the vehicle.  USAA acknowledged this in their Claim Notes, Doc. No. 6, stating: "member will have to call back did not want to make decision on where to take iv [incident vehicle] for repair".  Alexander Sigler is a child dependent on the Plaintiff's auto policy, and according to the terms of the policy, has no rights to file any collision claim on this vehicle; especially since Alexander Sigler is not even a legal owner of this vehicle.

30.  On March 2, 2020 Plaintiff was contacted by USAA regarding getting his vehicle repaired at USAA's Direct Repair Program (DRP) member Imperial Body Shop (IBS).  The discussion only covered getting the Plaintiff's vehicle repaired and never included any discussion of the possibility or filing of a Total Loss Claim.  The Plaintiff has a $1,000 deductible on his collision policy, so

_____12_____

agreeing to filing a Total Loss Claim under his policy would be a very poor financial decision the Plaintiff would never agree to since the accident was clearly the other driver's fault.

31.    The offer discussed on March 2, 2020 was that since the accident was the other person's fault, USAA's DRP member would repair the Plaintiff's vehicle at no "out-of-pocket" charge to the Plaintiff, and USAA would facilitate IBS getting reimbursed from the other party's insurer.  At no time was there any discussion of a claim being filed against the Plaintiff's insurance policy or discussion of a total loss claim.  USAA has a company claims policy that states "even if you are not at fault, we consider multiple variables before determining if your premium needs to be adjusted".  As such, to avoid any risk of increased premiums for an accident that was not his or his son's fault, the Plaintiff had additional reasons to never agree to file a claim with USAA against his policy.

32.    On March 6, 2020 Plaintiff's vehicle was towed to Imperial Body Shop in La Habra, CA.  On March 9, 2020 Plaintiff visited IBS to inspect his vehicle and signed papers agreeing to have his vehicle repaired.  At no time, and nowhere within the documents signed by the Plaintiff was there any mention or agreement concerning a Total Loss Claim.

33.    On March 9, 2020, IBS employee Pablo Galvez created a Vehicle Valuation Report (VVR) under the direction of USAA; an act that was not previously disclosed to, or authorized by the Plaintiff.  Mr. Galvez's initial VVR, herein after referred to as Galvez-VVR-00, listed the value of Plaintiff's vehicle as $9,238.52 (base vehicle value of $8,437 plus tax).  The Galvez-VVR-00 contained misrepresentations regarding the condition of the Plaintiff's vehicle, including falsely stating the vehicle did not have a sunroof or CA Emission equipment. Both of these misrepresentations were used to artificially depress the appraised value of the Plaintiff's vehicle.

_____13_____

34.   Through discovery in 2023, Plaintiff obtained photos taken of his vehicle by Pablo Galvez on or about March 9, 2020 which were forwarded to USAA.  Galvez's photos included multiple photos of the sunroof, both from inside and outside of the vehicle, as well as photos of the vehicle's engine compartment; indicating it is unlikely that Galvez did not see this equipment (sunroof and CA emission Equipment) that Galvez stated was missing from the vehicle.

35.   On March 10, 2020 IBS employee Pablo Galvez created a repair estimate for the Plaintiff's vehicle, totaling $9,775.68.  In violation of California State laws, this estimate was never provided to the Plaintiff by USAA or IBS. The Plaintiff did not obtain a copy of this estimate until May 2023 as part of a discovery requests served on IBS and USAA.

36.   On March 11, 2020, USAA notified the Plaintiff in a letter sent through email that his vehicle was a "total loss"; meaning that *"it costs more to repair the vehicle than the vehicle is worth"*.  Said letter was unsigned by any USAA employee, but was preceded by a letter dated March 2, 2020 signed by Danelle Bushnell stating that she was there to "help by making sure your claim is resolved fairly and as quickly as possible".  Unbeknownst to the Plaintiff on March 11, 2020, and without notice or Plaintiff's consent, USAA instituted a Total Loss Claim on the Plaintiff's vehicle based upon the depressed Galvez-VVR-00 valuation of $9,238.52, and the Galvez repair estimate of $9,775.68; which the Plaintiff discovered three years later was artificially inflated.  Since USAA failed to provide the Plaintiff with a copy of the Galvez repair estimate, the Plaintiff relied on the assertion by USAA that his vehicle was "a Total Loss".

37.   In May 2023 the Plaintiff obtained a copy of the Galvez VVR through a discovery request served on IBS.  It was not until September 2023, when the Plaintiff was reviewing documents as part of his effort to file an Amended Complaint that the Plaintiff discovered that he had actually been defrauded for the

past three years into believing his vehicle was a "Total Loss" by both USAA and THE EXCHANGE, with the assistance of fraudulent appraisals and repair estimates created by IBS.

38.   During a complete document review, the Plaintiff compared the Galvez Repair Estimate against the various "Amount of Loss" offers USAA provided in 2020 and discovered that his vehicle was not a total loss.  This discovery lead to the Plaintiff comparing the Galvez Repair Estimate against copies of the Taylor Repair Estimate, a repair estimate prepared for THE EXCHANGE by Greg Taylor at IBS.  Comparison of the Taylor Repair Estimate against THE EXCHANGE's valuations of the Plaintiff's vehicle showed that THE EXCHANGE had also defrauded the Plaintiff into believing his vehicle was totaled when in fact it was not.

39.   Comparison of the two repair estimates also revealed major discrepancies with both repair estimates and evidence that both repair estimates had been "doctored" to create repair estimates greater than the original fraudulent VVR's created by both insurers.

40.   It was found that the Galvez repair estimate used inflated labor rates to artificially increase the labor repair costs, thus inflating the overall repair estimate in what can only be described as a deliberate attempt to falsify the repair costs versus the vehicle's appraised value to fraudulently justify the false representation that the Plaintiff's vehicle was a "total loss".  Where the Galvez Repair Estimate used labor rates ranging from $50 - $95 per hour, the Taylor Repair Estimate used labor rates ranging from $42 - $62 per hour; noting thast both repair estimates were performed for repair to be performed at the same repair shop, IBS.  Recomputing the Galvez Repair Estimate using the Taylor labor rates, reduced the Galvez Repair Estimate by $542, making the cost to repair the

Plaintiff's vehicle $9,233.68. (essentially the same as the Galvez-VVR-00 valuation of $9,238.52)

41.     As previously discussed in ¶33, Galvez-VVR-00 valued the Plaintiff's vehicle at $9,238.52, making it slightly less expensive to repair the vehicle (based upon the corrected Galvez Repair Estimate values) than what USAA claimed the vehicle was worth; meaning that using honest labor rates in the Galvez Repair Estimate, and providing the repair estimate to the Plaintiff would have supported, and allowed the Plaintiff to get his vehicle repaired as he had originally wanted back on March 2, 2020; and not have his vehicle falsely labeled a "total loss". These numbers would explain why USAA "doctored" and then withheld the Galvez Repair Estimate from the Plaintiff in the first place as part of their scheme to deceive the Plaintiff into believing his vehicle was a total loss.

42.     On March 23, 2020 USAA undated the Galvez-VVR-00 to account for the misrepresentations regarding the sunroof and the emission equipment. This updated VVR, herein after referred to as Galvez-VVR-23 returned an appraised value of $9,714.84, clearly pushing the appraised value above the corrected repair cost almost to the level of the fraudulent repair estimate; and making the vehicle NOT a total loss allowing the possibility to the Plaintiff of getting his vehicle repaired.  No such option was made available to the Plaintiff because USAA was choosing to stick to their original plan to deceive the Plaintiff into believing that his vehicle was a "total loss".  Although USAA accounted for the misrepresentation of missing equipment, at this time USAA refused to recognize the increased valuation of the Plaintiff's vehicle for the non-standard equipment on the vehicle.

43.     Relying on USAA's misrepresentation that the Plaintiff's vehicle was a total loss, and being deprived of the Galvez Repair Estimate, the Plaintiff went down USAA's misrepresented path of attempting to negotiate a fair valuation for

his vehicle instead of demanding that his vehicle be repaired as was the original intent and agreement made on March 2, 2020.  In addition to misrepresenting the repair costs and valuation of the Plaintiff's vehicle, unbeknownst to the Plaintiff and without the Plaintiff's consent or knowledge, on or about March 18, 2020, USAA sold the Plaintiff's vehicle to an online auction company called CoPart.

44.    With a stalemate on an honest valuation of the Plaintiff's vehicle, and the deception of USAA selling the Plaintiff's vehicle "behind the Plaintiff's back", on March 26, 2020 the Plaintiff, with the mutual agreement of USAA, cancelled the Total Loss Claim that USAA had initiated without his consent or agreement.  USAA's Claim Notes, Doc. No. 83 – 87 document that USAA agreed to the termination of the Total Loss Claim which was acknowledged by USAA employees Danelle Bushnell, Melissa Ordell, and Tanya Delay.  USAA also informed outside sources that their Total Loss Claim was cancelled on this date, including sending notice to THE EXCHANGE.

45.    Even after agreeing to the cancellation of their Total Loss Claim on March 26, 2020; USAA continued in their efforts to deceive the Plaintiff into settling his damages under a fraudulent total loss settlement.  On March 31, 2020, days after USAA agreed the Total Loss Claim was cancelled, USAA again updated the Galvez-VVR to an offer on the Plaintiff's vehicle valuation of $10,090.05; this time including some of the non-standard equipment on the vehicle.  Comparison of this offer to the Galvez Repair Estimate (originally $9,775.68, corrected to $9,238.52) now showed that the Plaintiff's vehicle was clearly NOT a "total loss" by any standard, as represented by USAA. Unfortunately, even at this time, the Plaintiff did not have a copy of the Galvez Repair Estimate and was still under the assumption that USAA's original misrepresentation that his vehicle was a "total loss" was truthful.  Without a copy

of the Galvez Repair Estimate, still being withheld by USAA, Plaintiff had no way of knowing that his vehicle was actually repairable.

46.     This final offer on March 31, 2020 was preceded by a phone call from USAA employee Melissa Ordell who blamed all the misrepresentations within the Galvez VVR on a false narrative that the appraiser had used the official VIN report to create his appraisal and no act of fraud had occurred.  After ending the conversation, the Plaintiff downloaded a copy of the VIN Report on his vehicle and determined that Ordell's narrative was itself false and there were no errors in the VIN Report.  This was just another example of the falsehood and deceptive that permeated USAA's settlement process to falsely deceive the Plaintiff into believing his vehicle was a total loss in contradiction to Danelle Bushnell's initial misrepresentation that "We're here to help by making sure your claim is resolved fairly and as quickly as possible for your peace of mind and convenience".

47.     Plaintiff was actually defrauded by USAA's false representation that his vehicle was a total loss for more than three years, because it was not until obtaining discovery in May 2023 that Plaintiff obtained copies of the Galvez and Taylor repair estimates, discovered the Galvez repair costs were less than USAA's valuation of his vehicle, and that the Galvez Repair Estimate had also been falsified.  If the Plaintiff had not been defrauded by USAA, and if Plaintiff had not relied on USAA's misrepresentation that his vehicle was a total loss; Plaintiff would have gotten his vehicle repaired and not suffered extensive damages for "Loss of Use" and storage costs.  USAA's misrepresentation that the Plaintiff's vehicle was a total loss also overflowed into the Plaintiff's efforts to settle the damages with the at-fault insurer, THE EXCHANGE.  With the false claim by USAA that his vehicle was a total loss, the Plaintiff was predisposed into also believing THE EXCHANGE false assertion that his vehicle was also a total loss; a vulnerability THE EXCHANGE exploited after discussions with USAA to match

USAA's initial offer to the Plaintiff in a criminal act of price fixing THE EXCHANGE's initial settlement offer to the Plaintiff.

48. **USAA conspired with THE EXCHANGE to unethically and criminally deny the Plaintiff the right to a competitive settlement offer from THE EXCHANGE in violation of Section 1 of the Sherman Act (15 U.S.C. 1).** In response to the valuation fraud occuring with USAA / Galvez, and still ignorant of the fact that his vehicle was not a total loss, on March 19, 2020 the Plaintiff decided to get a competitive offer for compensation for the property damage from the at-fault insurer THE EXCHANGE.  As such, the Plaintiff had his son contact THE EXCHANGE for him to request a settlement quote from the at-fault insurer.  In a phone call recorded by THE EXCHANGE, EXCHANGE employee Amber Peterson stated that they would accept responsibility for the damages and provide a fair and honest settlement.  During said phone call, Alexander Sigler explained the problem of the false representations that had occurred with USAA, including the issue of no sunroof and no emission equipment.  THE EXCHANGE stated that they would obtain their own fair and honest appraisal of the vehicle and get back to the Plaintiff.

49. Through discovery, the Plaintiff obtained evidence that on March 20, 2020, the day after the Plaintiff requested a competitive offer from THE EXCHANGE, USAA's Danelle Bushnell contacted THE EXCHANGE's Amber Peterson by phone, as documented in USAA's Claim Notes, Doc. No. 67.  In this notation, Bushnell documented her conversation with Peterson discussing the valuation of the Plaintiff's vehicle and USAA's determination that the vehicle was a total loss.  Bushnell also documented Peterson agreement to match USAA's Galvez-VVR-00 valuation, stating Peterson said that THE EXCHANGE "will have a similar value from IV [incident vehicle]".

50.   Through discovery, the Plaintiff obtained evidence that USAA provided THE EXCHANGE a Confidential copy of the Galvez-VVR-00 prior to THE EXCHANGE producing their initial valuation of the Plaintiff's vehicle on March 23, 2020.   The Galvez-VVR-00 copy THE EXCHANGE disclosed in discovery was marked USAA Confidential, meaning it could have only come from USAA.   The date when USAA provided the Confidential copy of Galvez-VVR-00 to THE EXCHANGE can be further narrowed down by the following facts:

a.     Since USAA updated Galvez-VVR-00 on March 23, 2020 to the Galvez-VVR-23 valuation.   The Galvez-VVR-00 would have been obsolete on March 23, 2020, so if USAA provided a copy of their valuation after March 23, 2020, USAA would have provided the Galvez-VVR-23.

b.     USAA's claim Notes indicate the following contact between USAA and THE EXCHANGE from March 11, 2020 to March 23, 2020, indicating the only reasonable time when USAA would have provided the Galvez-VVR-00 to THE EXCHANGE would have been between March 19 to March 20, in support of a price fixing scheme.

i.   March 11, 2020 – inbound call from THE EXCHANGE stating THE EXCHANGE accepted liability.

ii.   March 18, 2020 outbound call from Bushnell to Peterson, no answer.

iii.   March 19, 2020 inbound call from THE EXCHANGE informing USAA of Plaintiff's phone call wanting a competitive offer from THE EXCHANGE.

iv.   March 20, 2020 – outbound call to Peterson at THE EXCHANGE that discussed appraisal of Plaintiff's vehicle including the statement that THE EXCHANGE would produce a VVR with similar values.

Plaintiff   John W. Sigler:                                                                        8:22-cv-2325-CJC-JDE
FIRST AMENDED COMPLAINT

The only reasonable time for USAA to have provided the Galvez-VVR-00 to THE EXCHANGE would have been from March 19 – 20, after the two insurers communicated that the Plaintiff was seeking a competitive settlement offer process.  The only possible reason for USAA to provide THE EXCHANGE with a copy of a VVR which USAA knew contained fraudulent representatives and they were planning on updating, was to avoid a bidding war and illegally engage in a criminal price fixing scheme to deny the Plaintiff the option of competitive bids.

51.    The presence of a price-fixing / bid rigging scheme is evidenced by Peterson comment on March 20, 2020 that THE EXCHANGE would produce a VVR of similar value, and the fact that the Taylor-VVR-00 matched a fraudulent valuation of the Plaintiff's vehicle that could only have been created through a similar act of fraud to produce the exact same base vehicle valuation of $8,437 as contained in the fraudulent Galvez-VVR-00.  In order for the Taylor-VVR-00 to duplicate the valuation in Galvez-VVR-00, the Taylor-VVR-00 had to also falsely claim two major deficiencies in the equipment on the Plaintiff's vehicle.  It is improbable that both VVRs (Galvez-VVR-00 and Taylor-VVR-00) contained similar deficiencies that while not exactly the same, had the exact same detrimental effect on the Plaintiff's vehicle's valuation.

52.    Plagiarism did not occur because for the second deficiency the Galvez-VVR-00 stated no CA emission equipment and the Taylor-VVR-00 stated no metallic paint.  Taking into account the similarities and the differences, the only explanation for the two VVR ending up with the exact same valuation is that the Taylor-VVR-00 was the result of intentional fraud committed as part of a criminal price fixing / bid rigging conspiracy between USAA and THE EXCHANGE, with the assistance of their mutual partner IBS, with the end goal to prevent the Plaintiff from obtaining a competitive offer from THE EXCHANGE

in violation of Section 1 of the Sherman Act and depriving the Plaintiff of his legal right to fair competition and offers.

53.    Additional proof of fraud can be obtained mathematically by applying standard probability theory to the two false statements in both the Galvez-VVR-00 and in Taylor-VVR-00.  Evaluating the four false statements and assuming a 50/50 chance Galvez or Taylor just did not see the sunroof, Emission equipment, or metallic paint; the probability that they missed seeing equipment four times is less than 6.25%, or the probability that fraud was involved is 93.75%.  Using a more realistic assumption that there was only a 25% chance that Galvez and Taylor did not see the sunroof, Emission equipment or metallic paint; the probability of fraud increases to 99%.

54.    Additional proof of this criminal act can be found in the sworn declaration of Melissa Ordell, dated May 25, 2023.  In this sworn declaration, Ordell stated that USAA's Claim Notes function as a diary of activities regarding a given claim and are reliable business records.  Nowhere in USAA's Claim Notes, dating from March 10, 2020 (the date Galvez-VVR-00 was created) to March 23, 2020 (the date Galvez-VVR-23 was created and Galvez-VVR-00 became obsolete), is there any documentation of USAA providing a Confidential Copy of Galvez-VVR-00 to THE EXCHANGE.

55.    Providing THE EXCHANGE with a Confidential copy of Galvez-VVR-00 would have been a major event worth notation in the Claim Notes if it was a legitimate business activity.  The lack of any notation would indicate that this was not a legitimate business activity, supporting the conclusion that providing a Confidential Copy of the Galvez-VVR-00 was part of a criminal conspiracy in support of the USAA/THE EXCHANGE/IBS scheme of price-fixing / bid rigging of the vehicle valuation reports.  The only reason for there not to be a notation of transmission of a copy of the Galvez-VVR-00 to THE

_____22_____

EXCHANGE, would be because this was a criminal act and no record of it should be made, or USAA purged any record of the transaction from the Claim Notes to cover-up this criminal activity and missed the notation stating that THE EXCHANGE had agreed to engage in a price fixing scheme.

56.   **USAA has a history of influencing appraisal companies to falsify appraisals, and falsifying total loss claims because these acts of fraud can produce ill-gotten gains of over $15 million per year.**   The Plaintiff first obtained information regarding USAA falsifying appraisals from articles in the Dallas Morning News which documented three cases ranging from 2017 to 2019 where USAA appraisers admitted to falsifying appraisals under influence from USAA.(Exhibit B)

a) In 2017 after Hurricane Harvey, USAA policyholders Larry and Shirley Reyes of Deer Park, TX filed an insurance claim on their home at 1106 Marshall St., Deer Park, TX under their homeowner's policy.  In the disputing of USAA's appraisal on this claim, USAA's appraiser, Jennifer Posas, who was later labeled a "whistleblower" against USAA, testified under oath in a deposition that her supervisor at Allcat, a Claims Servicing Company hired by USAA, influenced Ms. Posas to falsely reduce her original damage appraisal on the Reyes' home from $33,000 to a value of $2,900; changing her original evaluation that the damage was due to Hurricane Harvey, to a false statement that the damage was pre-existing.  Copies of the Posas' deposition to be requested through discovery.

b) In 2018 USAA policyholder Dr. John Kelley and his wife Sharon, filed a homeowners' claim for roof damage.  Initially Gair Allie, another Allcat appraiser working for USAA, appraised the Kelley's roof damage at $19,800 due to wind damage.  Later, under the influence of USAA, Allie changed his appraisal, stating the damage was due to "roof vandalism" and dropped the appraisal to $1,200, well under the Kelley's deductible.   A jury found these actions questionable and

awarded the Kelley's $143,000 in damages.  (Kelley v. USAA, Case No. 19-0314-C26, filed in the State District Court of Texas, 26th Judicial District, Williamson County, TX.  Copy of Second Amended Complaint and Judgment contained in Exhibit C)

c)  In a third case of Kraig Vandewalle vs. USAA (2019), the previous listed Allcat Appraiser, Gair Allie, appraised Vandewalle's roof for replacement, but later changed his appraisal due to pressure from USAA's subcontractor, Allcat's vice president of claims, Joel Love.  Mr. Allie testified that he was told to change his original opinion, stating "He was given a word-for-word statement of what his conclusion should be".  The Vandewalle's attorney has stated that "They [USAA and Allcat] were manipulating it [the appraisal] to make it look like he [Allie] was in agreement with the ultimate decision made by USAA."  It was also found that Joel Love, the vice president of claims at Allcat, after working to influence Mr. Allie's appraisal reduction, then requested that his name be removed from the file and all logs, in order to keep his role hidden.  Vandewalle's attorney added charges of fraud and conspiracy to the Vandewalle's complaint, stating on page 3 of his amended complaint after deposing Mr. Allie, that "*Defendant Joel Love contacted USAA representatives to conspire to reduce Plaintiff's property settlement and lessen USAA's liability in the claim.  Defendant Love had this conversation without the input of AllCat's Adjuster and made these determinations without inspecting the roof himself. Defendant Love then directed adjuster Gair Allie to change his opinions and erase any mention of Mr. Love from the claim record so that the Plaintiff could not readily uncover this information.*"  Vandewalle's attorney also stated "*Additionally, Mr. Allie has identified that this [conspiring with USAA] is a common practice with Defendants Allcat and Joel Love*".  (Vandewalle v. USAA, Case No. 2020C107408 in the State District Court of Texas , 37th Judicial Court, Bexar County, Texas.  Copy of First Amended Complaint contained in Exhibit D)

Plaintiff   John W. Sigler:                                                            8:22-cv-2325-CJC-JDE
FIRST AMENDED COMPLAINT

57.     These three claim incidents show a pattern of USAA using its influence over appraisal companies to sway appraisers to falsify appraisals to reduce USAA's liability, the same practice USAA used to influence IBS to falsify the Galvez-VVRs and Galvez Repair Estimate by using USAA's Direct Repair Program (DRP) influence.  Initially the Direct Repair Program had a legitimate business purpose to exchange increased business activity to repair facilities in exchange for discounted repair costs to the insurer.  Insurers perverted this arrangement into racketeering enterprises to handle accident vehicles which were determined to be "totaled".  With no repair activities / costs to discount, insurers chose to use their DRP relationship to "influence" repair facilities to falsify Vehicle Valuation Reports (VVR) to undercut the valuation of "totaled" vehicle, and falsify Repair Estimates to falsely claim damaged vehicle were a total loss when insurers determined it would be to their benefit to total a vehicle and then cheat the "totaled" vehicle's owner out of fair market compensation.

58.     Falsifying Total Loss Claims is big business for USAA as shown in the case of Letot v. USAA, Case No. DC-13-00156, State District Court of Texas, 101st Judicial District, Dallas, TX, filed 2013, which obtained class action status, affirmed by the Court of Appeals on February 10, 2022.  A summary of the issues can be found in the News Article, "Class Action lawsuit takes USAA to Court over Thousands of Total Loss Claims" provided as Exhibit E, with backup information from Letot's Class Action Lawsuit's Seventh Amended Original Petition included as Exhibit F.

59.     As stated in paragraph 15 of Letot's Seventh amended Petition, during a two year period preceding the filing of the lawsuit, Letot obtained records from the Texas Department of Transportation indicating that 1,814 Owner Retained Reports (ORR) were filed by USAA.  Each ORR corresponds to a Total Loss Claim created by USAA.  This number converts to 907 ORRs per year in Texas, a

state containing approximately 10% of the national population.  Ratioing the 907 number to a national level, equates to approximately 9,070 ORRs or Total Loss Claims by USAA per year nationwide.  With a similar level of fraud as in this Plaintiff's case of $1,661.53 ($10,090.05 - $9,238.52) per Total Loss Claim, a rough estimate of annual "ill-gotten-gains" by USAA from falsifying Total Loss Claims is $15,050,077 per year.

60.  In the Plaintiff's case, USAA followed the same scheme as alleged in the Letot lawsuit.  For Letot, USAA had an appraiser (Stewart Mayfield) falsify an appraisal of Letot's vehicle and then the same appraiser estimated the repair costs greater than the appraised value.  USAA unilaterally determined the vehicle to be a total loss without any agreement by Letot, and subsequently filed the ORR which devalued Letot's vehicle more with a salvage title.  The scheme in the Letot case is similar to the scheme USAA ran on this Plaintiff, with the exception of the additional step of filing the ORR with the Texas DOT for Letot, and withholding the repair estimate from this Plaintiff.  In the Plaintiff's case, USAA failing to disclose the Galvez Repair Estimate was an additional act to cause the Plaintiff to rely solely upon USAA's false representation that his vehicle was "totaled".

61.  **USAA engaged in multiple acts of extortion, solely, and teaming with IBS, to threaten and cause financial harm to the Plaintiff in attempts to force the Plaintiff to accept a fraudulent settlement offer.**

62.  In order to minimize the financial losses from the accident, on March 19, 2020, the Plaintiff attempted to cancel the insurance policy on his "totaled" vehicle via USAA's online system.  USAA's online software refused to allow Plaintiff's attempt.  When Plaintiff contacted USAA via phone to have the insurance on his "totaled" vehicle cancelled, USAA's representative refused to cancel the insurance policy on the Plaintiff's "totaled" vehicle, stating that "he [the Plaintiff] could not cancel his insurance policy until he settled his claim, a

_____26_____

claim based upon the fraudulent Galvez-VVR-000 appraisal". Plaintiff would have to continue paying "un-necessary premiums" on his "totaled" vehicle, amounting to an additional estimated loss of $320.

63. When the Plaintiff proposed to quit paying the "un-necessary premiums" on this vehicle, USAA's representative stated that Plaintiff would jeopardize his insurance coverage on all his vehicles, and possibly his home too, since all of the Plaintiff's insurance is lumped into a common monthly payment and that payment would be classified as delinquent if not paid in full, including the "un-necessary premiums" on the "totaled" vehicle. USAA claims that this is their standard policy, but nowhere is this policy defined in writing and USAA had no legal right to refuse the Plaintiff's request to cancel his policy and had no legal right to these "un-necessary premiums".

64. The Plaintiff's auto policy states in Part E. GENERAL PROVISIONS, TERMINATION, Paragraph A. Cancellation. Section 1. "*You may cancel this policy at any time*". The Plaintiff's auto policy also states in Part E. GENERAL PROVISIONS, CHANGES, Paragraph D. "*Otherwise, this policy includes all of the agreements between you and us. Its terms may not be changed or waived except by endorsement issued by us.*" Plaintiff's auto policy never contained any provision regarding refusing to allow Plaintiff to cancel his policy, and USAA's undisclosed "un-necessary premium" policy is illegal and a violation of the terms of USAA's policy. The only possible purpose of this "un-necessary premiums" policy, that USAA refuses to disclose in writing, is to cause a policyholder additional financial harm in an effort to force a policyholder to accept a fraudulent settlement under the threat of substantial financial harm caused by the cancellation of all his insurance coverage.

65. The existence of USAA's "un-necessary premium" policy is further confirmed  and proven to be an extortion attempt by statements from Danelle

Bushnell (Claim Notes, Doc. 137) and Melissa Ordell (Claim Notes, Doc. 138) made on May 22, 2020; including the statement "*incident vehicle would not be removed until the TL claim was settled*".   On March 26, 2020, (Claim Notes – Doc. 85 – 87), both Bushnell and Ordell noted that the Plaintiff's Total Loss Claim had been cancelled.   Two months later, on May 22, 2020, both Ordell and Bushnell continued to state that the Plaintiff must pay premiums until his total loss claim was settled.   Both Bushnell and Ordell insisted the Plaintiff continue to pay "un-necessary premiums" on May 22, 2020 knowing they had cancelled the Plaintiff's claim two months prior.   The "un-necessary premiums" policy, which is enforced, whether or not a TL Claim exists, can only be explained as a deliberate act of extortion to force policyholders to accept unfair settlement offers.

66.   In a second act of extortion, in March 2020, the Plaintiff was informed that since he would not accept a settlement offer based upon the fraudulent VVR created by IBS, he would need to start paying storage costs of $80 per day to Imperial Body Shop, the company who produced both fraudulent Vehicle Valuation Reports on the Plaintiff's vehicle.   The Plaintiff refused to pay storage costs, and to mitigate the damages chose to provide storage for his "totaled" vehicle at his residence.   The normal storage location for the "totaled" vehicle was, and had been for the previous two years, with the Plaintiff's son at his apartment in Fullerton where his son attended CSUF.   In March 2020 the Plaintiff's son moved to Costa Mesa which is where this vehicle would have been stored had the accident not occurred.   The Costa Mesa storage location is now occupied by a temporary vehicle and the Plaintiff is having to apportion part of his property as a storage location for this "totaled" vehicle.

67.   **USAA engaged in acts of fraud to deceive the court into believing an arbitration clause relating to total loss valuation was in effect at the time the Plaintiff filed his original complaint.**   On June 1, 2023 USAA filed a Motion

for Judgment on the Pleadings, stating that the Plaintiff failed to participate in a mandatory appraisal arbitration process and therefore could not bring legal action against USAA.  USAA's auto policy states in Part D – PHYSICAL DAMAGE COVERAGE, - APPRAISAL, "*If we and you do not agree on the amount of loss, either may demand an appraisal. In this event, each party will select a competent appraiser. The two appraisers will select an umpire. The appraisers will state separately the actual cash value and the amount of loss. If they fail to agree they will submit their differences to the Empire.  A decision agreed to by any two will be binding. Each party will pay its chosen appraiser and share the expense of the Empire equally. Neither we nor you waive any rights under this policy by agreeing to an appraisal.*"  USAA's auto policy further states in Part E – GENERAL PROVISIONS, - LEGAL ACTION AGAINST US, Paragraph A. "*No legal action may be brought against us until there has been full compliance with all the terms of this policy*".

68.   As previously stated in paragraph 65, USAA agreed to cancel their Total Loss Claim on March 26, 2020.  In a June 9, 2021 email, USAA representative Darcy Harrison stated "If it is your intent to exercise your rights to appraisal, USAA will proceed with the appraisal process".  Never did Harrison state that USAA was invoking the appraisal arbitration clause any place within this correspondence.  As of June 9, 2021, which was the last correspondence from USAA regarding this accident, USAA was choosing not to invoke their rights under the Appraisal Arbitration Clause of the policy.

69.   The first instance of USAA invoking the Appraisal Arbitration Clause was in a March 16, 2023 letter from USAA's attorney Vivian Orlando.  A request that occurred approximately three years after USAA agreed to cancel the Total Loss Claim which is [the total loss claim] a mandatory prerequisite for appraisal arbitration.  USAA's invoking of Appraisal Arbitration also occurred six months

after the Plaintiff filed his lawsuit; both material facts Ms. Orlando and Ms. Ordell withheld from their sworn statements filed with USAA's Motion for Judgment on the Pleadings.

70.   Unknown to the Plaintiff at the time of USAA's filing for a Judgment on the Pleadings regarding appraisal arbitration, Appraisal Arbitration should never have even been "on the table" since the Plaintiff's vehicle was not a total loss.  USAA had in their possession the Galvez Repair Estimate of $9,775.68, and USAA's last valuation of the Plaintiff's vehicle at $10,090.05; hard facts indicating the Plaintiff's vehicle was not a total loss and Appraisal Arbitration should not even occur because the vehicle should be repaired.

71.   In addition to withholding material facts that USAA never exercised their right to arbitration until six months after the lawsuit was filed and three years after USAA canceled the claim that would trigger arbitration, USAA engaged in a deliberate act of fraud to fabricate evidence to claim the Total Loss Claim was still in effect.  In response to Ms. Orlando's March 16, 2023 letter, the Plaintiff responded to Ms. Orlando that appraisal arbitration was a moot point since there was no claim against which to apply an arbitration decision. (the total loss claim was cancelled on March 26, 2020).  Unbeknownst to the Plaintiff until the July 2023 timeframe, sometime in May or June 2023, USAA went "behind the Plaintiff's back" and reinstated their Total Loss Claim without the Plaintiff's knowledge or consent.  In July 2023 the Plaintiff discovered in his online USAA account a new listing of the original Total Loss Claim that had been mutually cancelled on March 26, 2020.  Prior to May 2023 there were no open claims listed on the Plaintiff's USAA account.  USAA fraudulently recreated a Total Loss Claim three years after USAA cancelled the original claim as manufactured evidence to argue that a Total Loss Claim exists today, three years later, when it actually does not.  In addition to fraudulently re-opening a claim without the

Plaintiff's knowledge or consent that USAA had agreed was closed on March 26, 2020; USAA's reopened claim continued to state that the Plaintiff's vehicle was a totaled loss and valued at $10,090.05, well over the Galvez Repair Estimate (originally $9,775.68, corrected to $9,238.52) which would mean the Plaintiff's vehicle was NOT totaled as USAA was continuing to misrepresent to the Plaintiff. USAA reinstating the total loss claim, when USAA knew the vehicle was not totaled, was an additional predicate act of fraud committed by USAA in support of their original fraud from March 2020 falsely representing to the Plaintiff that his vehicle was a total loss.

72. **THE EXCHANGE conspired with USAA and IBS to engage in price-fixing and bid rigging of settlement offers to the Plaintiff in restraint of trade in the form of competitive settlement offers for damage to the Plaintiff's vehicle caused by THE EXCHANGE's policyholder in violation of Section 1 of the Sherman Act (15 U.S.C. 1)** On March 23, 2020 IBS employee Greg Taylor created the Taylor-VVR-00 appraisal at the direction of THE EXCHANGE employee Amber Peterson. Prior to Mr. Taylor creating his appraisal, on March 20, 2020 Peterson was party to a phone call with USAA employee Danelle Bushnell who documented the phone conversation, including Peterson's statement that they [her and her employee THE EXCHANGE] *would produce an appraisal with similar values*, referring to the Galvez-VVR-00, which was the only other existing VVR at the time.

73. Discovery evidence obtained from THE EXCHANGE proves that THE EXCHANGE was in the possession of a confidential copy of the Galvez-VVR-00 provided to THE EXCHANGE by Bushnell at USAA. Bushnell and Peterson conspired to produce similar VVRs with similar valuations to prevent the Plaintiff from obtaining fair competition between the two insurers for a settlement

_____31_____

offer of the damages to his vehicle, and to prevent the Plaintiff from determining that his vehicle was not a total loss and that it was repairable.

74.   The fact that the Galvez-VVR-00 and the Taylor-VVR-00 resulted in the exact same valuation is proof of the conspiracy of price-fixing / bid rigging. Both VVRs contained false representations concerning missing features on the Plaintiff's vehicle.  Galvez falsely stated the Plaintiff's vehicle did not have a sunroof or CA emission Equipment.  Taylor falsely stated the Plaintiff's vehicle did not have a sunroof or metallic paint.  The only way the two VVRs could have ended up with the same exact false valuation would be if the value of missing CA emission equipment was equal to the value of a metallic paint job to the exact penny.  Since it is unreasonable to believe these two items are of exactly the same value, the rigging of the settlement offers to be the exact same fraudulent value, could only occur from a deliberate act by Peterson, THE EXCHANGE and Taylor in falsify the Taylor-VVR-00 to exactly match the Galvez-VVR-00 appraisal provided to THE EXCHANGE by USAA and Bushnell.

75.   **THE EXCHANGE, Peterson, and Taylor engaged in their own joint act of falsifying Taylor's repair estimate to misrepresent to the Plaintiff that his vehicle was a total loss**.  On March 25, 2020 THE EXCHANGE employee Amber Peterson emailed the Plaintiff stating that the Plaintiff's "vehicle is non-repairable", i.e. a "Total Loss".  Peterson based this representation on the fraudulent Taylor-VVR-00 that she, Bushnell, and Taylor had previously conspired to falsify to exactly match USAA's Galvez-VVR-00, and on a fraudulent repair estimate that Taylor created, falsely representing repair costs of $9,654.78, an amount in excess of the fraudulent valuation stated in the price-fixed Taylor-VVR-00 of $8,437, before taxes. (including taxes valuation would be $9,238.52)

76.   Evidence of falsification of the Taylor repair estimate can be found through comparison of the Taylor Repair Estimate to the Galvez Repair Estimate; both performed by employees at the same repair shop.  As previously stated in paragraph 40, Galvez and Taylor, while quoting work to be performed at the same shop, quoted different labor rates for the same labor classes.  Comparison of the two repair estimates also showed that Taylor quoted replacement of parts that were never identified as damaged in the Galvez Repair Estimate.  Taylor also quoted sales tax in his estimate on a fictitious value for parts that did not exist, and quoted exorbitant labor on parts and supplies.

77.   If the Taylor Repair estimate is adjusted, removing the cost for the parts not specified as damaged in the Galvez Repair Estimate, and removing the labor on Parts and Supplies, a corrected Repair Cost for the Taylor Repair Estimate is $8349.10; making the Plaintiff's vehicle REPAIRABLE based upon the Taylor-VVR-00 valuation of $8437. ($9,238.52 with tax)

78.   Based upon THE EXCHANGE's representation that the Taylor-VVR-00 and the Taylor Repair Estimates were true valuations, the Plaintiff relied upon Ms. Peterson representation that his vehicle was totaled and did not seek the option of having his vehicle repaired.  Ms. Peterson also took advantage of the knowledge shared with her by Bushnell during their March 20, 2020 phone call, that USAA had also falsely stated to the Plaintiff that his vehicle was totaled, using this information to further reinforce her deception to the Plaintiff that his vehicle was totaled and non repairable.

79.   A month later, on April 15, 2020, Peterson and THE EXCHANGE provided a final settlement offer stating the total valuation of the Plaintiff's vehicle, including taxes and license fees was $10,695.97.  Comparing this value to the questionable Taylor Repair Estimate of $9,654.78 was clear evidence that THE EXCHANGE's had mislead the Plaintiff with their assertion that the

Plaintiff's vehicle was totaled, but by this time, with USAA and THE EXCHANGE continuing to tell the Plaintiff his vehicle was totaled, the Plaintiff never put the facts together until he got both the Galvez and the Taylor repairs estimates from IBS during discovery in May 2023.  As a direct result of relying on the misrepresentations by THE EXCHANGE, Peterson, and Taylor that the Plaintiff's vehicle was totaled, the Plaintiff lost out on his option to have his vehicle repaired, and sustained additional damages in the form of "Loss of Use" and storage costs since according to valuations the Plaintiff obtained online, his vehicle was worth more than THE EXCHANGE was offering, and accepting the EXCHANGE's fraudulent valuations was not an option.

80.  **THE EXCHANGE and Peterson engaged in their own, internal acts of fraud to falsify "Loss of Use" offers to the Plaintiff.**  On April 3, 2020 THE EXCHANGE submitted a settlement offer to the Plaintiff via email and USPS mail containing an offer for ""Loss of Use"".  In the offer, Ms. Peterson misrepresented the cost to rent an equivalent vehicle as $38.99 per day based upon an Enterprise Rental Car price list.  Ms. Peterson's exact wording was "the cost to rent a Chevrolet Impala is $38.99 per day".  The Enterprise price list Ms. Peterson used, clearly stated that the $38.99 per day price was the base price and did not include auxiliary costs such as taxes, and other mandatory fees.  Evidence obtained by the Plaintiff from online sources, indicates that Peterson has worked as an adjuster for well over ten years for THE EXCHANGE.  Review of Peterson's evaluation of the Plaintiff's counter offers shows that Peterson has an above-average comprehension of costing involved in claim settlement.  Peterson's level of experience and her demonstration of knowledge indicate that not including taxes and fees in the rental car pricing could only have been a deliberate act by Peterson to deceive the Plaintiff.  While falsifying the "Loss of Use" offer occurred at the same time as misrepresenting the vehicle's valuation and status of

being non-repairable, this fraud scheme differed in that for the "Loss of Use" fraud, Peterson acted on her own, solely as an employee of THE EXCHANGE, and did not involve an outside individual in her fraud scheme like Mr. Taylor.

81.   Ms. Peterson acknowledged her deceit in a subsequent email where Ms. Peterson redid her ""Loss of Use"" compensation; this time including taxes and fees; but "doubled down" on her acts of fraud by falsifying the base rate portion of her new offer's calculations.  In her second ""Loss of Use"" offer on April 15, 2020, Ms. Peterson depressed the base rate for an equivalent rental car by using a special "COVID-19" discount rate from AVIS.  This special "COVID-19" discount rate did not exist until months after the accident date, and this fact would have been apparent to an individual like Peterson with her years of experience and above-average knowledge.  On April 15, 2020 Peterson provided a second "Loss of Use" offer to the Plaintiff stating that she based this "Loss of Use" offer on the fair market value of a rental car from AVIS which Ms. Peterson quoted at $54.23 per day.  Ms. Peterson specifically stated in her offer that the $54.23 per day rate included all applicable taxes and fees, including AVIS's $27 per day underage driver fee since the rental car was to replace a vehicle used by an underage driver.

82.   Ms Peterson's representation that the $54.23 per day rate was the fair market value was an intentional misrepresentation of the facts that can be proven through simple mathematics.

a.   subtracting the $27 underage fee from the original $54.23, leaves a remaining rate of $27.23  per day.

b.   estimating taxes and other fees at $7 per day and subtracting this amount from $27.23, leaves the remainder of $20.23 as the base daily rental car rate. AVIS has not had a standard base rate of $20.23 per day for this class of vehicle in years.  If this low rate was actually available at the time of the accident, THE

_____35_____

EXCHANGE would have used this rate in their initial ""Loss of Use"" offer.  The Plaintiff has discovered that this low value base rate of $20.23 per day was a COVID-19 discount rate that AVIS implemented months after the accident date. The Defendants stated this rate was for ""Loss of Use"" starting on February 28, 2020, knowing that this rate was not even available at that time and was only available for a limited time due to COVID.

83.   In both cases of Peterson and THE EXCHANGE falsifying their "Loss of Use" offers, the Plaintiff relied upon Peterson's original representation through the Plaintiff's son on March 19, 2020 that THE EXCHANGE would provide a fair and honest settlement offer.  If the Plaintiff had know the extent of fraud that THE EXCHANGE and Peterson would commit, and that when caught in multiple acts of fraud THE EXCHANGE's final response would be to dismiss the fact they were committing fraud at all, and refuse to provide a legitimate offer that was not based upon fraud; the Plaintiff would have pursued other options in settling the damages, including the "Loss of Use".

84.   As disclosed in ¶1, a personal injury claim was pursued by the Plaintiff's son through a local law firm.  Hiring an attorney to settle a "Loss of Use" claim is cost prohibitive because most attorneys working on a contingency basis on this small of an amount would want 30% - 40%.  Since the Plaintiff's son was hiring an attorney for the personal injury, there existed the possibility of getting the attorney to handle the property and "Loss of Use" damages as a free service included with the personal injury action.  The Plaintiff was deprived of this possibility because by the time THE EXCHANGE had finished with all their multiple acts of fraud, the retainer agreement for the personal injury attorney was signed and the Plaintiff had no leverage to negotiate with the PI attorney to handle the property and "Loss of Use" damages for gratis.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

85.   **THE EXCHANGE engaged in acts of Obstruction of Justice by destroying evidence in violation of Federal Laws.**   In an act to cover up evidence of fraud, THE EXCHANGE and Peterson willfully violate Federal Law 18 U.S.C. 1512 (c)(1) by concealing or destroying the recording of the phone call made on March 19, 2020 between Ms. Peterson and the Plaintiff's son.   During said phone call the Plaintiff's son informed Ms. Peterson of the fraud occurring with USAA, and Ms. Peterson agreed that THE EXCHANGE could handle the property damages directly and THE EXCHANGE would provide a fair and honest settlement offer.

86.   The Plaintiff's original complaint contained a Cause of Action for Obstruction of Justice concerning the concealment or destruction of said phone recording.   In two Motions to Dismiss filings by THE EXCHANGE, dated 1/30/2023 and 4/21/2023, THE EXCHANGE stated in their filings, "*the Cause of Action was Alleged in Anticipation of Conduct that has not occurred*". EXCHANGE clearly stated that at that time (1/30/23, and 4/21/23) the "Conduct" concealing or destroying the audio-recording "has not occurred".   On June 7, 2023 the Exchange responded to the Plaintiff's request for production of the said phone recording, stating that the recording does not exist.   If concealment or destruction had not occurred on 1/30/2023 and 4/21/2023, but then on 6/7/2023 the recording no longer exists, it is clear from THE EXCHANGE's own statements that sometime between 4/21/2023 and 6/7/2023, based upon THE EXCHANGE's statements, THE EXCHANGE destroyed the phone recording and with it destroyed evidence that THE EXCHANGE and Ms. Peterson knew about the fraudulent statements within the Galvez VVR, and destroyed evidence that Ms. Peterson had falsely represented that she and THE EXCHANGE would provide fair and honest settlement offers; a misrepresentation that the Plaintiff had relied upon.   Proof that THE EXCHANGE knew of the Galvez-VVR-00 fraud would be

additional evidence of criminal intent in the price fixing scheme that THE EXCHANGE engaged in with USAA.

87.    **THE EXCHANGE, through their attorney, conspired with THE EXCHANGE's policyholder Jorge Gonzalez to engage in acts of Obstruction of Justice through the submission of a forged Waiver of Service of Summons to the court.**    On April 23, 2023 THE EXCHANGE's and Jorge Gonzalez's attorney Eran Forster filed a forged Waiver of Service of Summons with the Federal court, listed in the pleadings as Docket 30.   The defendants and their attorney filed this forged document in a deliberate attempt to impede the due administration of justice in violation of 15 U.S.C 1503.   In the forged document, THE EXCHANGE's and Gonzalez's attorney falsified the mailing dated listed on the Waiver in order to present the Waiver as being valid and granting Mr. Gonzalez an additional 30 days to file his answer.   Proof of the forgery and THE EXCHANGE's and Gonzalez's involvement in this act of Obstruction is as follows:

a) The date the original Waiver was mailed was 3/17/2023.

b) The sent date on the forged Waiver was changed to 3/22/2023.

c) THE EXCHANGE's and Gonzalez's attorney signed the Waiver, stating he signed it on 3/22/2023, the same day the parties claimed the Waiver was mailed to Gonzalez through USPS; an impossible event.

d) The reason the sent date was changed to 3/22/2023 is that after mailing the Waiver on 3/17/2023, that afternoon the Plaintiff was informed that Forster's law firm was representing Gonzalez and all legal papers were to be served on them.   On this basis, on 3/22/2023 a copy of the summons and complaint for Gonzalez was personally served on Gonzalez through his attorney's law firm.   If the Waiver was signed

after 3/22/2023, it would not be valid since the Defendant had already been served.

e) A date earlier than 3/22/2023 could not be selected because a Waiver must be returned to the Plaintiff within 30 days.  Since the Waiver was filed with the Court on April 23,2023, (which actually is not returning the Waiver to the Plaintiff); stating that it was mailed prior to 3/22/2023 would make the Waiver invalid since it must be "returned" within 30 days.

f) Additional proof that the signing date was also a forgery is found in the fact that the signed forged Waiver was never returned to the Plaintiff.  If the Waiver was signed on 3/22/2023, why was it not returned to the Plaintiff in the self-addressed stamped envelope provided prior to the 30 day time limit.

g) Attorney Eran Forster had no first-hand knowledge that the Waiver even existed.  The only way for Forster to have known about the Waiver was for Gonzalez to inform Forster about it, so when a Waiver with a sent date of 3/22/2023 was filed, Gonzalez had to know that Waiver was a forgery.

h) THE EXCHANGE pays for Mr. Forster to represent themselves and Mr. Gonzalez, and therefore is responsible for the action of their attorney.  The forged Waiver was clearly discussed in the Plaintiff's declaration filed on April 27, Docket No. 35), which was served on both THE EXCHANGE and Gonzalez.  Both THE EXCHANGE and Gonzalez knew from the contents of the Plaintiff's Declaration that the Waiver filed with the court was a forgery and neither party took any action to correct or withdraw the filing.

i)  Neither Gonzalez nor THE EXCHANGE get to claim "ostrich" status and say they are not responsible for the actions of their attorney, when they themselves are benefitting from said actions.  While Gonzalez had to know the forged document that was filed to be a forgery, it was THE EXCHANGE who paid this attorney to commit this act of Obstruction of Justice, and THE EXCHANGE is legally responsible for acts committed by this attorney which they were paying.

88.   Filing of the forged Waiver on April 23, 2023 is also evidence that the criminal activities of the Defendant THE EXCHANGE, including this act of Obstruction of Justice that was committed through wire fraud, extended over a period greater than three years since their initial acts of fraud occurred in March 2020 to falsify VVRs and repair estimates to misrepresent that the Plaintiff vehicle was totaled.

89.   While the Plaintiff knew the Waiver was a forgery when it was filed, the court did not and the reliance of the court on the forged document caused harm to the Plaintiff in that the Plaintiff had to file a request for entry of Default judgment to stop the unwarranted affect of the forged Waiver granting Gonzalez an additional 30 days to file his answer.  In addition to the damage of having to file the Request for Entry; as of this date the court has failed to respond to the Plaintiff's request, more than likely because the court ignored the Plaintiff's filing since a Waiver was already on record.  In this case the court's reliance caused harm to the Plaintiff by influencing the court to ignore a filing by the Plaintiff and essentially taking away the Plaintiff's voice in a legal proceeding.  As such, the court's reliance on this forged Waiver can be considered as a substitute for the Plaintiff's reliance under the concept of third-party reliance.

90.   Imperial Body Shop engaged in their own acts of Witness Tampering as part of their efforts to attempt to conceal documents to impair their availability

for use in an official proceeding.  On April 5, 2023 IBS was served with a request for production of documents that included requests for all contracts and business agreement between IBS and the two insurers, USAA and THE EXCHANGE.  IBS refused to provide any of these documents, and on September 28, 2023, during a hearing on a Motion to Compel, Judge Early ordered IBS to provide all such contracts and business agreements between IBS and the two insurers in effect from March 2018 to present.  IBS has intentionally, and in violation of Judge Early's order, withheld it's labor rate agreements with both insurers.  In the case of THE EXCHANGE, as referenced in *Interinsurance Exchange Of The Automobile Club, The Exchange Member Preferred Repairs Agreement, Exhibit A,* IBS is concealing "Item 1.  Labor Rates. The labor rates for Repair Services provided to Vehicle Owners shall be agreed upon from time to time by separate letter agreement (the "Rate Letter")."  The labor rates in effect at the time IBS prepared the Taylor Repair Estimate would provide evidence of doctoring of the Taylor Repair Estimate.  In the case of USAA, as referenced in *The USAA Stars Agreement with Imperial Body Shop, Inc, Exhibit L.  Rate and Adjustments*, IBS is concealing "the rate and adjustment guidelines set forth herein for the rates set forth in the USAA contract management system at the time of repair".  As with THE EXCHANGE, IBS is concealing their agreed upon labor rates with USAA in order to withhold evidence of doctoring of the Galvez Repair Estimate.

91.   In addition to concealing these rate agreements, IBS wa order to produce all DOCUMENTS related to relating to the inspection, appraisal, or valuation of the Plaintiff's vehicle conducted by Imperial Body Shop.  Nowhere in the documents provided under Judge Early's order are there any documents show a request to IBS be either USAA or AAA to perform an appraisal on the Plaintiff's vehicle.  Nowhere in the documents provided are there any copies of a bill or invoicing for the cost to perform the appraisals on the Plaintiff's vehicle.  It

would be beyond belief to think that none of this work was documented by a written request to perform the work, or by a written document to bill for the work.

92.   **Plaintiff has suffered damages as the direct result of the above listed actions by the Defendants as follows:**

93.   Replacement value of the Plaintiff's vehicle in the amount of $14,920. This amount is apportioned 100% to Jorge Gonzalez who caused the actual damages.  No action by any of the other defendants caused the actual damage to the plaintiff's vehicle.

94.   "Loss of Use" damages from 2/28/2020 to 1/30/2022 of $74,840. This amount is based upon a fair market, non-discounted, rental car rate of $108 per day obtained from AVIS rental car for providing a rental car of the same make and model to an underage driver.  These damages reflect the time period starting on the date of the accident, until 1/30/2022 when the Plaintiff's son, through savings and obtaining multiple loans, was able to purchase a replacement vehicle for himself and the Plaintiff no longer had to provide a substitute vehicle.  During this time period the Plaintiff provided a replacement vehicle for the sole use of his son as a replacement for the damaged vehicle.  It just so happened that the Plaintiff had an extra vehicle that he was able to provide to his son until the issues of the damaged vehicle could be resolved, or in this case, until his son was able to put together the finances to purchase a replacement vehicle.  It is clear from the facts that the defendants use the financial leverage of accident victims being without a vehicle to force accident victims to accept unfair settlement offers to avoid further financial damages.  The Plaintiff was in a position that he was able to mitigate and survive this financial damage / leverage caused by the dishonest and illegal actions of the defendants through acts of fraud, price fixing, and obstruction of Justice that caused this protracted loss to the Plaintiff.  This amount should be apportioned over all the defendants as the jury sees fit since all the

Defendants had a hand in causing these damages as a result of their involvement in falsifying appraisals, falsifying repair estimates, price fixing to prevent fair competition, falsely representing that the Plaintiff's vehicle was totaled, and other actions that directly or indirectly delayed or prevented the obtainment of a fair settlement offer and / or repair of the Plaintiff's vehicle.

95.    Storage cost damages from 3/30/2020 to 10/31/2022 of $18,600.  This amount is based upon a fair market daily rate of $20 per day for providing parking for a stored vehicle.  Initially the Defendants requested $80 per day for storage costs, expecting to use these fees to force the Plaintiff to accept an unfair settlement offer to avoid further financial damages.   The Plaintiff had the resources to mitigate these damages by providing storage for the damaged vehicle his son normally had in his possession, on the Plaintiff's personal property.  This provided storage was not the normal storage location for the Plaintiff's vehicle being used by his son, which was at the son's apartment while attending CSUF, and then in Costa Mesa, after COVID and March 2020.  This amount should be apportioned over all the defendants as the jury sees fit since all the Defendants had a hand in causing these damages as a result of their involvement in falsifying appraisals, falsifying repair estimates, price fixing to prevent fair competition, falsely representing that the Plaintiff's vehicle was totaled, and other actions that directly or indirectly delayed or prevented the obtainment of a fair settlement offer and / or repair of the Plaintiff's vehicle.

96.    Business Damages in the amount of $7,425 for loss productivity from the Plaintiff's work in having to take time off to deal with the initial consequences of the accident and the related acts of fraud from the date of the accident to the date the lawsuit was filed.  Damages to be apportioned to the Defendants as the jury sees fit.

97.   Additional business damages from the date of filing to May 1, 2023 at the rate of $135 per hour for business losses resulting from lost productivity due to Plaintiff having to take time away from his work duties due to the demands of prosecuting claims in this lawsuit for violations under the RICO and Clayton Acts. Damages to be apportioned to the Defendants as the jury sees fit.

98.   Business damages from May 1, 2023 to the end of this lawsuit to compensate the Plaintiff for business losses associated with having to shutdown key activities at his business, specifically the business's LEAF program (Lightweight Electric Automatic Firearm program which was under development and scheduled for Low Rate Initial Production in 2025) due to the demands of prosecuting claims in this lawsuit becoming a fulltime effort for violations under the RICO and Clayton Acts..   Due to the Plaintiff having to respond to multiple attempts at the same Motion to Dismiss, Motions on fictitious claims of failure to participate in an appraisal arbitration process for a previously cancelled claim, failure by defendants to respond to discovery requests, and the heightened standard of the lawsuit being removed to Federal Court, the workload for prosecuting this lawsuit and its RICO and Clayton Act violations has become a fulltime effort.   The workload has became so extensive, building up in May to a fulltime level, that the Plaintiff had to choose between dropping the lawsuit, or suspending work on his business's LEAF program to prosecute this lawsuit. Allowing the Defendants to get away with fraud was not a morally acceptable option, so the Plaintiff was forced to suspend business operations on his business's LEAF program that will now push the sales and profits off into the future until this lawsuit is settled.   Profits that would have been obtained in 2025, would not be obtained until 2026 (assuming a one year program shutdown to fully prosecute this lawsuit).   Profits from 2026, would not be realized until 2027, 2027 to 2028, and etc over the expected production life of the LEAF program.   Since

the LEAF production will be covered by patent protections, at this time the Plaintiff does not envision any loss of profits over the life of the program, just a delay in realizing those profits.   As such, currently the Plaintiff is seeking damages in the form of 1% simple annual interest on the total profits that would be realized from the LEAF program, for a delay period starting from May 1, 2023 until the end of trial, when efforts on the LEAF program can be resumed.  Interest on the delayed profit of 1% per year of delay to be compute at a monthly rate of 1/12% interest per month until such time as the lawsuit is settlement and work on the LEAF program can resume.  Damages to be apportioned to the Defendants as the jury sees fit.

99.   Punitive damages in an amount decided by the jury to discourage the Defendants from repeating their unethical and illegal behavior of falsifying appraisals, falsifying repair estimates, price fixing to prevent fair competition, falsely representing that victim's vehicle as totaled, and acts of fraud committed as part of an overlaying act of Obstruction of Justice.

100.  Plaintiff suffered damages in a sum to be proven at trial in an amount that is not less than $75,001.00.

101.  All acts of corporate employees as alleged were authorized or ratified by an officer, director or managing agent of the corporate employer.

102.  Each Defendant whether actually or fictitiously named herein, was the principal, agent (actual or ostensible), or employee of each other Defendant and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which each Defendant is liable, both jointly and severally, to Plaintiff for the relief prayed for herein.

## FIRST CAUSE OF ACTION

## BY PLAINTIFF AGAINST DEFENDANT JORGE GONZALEZ

## NEGLIGENCE

103. Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

104. On the morning of February 28, 2020 at approximately 7:00am, Plaintiff's son, Alexander Sigler, was driving Plaintiff's car near the 700 block on Victoria Blvd in Costa Mesa, CA; when the Plaintiff's vehicle was struck from behind by a vehicle driven by Defendant Jorge Gonzalez; causing property damage to the Plaintiff's vehicle.

105. The collision was caused by the recklessness, carelessness and negligence of the Defendant, Jorge Gonzalez, for that among other acts and omissions, Defendant Gonzalez:

a. operated a motor vehicle at a high, dangerous and excessive rate of speed under the circumstances then and there existing;

b. failed to reduce speed to avoid a collision;

c. failed to maintain a safe distance between his vehicle and the vehicle he was following;

d. failed to observe due care and precaution and to maintain proper and adequate  control of his motor vehicle;

e. failed to keep a proper lookout for other vehicles lawfully upon the highway;

f. failed to exercise reasonable care in the operation of his motor vehicle under the circumstances then and there existing; and

g. in other respects not now known to the Plaintiff but which may become known before or at the time of trial.

106. As a direct and proximate result of the aforesaid collision caused by the negligence of Defendant, Jorge Gonzalez; the Plaintiff, John Sigler, suffered damage to his vehicle for which the Plaintiff is seeking compensation.

107. As a further direct and proximate result of the negligence of the Defendant, Jorge Gonzalez; the Plaintiff, John Sigler, suffered ""Loss of Use"" of his vehicle and had to use his own resources to provide a replacement vehicle for his son.

108. The Plaintiff is seeking remuneration for reasonable compensation for ""Loss of Use"" over the time period that a jury would apportion to this Defendant.

109. As a further direct and proximate result of the negligence of the Defendant Jorge Gonzalez, the Plaintiff's business has suffered financial losses resulting from the loss of Mr. Sigler's services due to lost time from the Plaintiff having to deal with the after affects from this accident (i.e. dealing with the body shop and insurance claims).

110. These losses were, are, and will be due to the carelessness and negligence of the Defendant without any negligence or want of due care on the Plaintiff's part.


**SECOND CAUSE OF ACTION**

**BY PLAINTIFF AGAINST DEFENDANTS IMPERIAL BODY SHOP, PABLO GALVEZ, USAA, DANELLE BUSHNELL, MELISSA ORDEL, and DOEs 1-99**

**( INTENTIONAL MISREPRESENTATION )**

111. Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

Plaintiff   John W. Sigler:                                    8:22-cv-2325-CJC-JDE
FIRST AMENDED COMPLAINT

112. The Defendants willfully engaged in fraud and intentional misrepresentation as defined by California Civil Code 1709, and 1710 which states: "one who willfully deceives another with intent to induce him to alter his position to his injury, is liable for any damage which he suffers".

113. The primary act of fraud and intentional misrepresentation involves statements made by USAA in a Total Loss Settlement letter dated and sent March 11, 2020, to the Plaintiff via email, where USAA stated "This letter confirms we sent you information about the total loss of your vehicle". The letter was signed "USAA Casualty Insurance Company". These statements were reinforced verbally and through email by several USAA employees, including Danelle Bushnell and Melissa Ordell, throughout the settlement process. IBS and their employee, Pablo Galvez provided falsified appraisals and repair estimates to support the false representation that the Plaintiff's vehicle was a total loss.

114. "Total loss of a vehicle" occurs when the cost to repair the vehicle exceeds the fair market valuation of the vehicle.

115. On or About March 9, 2020, the Defendant USAA had Imperial Body Shop and their employee Pablo Galvez, create a Vehicle Valuation Report (VVR) indentified as Galvez-VVR-00. Galvez-VVR-00 was created through software provided by CCC, and listed Pablo Galvez as the appraiser, and stated "the value of the loss vehicle, [was] based on information provided to CCC by USAA Casualty Insurance Company".

116. Said VVR contained misrepresentations of the vehicle's characteristics which included: a) falsely stating that the Plaintiff's vehicle did not have a sunroof, and b) falsely stating that the Plaintiff's vehicle did not have CA Emission equipment. Mr. Galvez and USAA made these false statements recklessly, without regard for the truth, and used these false statements of missing

_____48_____

equipment to lower the appraised value of the Plaintiff's vehicle to a below market level of $9,238.52 ( a base vehicle rate of $8,437)

117. After Plaintiff pointed out the misrepresentations in Galvez-VVR-00, on March 23, 2020, USAA revised the Plaintiff's vehicle's valuation upward to $9714.84.

118. After Plaintiff pointed out omission of the valuation of non-standard equipment on the Plaintiff's vehicle, on March 31, 2020 USAA again revised the Plaintiff's vehicle valuation upward to a new "claimed" fair market value of $10,090.05.

119. On March 10, 2020 Pablo Galvez created a repair estimate, after creating the Galvez-VVR-00 appraisal of "the value of the loss vehicle".  Said Repair Estimate valued the repair of the Plaintiff's vehicle at $9,775.68. Defendant failed to comply with California State law and provide Plaintiff with a copy of the Galvez Repair Estimate.  Plaintiff only obtained a copy of the repair estimate in May 2023 through a discovery request on Imperial Body Shop.

120. Once the appraised value of the Plaintiff's vehicle ($10,090.05) exceeded the repair costs ($9,775.68) the Plaintiff's vehicle was no longer a "total loss" and at the very least the Plaintiff should have been provided the option of having the vehicle repaired, but USAA continued with their false assertion that the Plaintiff's vehicle was a total loss.

121. USAA intentionally withheld the Galvez Repair Estimate from the Plaintiff preventing the Plaintiff from knowing that his vehicle was NOT a total loss.  Throughout the entire settlement process, the Plaintiff was force to, and did rely on USAA's initial false representation that "This letter confirms we sent you information about the total loss of your vehicle".

122. Evaluation, and comparison of the Galvez Repair Estimate against a subsequent repair estimate created by fellow IBS employee Greg Taylor on the

Plaintiff's vehicle for THE EXCHANGE, indicated notable discrepancies in the Galvez Repair Estimate.  As previously state, it was found that Galvez used inflated labor rate in his Repair Estimate that inflated the repair cost by $542. Correcting the Galvez labor rate to reflect the Taylor labor rates, reduced the Galvez Repair Estimate to $9,223.68; an even match to the original Galvez-VVR-00 valuation of $9,238.52, making totaling of the vehicle questionable which would explain the doctoring of the Galvez Repair Estimate with higher labor rates.

123.  Comparison of the corrected repair cost ($9,223.68) to USAA's final vehicle valuation of $10, 090.05, proves the Plaintiff's vehicle was not a total loss as USAA continually misrepresented to the Plaintiff throughout the entire settlement process, and continues to misrepresent to the Plaintiff and the court to this date.

124. Even using the "doctored" value of the Galvez Repair Estimate of $9,775.68, the cost to repair is less than the final valuaiton of the vehicle and the vehicle is not a total loss and at the very least USAA should have provided the option to repair.

125. Danelle Bushnell acted as the USAA claims adjuster during the settlement process and continuously reinforced USAA's misrepresentation that the Plaintiff's vehicle was totaled.

126. USAA employee Melissa Ordell also reinforced USAA's misrepresentation that the Plaintiff's vehicle was a total loss.  On March 31, 2020 Ordell contacted the Plaintiff, as described in ¶46.  In addition to attempting to convince the Plaintiff with her false narrative about fictitious VIN Report errors being the source of the misrepresentations in Galvez-VVR-00, Ordell continued to reinforce to the Plaintiff that his vehicle was totaled and  it was Ordell who presented the Plaintiff with USAA's final loss offer of $10,090.05 with the knowledge that, using either the "doctored" or the "corrected" value of the Galvez

Repair Estimate, the Plaintiff's vehicle was not a total loss as Ordell continued to present to the Plaintiff.  Even not taking into account the "doctoring" of the Galvez Repair Estimate, Ordell's offer of $10,090.05 was greater than the inflated repair estimate of $9,775.68 and she had a duty to this USAA policyholder to inform him that his vehicle was not "totaled" and he could have the option of getting it repaired.   Instead, Ordell chose to continue the false representation that a "totaled" vehicle was the Plaintiff's only option.

127.  The Plaintiff relied upon these Defendants' misrepresentation that his vehicle was a total loss, and these defendants' actions to continually represent that the Plaintiff's vehicle as "totaled", damaged the Plaintiff by denying him the option of getting his vehicle repaired which resulted in the Plaintiff suffering further damages in the form of additional "Loss of Use" damages, and additional Storage cost damages; all damages that could have been avoided if USAA had not falsely represented that the Plaintiff's vehicle was "totaled" when it was NOT.

128.  A summary of the Particularities of this fraud claim are as follows:

a.  WHO.

   i.  <u>Pablo Galvez</u> who falsified the Galvez-VVR-00 appraisal and falsified the Galvez Repair Estimate to falsely support a representation of a "totaled" vehicle.

   ii.  <u>Imperial Body Shop</u> who employed and directed Galvez and Pursuant to the legal theory of respondeat superior, is liable for the conduct of Mr. Galvez.

   iii.  <u>USAA</u> who directed IBS and Galvez, who withheld the Galvez Repair Estimate from the Plaintiff, and who falsely represented to the Palintiff that his vehicle was "totaled" when a true valuation and repair estimate proves it was not.

iv.   <u>Danelle Bushnell and Melissa Ordell</u> who as employees of USAA repeatedly reinforced to the Plaintiff that his vehicle was totaled, even when they had information proving otherwise.

b. WHAT

   i.   The fraudulent Galvez Vehicle Valuation Report

   ii.   The "doctored" Galvez Repair Estimate.

   iii.   USAA's initial false representation that the Plaintiff's vehicle was totaled, reinforced multiple times by Bushenll and Ordell.

c. WHEN

   i.   <u>March 9, 2020</u> – Fraudulent Galvez-VVR-00

   ii.   <u>March 10, 2020</u> – "Doctored" Galvez Repair Estimate

   iii.   <u>March 11, 2020</u> – USAA initial misrepresentation that Plaintiff's vehicle was "Totaled"

   iv.   <u>March 31, 2020</u> – USAA final loss offer proving the Plaintiff's vehicle was not totaled made by Ordell.

   v.   March 31, 2020 – today – USAA continued insistence that the Plaintiff's vehicle was totaled despite the evidence

d. WHERE

   i.   Galvez and IBS at IBS facility on La Habra, CA

   ii.   USAA – headquartered in Texas, using adjusters based out of Arizona (Phoenix or Flagstaff)

e. WHY

   i.   Pablo Galvez and IBS falsified appraisals and estimates to comply with USAA "suggestion" that the Plaintiff's vehicle was "totaled".

   ii.   USAA – has a history of totaling vehicles that are anywhere close to having major damage, because overall it is cheaper for USAA since in most cases the accident victims accept USAA's "low-ball" offers, and USAA can

recover some of their losses by selling the "totaled" vehicle, which can often be repaired or sold for parts.

129.  Reliance, both Actual and Reasonable can be found in USAA's initial representation that the Plaintiff's vehicle was "totaled".  Based upon USAA's statement, the Plaintiff assumed USAA's representation that his vehicle was totaled was truthful and did not pursue his original plan from March 2, 2020 to get his vehicle repaired.  The assumption that USAA was telling the truth was further reinforced by Danelle Bushnell's March 2, 2020 statement that she was there to "help by making sure your claim is resolved fairly and as quickly as possible". The Plaintiff rightfully assumed that USAA and their employees were working for his benefit and were not making false statements about his vehicle being a totaled loss.  USAA's employees continued to reinforce the Plaintiff's reliance on USAA's false statement about a totaled vehicle, and without being provided a copy of the Galvez Repair Estimate, and having the Taylor Repair Estimate to discover the Galvez Estimate was "doctored", it was reasonable for the Plaintiff to believe USAA's false statement that his vehicle was a total loss.

130.  Since the Plaintiff did not get a copy of the Galvez Repair Estimate until May 2023, USAA's intentional misrepresentation, and the Plaintiff's reliance on USAA's misrepresentation lasted for over three years until the Plaintiff was able to discern the truth.

131. Pursuant to the legal theory of respondeat superior, Mr. Galvez's employer, Imperial Body Shop is liable for the conduct of Mr. Galvez and all damages arising from the fraudulent Galvez VVR since the creation of the fraudulent Galvez VVR was performed by Mr. Galvez as part of his work duties and at the direction of Mr. Galvez's employer, Imperial Body Shop.

132.  The actions of the Defendants are a violation of California Penal Code 500(b)(1) and 500(b)(2); which makes it a crime to knowingly make statements in opposition to an insurance claim containing any false or misleading information.

133.  California Civil Code section 3294.(a) allows for award of punitive damages where there is clear and convincing evidence of fraud.  Plaintiff has been damaged by the Defendants' intentional misrepresentations which are defined as fraud and the Plaintiff is entitled to punitive damages that will serve to punish the Defendants and act to discourage the Defendants from engaging in these types of misrepresentations in the future against other accident victims.

## THIRD CAUSE OF ACTION
## BY PLAINTIFF AGAINST DEFENDANTS IMPERIAL BODY SHOP, GREG TAYLOR, THE EXCHANGE, AMBER PETERSON, and DOEs 1 - 99
## ( INTENTIONAL MISREPRESENTATION )

134.  Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

135.  The Defendants willfully engaged in fraud and intentional misrepresentation as defined by California Civil Code 1709, and 1710 which states: "one who willfully deceives another with intent to induce him to alter his position to his injury, is liable for any damage which he suffers".

136.  The primary act of fraud and intentional misrepresentation involves statements made by THE EXCHANGE, starting in an email on March 25, 2020 by Amber Peterson, an employee of THE EXCHANGE, to the Plaintiff, in which Peterson stated "Your vehicle is non repairable". This statement was reinforced verbally and through letters and email throughout the settlement process by

_____54_____

Peterson.  IBS and their employee, Greg Taylor provided falsified appraisals and repair estimates to support this false representation that the Plaintiff's vehicle was a total loss.

137. "Total loss of a vehicle" occurs when the cost to repair the vehicle exceeds the fair market valuation of the vehicle.

138. On or About March 23, 2020, the Defendant THE EXCHANGE had Imperial Body Shop and their employee Greg Taylor, create a Vehicle Valuation Report (VVR) herein indentified as Taylor-VVR-00.

139. Taylor-VVR-00 was created through software provided by CCC, which listed Greg Taylor as the appraiser, and stated "the value of the loss vehicle, [was] based on information provided to CCC by Auto Club Enterprises".

140. Said VVR contained misrepresentations of the vehicle's characteristics which included: a) falsely stating that the Plaintiff's vehicle did not have a sunroof, and b) falsely stating that the Plaintiff's vehicle did not have metallic paint.  Mr. Taylor and THE EXCHANGE made these false statements recklessly, without regard for the truth, and used these false statements of missing equipment to lower the appraised value of the Plaintiff's vehicle to a below market level of a base vehicle rate of $8,437.  A rate identical to the base vehicle rate in the fraudulent Galvez-VVR-00 previously prepared for USAA, and provided to THE EXCHANGE prior to the creation of the Taylor-VVR-00.

141. After Plaintiff pointed out the misrepresentations in Taylor-VVR-00, on April 3, 2020, THE EXCHANGE eventually revised the Plaintiff's vehicle's total valuation, including taxes upward to $10,377.01

142. After Plaintiff pointed out omission of the valuation of non-standard equipment on the Plaintiff's vehicle, on April 15, 2020 USAA again revised the Plaintiff's vehicle valuation upward to a new "claimed" fair market value of $10,695.97.

143. On March 23, 2020 Greg Taylor created a repair estimate stating the repair costs for the Plaintiff's vehicle at $9,654.78.

144. Once the appraised value of the Plaintiff's vehicle ($10,695.97) exceeded the repair costs ($9,654.78) the Plaintiff's vehicle was no longer a "total loss", but THE EXCHANGE continued with their false assertion that the Plaintiff's vehicle was a total loss.

145. Prior to communicating with the Plaintiff on March 23, 2020 regarding the "total loss" of his vehicle, Peterson communicated with USAA's Bushnell and discussed establishing the Plaintiff's vehicle as a total loss. Peterson also obtained a copy of the fraudulent Galvez-VVR-00 appraisal, and stated to Bushnell that she and THE EXCHANGE would create a valuation of similar value.

146. As previously stated in ¶48, Peterson was fully aware on March 23, 2020 that the Galvez-VVR-00 contained misrepresentations that under-valued the Plaintiff's vehicle. Peterson presented the Taylor-VVR-00 to the Plaintiff, an appraisal that contained similar and identical false statements, as backup to support her misrepresentation to the Plaintiff that his vehicle was a total loss, and to match the determination previously provided to the Plaintiff by USAA that his vehicle was a total loss. Throughout the entire settlement process, the Plaintiff was lead to believe by Peterson's statements, and relied on THE EXCHANGE's and Peterson's false representation that his vehicle was "non repairable" and a total loss.

147. Comparison of THE EXCHANGE's first corrected valuation on April 3, 2023 of $10,377.01 made it clear to THE EXCHANGE that their total loss determination was fraudulent, but THE EXCHANGE continued to represent to the Plaintiff that his vehicle was a total loss, and the Plaintiff continued to rely upon THE EXCHANGE's, and Peterson's false representation.

148.  Evaluation, and comparison of the Taylor Repair Estimate against the initial repair estimate created by fellow IBS employee Pablo Galvez on the Plaintiff's vehicle for USAA, indicated notable discrepancies in the Taylor Repair Estimate where Taylor included extraneous labor costs and parts not listed in the Galvez Repair Estimate.  Subtracting just one of the extraneous parts and labor charge for supplies; reduces the Taylor Repair estimate to $7,929.1, a value below the initial fraudulent Taylor-VVR-00 appraisal of $8,437.

149.  Comparison of either the corrected repair cost ($7,929.1) or the inflated repair costs ($9,654.78) to any of THE EXCHANGE's valuations of the Plaintiff's vehicle, other than the known fraudulent value of the Taylor-VVR-00; shows the Plaintiff's vehicle was not a total loss as THE EXCHANGE misrepresented to the Plaintiff throughout the entire settlement process, and continues to misrepresent to the Plaintiff and the court to this date.

150.  Amber Peterson acted as the THE EXCHANGE claims adjuster during the settlement process and continuously reinforced THE EXCHANGE's misrepresentation that the Plaintiff's vehicle was totaled.

151.  Greg Taylor was the IBS employee who created the Taylor-VVR-00 appraisal with similar misrepresentations as the Galvez-VVR-00, and created the Taylor Repair Estimate with extraneous costs.  Taylor created both documents to support THE EXCHANGE's misrepresentation that the Plaintiff's vehicle was "non repairable".

152.  The Plaintiff relied upon these Defendants' misrepresentation that his vehicle was a total loss (non repairable).  These defendants' actions to continually represent that the Plaintiff's vehicle as "totaled", damaged the Plaintiff by denying him the option of getting his vehicle repaired which resulted in the Plaintiff suffering further damages in the form of additional "Loss of Use" damages, and additional Storage cost damages; since the Defendant's valuation of the Plaintiff's

vehicle continued to be below market.  All of these damages could have been avoided if THE EXCHANGE had not falsely represented that the Plaintiff's vehicle was "totaled" when it was NOT, and provide repairing of the Plaintiff's vehicle.

153.  A summary of the Particularities of this fraud claim are as follows:

a.  WHO.

    i.    Greg Taylor who falsified the Talyor-VVR-00 appraisal and falsified the Taylor Repair Estimate to falsely support a representation of a "totaled" vehicle.

    ii.   Imperial Body Shop who employed and directed Taylor, and Pursuant to the legal theory of respondeat superior, is liable for the conduct of Mr. Taylor.

    iii.  THE EXCHANGE who directed IBS and Taylor for the fraudulent Taylor-VVR-00 appraisal and repair estimate, and who falsely represented to the Plaintiff that his vehicle was "totaled" when a true valuation and repair estimate proved it was not.

    iv.   Amber Peterson who as an employees of THE EXCHANGE repeatedly reinforced to the Plaintiff that his vehicle was totaled, even when she had information proving otherwise.  Peterson also engaged in the criminal act of price fixing regarding the Taylor-VVR-00 appraisal.

b.  WHAT

    i.    The fraudulent Taylor Vehicle Valuation Report used to lower the appraised value of the Plaintiff's vehicle.

    ii.   The "doctored" Taylor Repair Estimate used to inflate the repair costs of the Plaintiff's vehicle to falsely claim the vehicle was "non repairable".

    iii.  THE EXCHANGE's initial false representation that the Plaintiff's vehicle was totaled, reinforced multiple times by Peterson.

_____58_____

c. WHEN

    i.   March 23, 2020 – Fraudulent Taylor-VVR-00

    ii.   March 23, 2020 – "Doctored" Taylor Repair Estimate

    iii.   March 25, 2020 – THE EXCHANGE initial email and misrepresentation that Plaintiff's vehicle was "Totaled" (non repairable)

    iv.   April 3, 2020 – THE EXCHANGE's first corrected offer after the known fraudulent Taylor-VVR-00 offer where THE EXCHANGE's offer exceeded even the inflated Taylor Repair Estimate proving the Plaintiff's vehicle was not totaled, and establishing that THE EXCHANGE knew their representation of the Plaintiff's vehicle as total was false.

    v.   April 15, 2020 - THE EXCHANGE's final valuation offer that again exceeded even the inflated Taylor Repair Estimate proving the Plaintiff's vehicle was not totaled, but also proving that THE EXCHANGE continued to misrepresent to the Plaintiff that his vehicle was totaled.

    vi.   April 15, 2020 – today – THE EXCHANGE continues to insistence that the Plaintiff's vehicle is totaled despite evidence to the contrary.

d. WHERE

    i.   Taylor and IBS at IBS facility on La Habra, CA

    ii.   THE EXCHANGE – headquartered in Costa Mesa, CA.

e. WHY

    i.   Greg Taylor and IBS falsified appraisals and estimates to comply with THE EXCHANGE stated intention to produce a valuation with "similar value" to USAA's fraudulent Galvez-VVR-00 and match USAA's earlier fraudulent assertion that the Plaintiff's vehicle was "totaled"

    ii.   THE EXCHANGE knew prior to communicating with the Plaintiff that USAA had falsely determined the Plaintiff's vehicle to be totaled and THE EXCHANGE saw an opportunity to engage in price fixing of their initial

offer and drag the Plaintiff down the same false path of believing his vehicle was totaled.

154. Reliance, both Actual and Reasonable can be found in THE EXCHANGE's initial false representation that the Plaintiff's vehicle was "totaled" and the Plaintiff relying on this intentional misrepresentation and going down the path of arguing the valuation of his vehicle instead of having his vehicle repaired as it should have been. Based upon THE EXCHANGE's statement, the Plaintiff assumed THE EXCHANGE's representation that his vehicle was totaled was truthful and did not pursue his original plan to get his vehicle repaired. The assumption that THE EXCHANGE would handle the settlement process honestly and their evaluations would be THE EXCHANGE's own evaluations was reinforced by Peterson's initial representations to the Plaintiff's son. The Plaintiff never suspected that THE EXCHANGE and USAA were conspiring behind his back in a criminal act of price fixing. The Plaintiff rightfully assumed that THE EXCHANGE and their employees would provide their own independent appraisals and repair estimates and were not conspiring with USAA to make false statements about his vehicle being a totaled loss, and conspiring to produce similar values as USAA.

155. THE EXCHANGE's employees continuously reinforced the Plaintiff's reliance on THE EXCHANGE's false statement about a totaled vehicle, and it was not until the Plaintiff obtained a copy of the Galvez Repair Estimate, that he started to put together the intentional fraud AAA engaged in with USAA to mislead the Plaintiff into believing his vehicle was totaled in the same way he had been defraud by USAA. With both insurers providing similar false estimates, false appraisals, and false representations, until the Plaintiff stumbled upon the overlying scheme within the last month, it was reasonable for the Plaintiff to believe THE EXCHANGE's false statement that his vehicle was a total loss.

_____60_____

156.  Since it took the Plaintiff getting a copy of the Galvez Repair Estimate to shed the initial light on the top level fraud that the Plaintiff fell for, THE EXCHANGE's intentional misrepresentation, and the Plaintiff's reliance on THE EXCHANGE's misrepresentation has lasted for over three years until the Plaintiff was able to discern the truth.

157. Pursuant to the legal theory of respondeat superior, Mr. Taylor's employer, Imperial Body Shop is liable for the conduct of Mr. Taylor and all damages arising from the fraudulent Taylor VVR since the creation of the fraudulent Taylor VVR was performed by Mr. Taylor as part of his work duties and at the direction of Mr. Taylor's employer, Imperial Body Shop.

158. 132.  The actions of the Defendants are a violation of California Penal Code 500(b)(1) and 500(b)(2); which makes it a crime to knowingly make statements in opposition to an insurance claim containing any false or misleading information.

159. California Civil Code section 3294.(a) allows for award of punitive damages where there is clear and convincing evidence of fraud.  Plaintiff has been damaged by the Defendants' intentional misrepresentations which are defined as fraud and the Plaintiff is entitled to punitive damages that will serve to punish the Defendants and act to discourage the Defendants from engaging in these types of misrepresentations in the future against other accident victims.

## FOURTH CAUSE OF ACTION
## BY PLAINTIFF AGAINST DEFENDANTS THE EXCHANGE,
## AMBER PETERSON, IMPERIAL BODY SHOP,
## GREG TAYLOR, AND DOES 1-99
## ( INTENTIONAL MISREPRESENTATION )

Plaintiff   John W. Sigler:                                      8:22-cv-2325-CJC-JDE
FIRST AMENDED COMPLAINT

160. Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

161. On March 19, 2020 THE EXCHANGE employee Amber Peterson intentionally made false representations to the Plaintiff, through the Plaintiff's son, Alexander Sigler, falsely stating to Alexander in a phone call that THE EXCHANGE would provide a fair and honest settlement of the accident damages caused by THE EXCHANGE policyholder Jorge Gonzalez.  Peterson made these false representation with the knowledge that she and her employer THE EXCHANGE would not abide by this representation and it would be her's and her employer's every intention to make false statements, and use a variety of deceptive practices to cheat the Plaintiff out of any fair and honest settlement of his accident claim.

162. The Plaintiff made the decision to engage with THE EXCHANGE and Ms. Peterson to handle the settlement of damages, relying on Peterson statement to the Plaintiff through his son, that THE EXCHANGE would provide a fair and honest settlement of the damages.  It was a reasonable assumption to accept Ms. Peterson at her word that she and her employer THE EXCHANGE would act honestly and provide a fair settlement offer.

163.  THE EXCHANGE constantly runs TV and radio ads stating that they are an honest company and that they treat people fairly.  When the Plaintiff received the same assertion from Peterson, through his son, it was reasonable for the Plaintiff to believe that he would be treated honestly and there would be no intentional acts of deception.  If THE EXCHANGE, through Peterson, had not been convincing that THE EXCHANGE would act in a fair and honest manner in processing the Plaintiff's claim, the Plaintiff would have sought other avenues instead of handling the claim himself with THE EXCHANGE and Peterson.

164.  Within 24 hours of making these intentional misrepresentations to the Plaintiff, THE EXCHANGE and Peterson were engaged in a phone conversation with USAA's adjuster Danelle Bushnell planning to falsify THE EXCHANGE's opening offer to the Plaintiff for the valuation of his vehicle.  THE EXCHANGE and Peterson were already planning to conspire with IBS and their employee Greg Taylor to falsify the valuation of the Plaintiff's vehicle to match the valuation that USAA had previously offered to the Plaintiff, even knowing that the valuation USAA had made contained multiple misrepresentations regarding the characteristics and equipment on the Plaintiff's vehicle which would fraudulently depress the valuation of the Plaintiff's vehicle.

165.  While IBS and Taylor did not make the false representations of provide a fair and honest settlement to the Plaintiff, both IBS and Taylor engaged in acts, falsifying appraisals and repair estimates that were essential components in THE EXCHANGE's and Peterson's schemes to commit dishonest acts to cheat the Plaintiff out of a fair settlement.

166.  In addition to conspiring with other parties to engage in acts of dishonestly and intentionally misrepresenting facts to deceive the Plaintiff out of a fair and honest settlement, as an adjuster and employee of THE EXCHANGE for a substantial number of years, Peterson had developed her own "bag of tricks" of deceptive practices that were approved by her employer THE EXCHANGE to use to deceive insurance claimants out of a fair and honest settlement.

167.  On or about April 3, 2020, THE EXCHANGE claims adjuster Amber Peterson, initiated one of her tried and true methods to deceive a claimant out of a fair and honest settlement of "Loss of Use" damages, intentionally violating her assertion to the Plaintiff that she and her employer THE EXCHANGE would be providing a fair and honest settlement.

168.  One of Peterson primary acts of dishonesty relating to reimbursement of "Loss of Use" damages, was to deceive the Plaintiff into believing that her "Loss of Use" offer is based upon an honest valuation.  When claimants use their own resources to mitigate "Loss of Use" damages, (i.e. provide a substitute vehicle) THE EXCHANGE and Peterson state that they will compensate the claimant per day based upon the fair market rate of what the Plaintiff would have to pay for a rental car equivalent to the damaged vehicle.  In Peterson's offer of compensation, Peterson stated to the Plaintiff that her offer was based upon the cost to rent an equivalent car from Enterprise Rental Car.  Ms. Peterson's exact wording was "the cost to rent a Chevrolet Impala is $38.99 per day".

169.  Peterson made this statement knowing full well that it was false and that she was providing an unfair and dishonest settlement offer to the Plaintiff. Peterson knew from experience that in many cases she can deceive claimants into accepting an unfair "Loss of Use" offer by stating that her offer was based upon the "cost to rent" an identical car, while purposely excluding essential and major components of the true cost to rent a specific car; such as the applicable taxes and fees which in many cases can double the base rate of the cost to rent that vehicle.

170. The  Plaintiff  relied  on  THE  EXCHANGE's  and  Peterson misrepresentation that he would receive a fair and honest settlement offer for "Loss of Use" damages and was deceived when Peterson violated that assurance with her fraudulent offer, wasting the Plaintiff's time and causing the Plaintiff additional "Loss of Use" and storage cost damages.

171.  After the Plaintiff confronted Peterson about her rental car deception, on April 15, 2023 THE EXCHANGE and Peterson engaged in a second act of deception related to "Loss of Use" damages.  This time Peterson falsified the base rate of her rental car offer, using a base rate that was not even in existence at the time of the Plaintiff's losses.  This time, THE EXCHANGE, through Peterson,

took advantage of the COVID crisis to find a rental car rate from AVIS that was discounted due to COVID.  Peterson represented this COVID rate as a standardly available rental car rate that represented the normal fair market rate of a rental car similar to the Plaintiff's damaged vehicle.

172. Defendants THE EXCHANGE and Peterson again violated their representation to the Plaintiff that they would provide a fair and honest settlement, a representation that the Plaintiff continued to relying upon with the expectation that THE EXCHANGE and Peterson would eventually perform as they originally represented with a fair and honest settlement.  After the Plaintiff confronted the defendants with their COVID fraud, the defendants have chosen to permanently breach their initial representation of providing a fair and honest settlement and have taken a stance that their fraudulent "Loss of Use" offer, based upon a fraudulent COVID based discounted rental car rate, was their final offer.  In so doing, THE EXCHANGE and Peterson finally and permanently violated their initial representation of providing a fair and honest settlement offer.

173. On multiple occasions, the Plaintiff relied on THE EXCHANGE's and Peterson's representation that their settlement offers would be fair and honest, a reliance which THE EXCHANGE and Peterson violated.  By the time that THE EXCHANGE and Peterson had continually strung the Plaintiff along with false promises of providing a fair and honest settlement offers, the Plaintiff had suffer additional "Loss of Use" and storage cost damages, as well as missed the opportunity to possibly "piggyback" settlement of the property damages onto the retainer agreement signed by his son with a local law firm.  As the direct result of THE EXCHANGE's and Peterson's deceptions, the Plaintiff was left with no other option but to file a lawsuit Pro Se against the defendants, costing the Plaintiff more "Loss of Use" and storage costs damages over the time it has taken for the Plaintiff to learn how to navigate and work through the legal system.

_____65_____

174. Final proof of THE EXCHANGE's and Peterson's intentional act of misrepresenting to the Plaintiff, through his son, that they would provide a fair and honest settlement offer can be found in THE EXCHANGE's criminal act of Witness Tampering, in violation of 18 U.S.C 1512(c)(1); by destroying evidence in the form of destroying the recording of M. Peterson's conversation with the Plaintiff's son.   THE EXCHANGE was requested in writing to preserve that recording as evidence of their fraud, and since that time, THE EXCHANGE has destroyed the recording to eliminate evidence of Ms. Peterson intentional deception.   The spoliation of evidence doctrine is based on the idea that if a defendant destroys evidence, it must be because the evidence is harmful to their case. After all, why else would THE EXCHANGE have destroyed the recording of the phone call?

175. A summary of the Particularities of this fraud claim are as follows:

a. WHO.

i. <u>Greg Taylor and IBS</u> who assisted THE EXCHANGE and Peterson in their efforts to deceive the Plaintiff into believing that THE EXCHANGE and Peterson would provide fair and honest settlement offers by falsifying appraisals and repair estimates for THE EXCHANGE.

ii. <u>THE EXCHANGE</u> who directed IBS and Taylor, and support Peterson in her efforts to deceive the Plaintiff by stating she and her employer THE EXCHANGE would provide fair and honest settlement offers when they had no intention of doing so from the very beginning.

iii. <u>Amber Peterson</u> who as an employee of THE EXCHANGE made the initial misrepresentation to the Plaintiff, through his son, that she and her employer THE EXCHANGE would provide fair and honest settlement offers when she had no intention of doing so, and through multiple acts, provided dishonest and unfair offers based upon intentional deceptions.

b. WHAT

    i.    The fraudulent "Loss of Use" offer, intentionally omitting taxes and fees.

    ii.    The fraudulent settlement offer based upon an unavailable COVID discounted rental car rate.

    iii.    Initially, within 24 hours of stating THE EXCHANGE and Peterson would provide fair and honest settlement offers, Peterson was conspiring to engage in a criminal price fixing scheme with USAA, supported by IBS and Taylor.

c. WHEN

    i.    <u>March 19, 2020</u> – Peterson's and THE EXCHANGE's initial false representation that they would provide fair and honest settlement offers.

    ii.    <u>March 23, 2020</u> – Peterson's and THE EXCHANGE's price fixing scheme which was unfair and dishonest.

    iii.    <u>April 3, 2020</u> – fraudulent "Loss of Use" offer, leaving off taxes and fees

    iv.    <u>April 15, 2020</u> – fraudulent "Loss of Use" offer based upon non existent COVID discounted rental car rate.

    v.    <u>April 15, 2020 – today</u> – THE EXCHANGE's continued insistence on refusing to provide a "Loss of Use" offer based upon a realistic and available rental car rate.

d. WHERE

    i.    Taylor and IBS at IBS facility on La Habra, CA

    ii.    THE EXCHANGE and Peterson from THE EXCHANGE's headquarters in Costa Mesa, CA.

e. WHY

i.   Greg Taylor and IBS falsified appraisals and estimates to comply with THE EXCHANGE's request to provide such documents in support of their dishonest intent to engage in price fixing in order to not provide a fair and honest settlement offer.

ii.   THE EXCHANGE – to reduce losses, THE EXCHANGE intentionally deceives claimants with promises to provide a fair and honest settlement because a majority of the time, THE EXCHANGE and their employees are able to deceive unwary claimants into accepting an unfair and dishonest settlement.

176.  <u>Reliance, both Actual and Reasonable</u> can be found in THE EXCHANGE's initial representation to the Plaintiff, through his son, that THE EXCHANGE would provide a fair and honest settlement offer.  Based upon Peterson's statements to the Plaintiff's son, the Plaintiff assumed THE EXCHANGE and Peterson would provide fair and honest settlement offers, and relying on that representation, the Plaintiff agreed to engage in the settlement process with THE EXCHANGE after encountering open fraud from his own insurer, USAA.  It was reasonable for the Plaintiff to assume Peterson was telling the truth, especially since she was sympathetic to the issue of USAA providing a fraudulent appraisal offer; an act she claimed THE EXCHANGE would never do. If THE EXCHANGE and Peterson had been honest and disclosed that they intended to also attempt by deceptive measures to cheat the Plaintiff out of a fair settlement, the Plaintiff would have not engage with THE EXCHANGE and would have sought an alternative approach to settling the property damages.

177.  The actions of Ms. Peterson violated California Penal Code 550(b)(1) and 500(b)(2) which makes it a crime to knowingly make statements containing any false or misleading information concerning any material fact in support of, or opposition to an insurance claim.   Falsely misrepresenting the cost of an

equivalent rental car was a criminal act that caused monetary damages to the Plaintiff.

178. In accordance with California Civil Code section 3294.(a) which allows for the award of punitive damages when there is clear and convincing evidence of fraud; Plaintiff has been damaged by the Defendants' intentional misrepresentations which are defined as fraud and therefore the Plaintiff is entitled to punitive damages that will serve to discourage the Defendants from engaging in this type of misrepresentation in the future.

## FIFTH CAUSE OF ACTION
## BY PLAINTIFF AGAINST DEFENDANTS THE EXCHANGE, AMBER PETERSON, USAA, DANELLE BUSHNELL, IMPERIAL BODY SHOP, AND GREG TAYLOR

## (CLAYTON ACT – SECTION 4 – 15 U.S.C. 15  SUITS BY PERSON INJURED, AND SHERMAN ACT – SECTION 1 – 15 U.S.C. 1.0  TRUSTS, ETC., IN RESTRAINT OF TRADE ILLEGALLY; PENALTY)

179. Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

180. The Defendants willfully engaged a criminal violation of Section 1 of the Sherman Act (15 U.S.C. § 1) through an intentional act of price fixing / bid rigging of vehicle valuation reports with the deliberate intent to cause damage to the Plaintiff's business and property.

181. According to USAA's Claim Notes No. 67, on March 20, 2020 at 10:47am, Amber Peterson, representing THE EXCHANGE, and Danelle

Bushnell, representing USAA, conspired via a phone call by Bushnell to Peterson, to illegally fix the pricing / rig the bidding of the valuation of the Plaintiff "totaled vehicle". In a phone conversation, Bushnell and Peterson discussed: 1) that the Plaintiff was pursuing a competitive bid from THE EXCHANGE for the valuation of his "totaled" vehicle, 2) USAA's prior determination of the Plaintiff's vehicle as a total loss, and 3) discussed the appraisal, previously identified as Galvez-VVR-00 that USAA had provided to the Plaintiff on the valuation of his vehicle. At the conclusion of the discussion, Peterson informed Bushnell that "[we] will have a similar value from IV [incident vehicle]".

182. As a result of this conversation, USAA provided THE EXCHANGE a copy of their offer to the Plaintiff, the Galvez-VVR-00 appraisal that was marked "USAA Confidential".

183. Three days later, on March 23, 2020, THE EXCHANGE had IBS employee Greg Taylor, produce an appraisal of the Plaintiff's vehicle, previously identified as Taylor-VVR-00. The Taylor-VVR-00 appraised the Plaintiff's vehicle for the exact same value as the Galvez-VVR-00. While the exact same valuation in itself is not evidence of price-fixing or bid rigging, the following are evidence of intentional price fixing / bid rigging:

a) the Galvez-VVR-00 falsely stated that the Plaintiff's vehicle did not have a sunroof or CA Emission Equipment, and used these deficiencies to depress the value of the Plaintiff's vehicle,

b) the Taylor-VVR-00 falsely stated that the Plaintiff's vehicle did not have a sunroof or metallic paint, and used these deficiencies to depress the value of the Plaintiff's vehicle,

c) while falsely stating that the vehicle did not have a sunroof would equally depress both valuations, it is improbable that the resulting value depression

from not have CA emission Equipment, and not have metallic paint are of equal value.

d) inclusion of similar, but different deficiencies, and producing the exact same valuation, could not be achieved without a prior agreement to produce an appraisal of the same valuation.

184. Greg Taylor was the IBS employee who assisted THE EXCHANGE in creating the identical appraisal on the Plaintiff's vehicle in violation of 15 U.S.C. 1.  When Greg Taylor and IBS colluded with THE EXCHANGE to duplicate the valuation found in the Galvez-VVR-00 appraisal, Taylor and IBS voluntarily agreed to join the conspiracy.

185. With two similar but different deficiencies in the two appraisals, resulting in the exact same valuation; the exact same valuation could not be the result of a mistake, accident, or innocent reason.  Taylor is an experienced estimator and in no possible way could he not have discerned that the Plaintiff's vehicle had metallic paint.  Taylor even costed metallic paint into his accompanying repair appraisal, so adding this as a deficiency to devalue the Taylor-VVR-00 to match the Galvez-VVR-00 could only have been a deliberate act.

186.  The Plaintiff had the legal right to obtain independent appraisals from USAA and THE EXCHANGE without the two businesses and their employees conspiring to eliminate a competitive bid and the defendants' actions were an unreasonable restraint of trade.

187. In addition to price fixing / bid rigging of the appraised value of the Plaintiff's vehicle, the two insurers also conspired to maintain the determination that the Plaintiff's vehicle was "non repairable", i.e. a "total loss".  THE EXCHANGE maintained this false representation by conspiring with Taylor and

IBS to falsify the Taylor Repair Estimate so the cost to repair would be greater than the false appraised value.

188. This price fixing scheme was an intentional and targeted attack against a single party, the Plaintiff. The Plaintiff had the legal right to obtain independent appraisals from USAA and THE EXCHANGE without these three businesses and their employees conspiring to eliminate a competitive bid, and conspiring to maintain the false representation that the Plaintiff's vehicle was "totaled". These defendants' actions were an unreasonable restraint of trade that injured the Plaintiff in his business or property by reason of the violation.

189. Essential elements of a Sherman Act violation include:

a) The charged conspiracy was knowingly formed and was in existence at or about the time alleged. THE EXCHANGE / Peterson knowingly agreed to produce an appraisal with similar values on March 20, 2020. USAA / Bushnell provided THE EXCHANGE with a copy of their Galvez-VVR-00 for THE EXCHANGE to match around the time of March 20,2020, and no later than March 23, 2020. IBS / Taylor produced the Talyor-VVR-00 that matched the Galvez-VVR-00 on March 23, 2020 by knowingly falsifying deficiencies about the Plaintiff's vehicle.

b) The defendant knowingly joined the charged conspiracy. THE EXCHANGE / Peterson knowingly agreed to produce a similar appraisal and continue the false representation of the Plaintiff's vehicle being "totaled". USAA / Bushnell voluntarily provided THE EXCHANGE with the Galvez-VVR-00 to match. IBS / Taylor agreed to produce the Taylor-VVR-00 that matched the Galvez-VVR-00.

c) The charged conspiracy either substantially affected interstate or foreign commerce or occurred within the flow of interstate or foreign commerce. The original Galvez-VVR-00 came from USAA who is based in Texas. The

Taylor-VVR-00 came from IBS and THE EXCHANGE based in California. Interstate commerce was affected.

190. The Plaintiff was injured in his business or property and under Section 4 of the Clayton Act  which states "*any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States*"; therefore, the Plaintiff has a right of private action against these defendants.  The wording "business or property by reason of" is the same wording used in the RICO Act.  The Ninth circuit, in interpreting RICO and the Clayton Act in tandem, stated that *"[Congress] used the same words [in RICO and the Clayton Act], and we can only assume it intended them to have the same meaning that courts had already given them."* (Diaz v. Gates, 420 F.3d, 909 (9th-Cir.2005) (per curiam)         In Diaz v Gates, the ninth circuit stated "*There is similarly no room in the statutory language for an additional, amorphous requirement that, for an injury to be to business or property, the business or property interest have been the "direct target" of the predicate act*". (Id. At 902)  With RICO and Clayton utilizing the same language "injury to business or property", injuries under Clayton to "business or property" must be considered exactly the same as injuries under RICO, which according to the Ninth Circuit in Diaz v Gate, do not have to be the direct target of the price fixing scheme.

191. The Plaintiff suffered injury to his property in the form of:

a) Loss of a fair and competitive offer for the valuation of his "totaled" vehicle, and / or loss of the option to have his falsely represented "totaled" vehicle repaired.

b) "Loss of Use" damages, and additional storage costs incurred after March 25, 2020 resulting from the Defendants' price fixing / bid rigging scheme that guaranteed the settlement process going down the "totaled" vehicle path which

_____73_____

continued the false representation that the Plaintiff's vehicle was "totaled" and allowed these defendants to engaging in unfair valuations of the Plaintiff's vehicle and prevented a timely settlement.  These damages were the direct result of the action of all these defendants, because without the bid rigging and the falsified Taylor Repair Estimate created to support the bid rigging, the Plaintiff's vehicle would not have been classified as "non repairable" and could have been quickly repaired with none of the additional "Loss of Use" or storage cost being incurred.

c) Damages to his business through interference with current business productivity due to the Plaintiff having to sporadically take time off work from March 2020 to May 2023 in order to prosecute this lawsuit.  Every hour taken off work, was a lost hour of the Plaintiff's productivity that his business will never get back.  These damages were the direct result of the action of all these defendants, because without the bid rigging and the falsified Taylor Repair Estimate created to support the bid rigging, the Plaintiff's vehicle would not have qualified as "totaled", could have been quickly repaired.  The Plaintiff would not have suffered these business damages because there would have been no reason for a lawsuit.

d) Since May 2023, the effort the Plaintiff has had to expend to prosecute this lawsuit has increased to a fulltime effort, resulting in the Plaintiff suffering additional interference with current development and future business sales to the extent that the Plaintiff has had to suspend his emerging LEAF (Lightweight Electric Automatic Firearm) program due to the full time effort required to respond to this lawsuit.  Currently the Plaintiff does not believe he will suffer lost sales, but his business will suffer lost interest on all the profits to be realized from LEAF sales being pushed off into the future.  Plaintiff's business is losing interest on all those sales equivalent to one month's of interest for

every month the business's program is suspend due to interference with the Plaintiff's business caused by schemes prohibited by the Clayton Act.

192. Although not the "direct target" of the price fixing scheme, lost productivity at the Plaintiff's business, and lost interest on future business sales resulting from the Plaintiff taking time to pursue a legal remedy for the Defendant's criminal acts under Clayton are recoverable, just the same as they would be recoverable under RICO. As previously quoted by the Ninth Circuit in Diaz, ""[Congress] used the same words [in RICO and the Clayton Act], and we can only assume it intended them to have the same meaning". If a damage is recoverable under a RICO Act violation, that same damage must be recoverable under a Clayton Act violation.

## SIXTH CAUSE OF ACTION
## BY PLAINTIFF AGAINST DEFENDANTS USAA, DANELLE BUSHNELL,
## MELISSA ORDELL, RANDY TERMEER
## IMPERIAL BODY SHOP, KEVIN KARAPOGOSIAN
## THE EXCHANGE, JOHN BOYLE, and DOEs 1 - 99

### ( 18 U.S.C. 1962 (c)– RICO ACT – PROHIBITED ACTIVITIES)

193. Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

194.  As stated in 18 U.S.C. 1962 (c), "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt".

_____75_____

195. Section 18 U.S.C 1964(c) establishes a private right of act for the Plaintiff by stating: "c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee".

196. <u>The "injured in his business or property" element of RICO</u> is the same as the "injured in his business or property" element discussed in Cause of Action No. Five for violation of the Clayton Act.  The phrasing "injured in his business or property" was pulled directly from the Clayton Act by Congress when writing the RICO Act.  The injury to his property and business suffered by the Plaintiff due to the Predicate Acts committed by these defendants include the damages listed in Cause of Action Five along with a few additions.

197. <u>Under this RICO Act claim the injuries to property or business</u> include:

a) Loss of a fair and competitive offer for the valuation of his "totaled" vehicle, and / or loss of the option to have his falsely represented "totaled" vehicle repaired as a result of the acts of wire fraud committed by these defendants: including falsifying appraisals, falsifying repair estimates, and falsely representing that the Plaintiff's vehicle was "totaled".

b) "Loss of Use" and storage cost damages resulting from the defendants acts of wire and mail fraud in misrepresenting the Plaintiff's vehicle as "totaled" through falsifying appraisals, repair estimates and the fair market value of "Loss of Use" reimbursement.

c) "Loss of Use" damages, and additional storage costs after March 25, 2020 resulting from the fraud engaged in by the Defendants' as part of their price fixing / bid rigging scheme that guaranteed the settlement process going down the "totaled" vehicle path which allowed these defendants to engaging

Plaintiff   John W. Sigler:                                               8:22-cv-2325-CJC-JDE
FIRST AMENDED COMPLAINT

in unfair valuations of the Plaintiff's vehicle and prevented a timely settlement. These damages were the direct result of the action of all these defendants, because without the falsified Taylor-VVR-00 appraisal and Taylor Repair Estimate, which USAA, THE EXCHANGE, IBS, Bushnell, Peterson, and Taylor were all involved in, to support the bid rigging scheme; the Plaintiff's vehicle could have been quickly repaired and none of the additional "Loss of Use" or storage costs would have been incurred.

d) Damages to his business through interference with current business productivity due to the Plaintiff having to sporadically take time off work from March 2020 to May 2023 in order to prosecute this lawsuit. Even hour being taken off work, was a lost hour of the Plaintiff's productivity that his business will never get back. These damages were the direct result of the action of all these defendants, because without the fraud of falsifying the Taylor-VVR-00 appraisal and the falsified Taylor Repair Estimate created to support the bid rigging and support the false representation that the Plaintiff's vehicle was totaled, the Plaintiff's vehicle would not have qualified at "totaled" and could have been quickly repaired. The Plaintiff would not have suffered these business damages because there would have been no reason for a lawsuit.

e) Since May 2023, the effort the Plaintiff has expended to prosecute this lawsuit has increased to a fulltime effort, resulting in the Plaintiff suffering additional interference with current development and future business sales. This has resulted in the Plaintiff having to suspend his emerging LEAF (Lightweight Electric Automatic Firearm) program due to the full time effort required to respond to this lawsuit. Currently the Plaintiff does not believe he will suffer lost sales, but his business will suffer having all the profits from LEAF sales being pushed off into the future. This means that the

Plaintiff's business will lose interest on all those sales equivalent to one month's of interest for every month the business's program is suspend due to interference with the Plaintiff's business caused by schemes prohibited by the RICO Act.

f)  Un-necessary premiums that were extorted from the Plaintiff by USAA through their "un-necessary premiums" policy which is not a legal policy clause of their auto insurance policy at all.   USAA's "un-necessary premium" policy is an internal, undisclosed policy that USAA implements to extort "un-necessary premiums" from policyholder in order to cause policyholder additional financial damages as part of an extortion act to force policyholders to accept unfair settlement offers or pay extorted "un-necessary premiums" or loose insurance on all their vehicle if they refuse to pay the "un-necessary premiums".

198. The enterprise element of RICO is satisfied by Defendants USAA, THE EXCHANGE and Imperial Body Shop who created an "association in fact" (AIF) enterprise for the purpose of engaging in racketeering activities with the goal of minimizing claims payouts to the Plaintiff resulting from the auto accident caused by Jorge Gonzalez.   In addition to falsifying settlement offer, these Defendants falsified appraisals and repair estimates in order to falsely classify the Plaintiff's vehicle as totaled.   Moving the Plaintiff's vehicle into the "totaled" category provided the Defendants with more leeway to undercut their liability with fraudulent valuation offers.   In addition, once the initial complaint was filed in Nov. 2022, defendant's engaged in Predicate Acts of wire fraud, Witness Tampering (in the form of concealing or destroying documents), and Obstruction of Justice to delay or impede the administration of justice, and to conceal or destroy documents so they are not available for use in an official proceeding.

199. The AIF enterprise was clearly in affect on March 20, 2020 when USAA and THE EXCHANGE conspired with each other and with IBS to engage in a price fixing / bid rigging scheme implemented by acts of wire fraud, relating to falsifying appraisals, falsifying repair estimates, and falsely representing to the Plaintiff that his vehicle was a total loss when it was not.  IBS's involvement was in providing the falsified appraisals and repair estimates to both insurers in support of their schemes to deceive the Plaintiff into believing his vehicle was non-repairable and he would have to settle for a below market valuation of his vehicle.

200. <u>Structure for the AIF enterprise</u> is provided by the Direct Repair Program contracts between USAA and IBS, and THE EXCHANGE and IBS. Initially the Direct Repair Program had a legitimate business purpose to exchange business activity to the repair facility, for discounted repair costs to the insurer. The Defendants perverted this arrangement into a racketeering enterprise to handle accident vehicles which were determined to be "totaled".  With no repair activities / costs to discount, the Defendants chose to use their DRP relationship to engage in the racketeering activities of fraud by having the repair facility falsify Vehicle Valuation Reports (VVR) and repair estimates to falsely classify vehicles as "totaled" and then undercut the valuation of "totaled" vehicle, to save insurers money by cheating the "totaled" vehicle's owner out of fair market compensation for their property.

201. <u>Longevity of the enterprise</u> was clearly expressed in USAA's Claim Note, Doc. No. 262 on June 3, 2021 when in an inbound phone call from THE EXCHANGE, an EXCHANGE employee named Jenny stated "we are all on the same boat".  Clearly expressing that their association in fact enterprise was still in existence.

_____79_____

202. <u>The interstate element of RICO</u> is clearly satisfied by the fact that USAA is located in Texas, and THE EXCHANGE and IBS are located in California.   All of the racketeering activities had some connection to the Plaintiff's insurance through USAA which provide the required interstate element for RICO.

203. The concepts of Conduct, Pattern, and the Predicate Act are interrelated under RICO through the phrasing "*conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity"*.   As such, the concepts of Conduct, Pattern, and the Predicate Acts will be addressed per each defendant in the follow section.

204. <u>USAA has been engaged in a pattern of racketeering activities involved wire and mail fraud</u> (18 USC 1341 and 18 U.S.C 13430 for years as plead in the cases of the Reyes (2017), the Kelleys (2018), Kraig Vandewalle(2019), and Sonny Letot (2013).   In these cases, USAA has "influenced" appraisers to falsify appraisals to below fair market values.  In Reyes (2017), the appraiser, Jennifer Posas, even turned "whistleblower" on USAA. With Kelley and Vandewalle, the same appraiser testified that USAA's "influencing" of appraisers is normal business practice.  In all these cases, USAA used email as part of their communication with these claimants, thus establishing the wire fraud nextus and a pattern that extends back over eight years from the time when USAA engaged in the same scheme to "influence" IBS and Pablo Galvez to falsify an appraisal of the Plaintiff's vehicle.

205.  In addition to falsifying an appraisal of the Plaintiff's vehicle, USAA, through communications via the internet, directly or indirectly had IBS falsify both an appraisal and repair estimate on the Plaintiff's vehicle, and then transmitted the fraudulent appraisal to the Plaintiff via email (wire fraud) in a scheme to falsely classify the Plaintiff's vehicle as a total loss and deceive the

Plaintiff to believe the valuation of his vehicle was a below market value.  This was the fraud scheme that was plead by Sunny Letot dating back to 2013 where USAA used falsified appraisals and repair estimates to wrongly classify that claimant's vehicle as a total loss, and then defraud the claimant through a below market falsified appraisal.

206.  A further predicate act directed by USAA was to on March 31, 2020 to direct their employee Melissa Ordell to contact the Plaintiff via phone, and in a scheme to deceive the Plaintiff, and in furtherance of USAA's scheme to falsely represent that the Plaintiff's vehicle was a total loss and worth a below market valuation, USAA direct Ordell to present to the Plaintiff a false narrative that the previous errors in the Galvez-VVR-00 appraisal were due to errors in the vehicle's VIN report, and USAA had committed no fraud and the USAA's new appraisal was honest and that the Plaintiff's vehicle was a total loss.

207. A further predicate act that occurred in the May – June 2023 timeframe was for USAA to communicate via the internet to the Plaintiff that USAA's fraudulent total loss claim: a) fraudulently created on March 11, 2020, b) agreed to be closed by USAA on March 26, 2020; was still open as part of USAA's false claim that USAA was entitled to appraisal arbitration on a claim they had closed three years earlier.  In addition to USAA falsely communicating that the closed claim was open when USAA had closed it three years prior, USAA continued as part of their false re-opening of the total loss calim to represent that the Plaintiff vehicle was still a total loss, even with USAA now valuing the Plaintiff's vehicle greater than the cost to repair the vehicle.

208.  A further predicate act committed by USAA was in violation of 18 U.S.C 1951(a), an act of extortion against the Plaintiff starting on March 19, 2020 and continuing into May 2020.  USAA created a false company policy claiming the Plaintiff could not cancel his insurance policy on his "claimed total loss"

_____81_____

vehicle until he settled his total loss claim.  As part of this fraudulent policy, USAA forced the Plaintiff to continue paying un-necessary premiums, constituting financial damage to the plaintiff, under the threat that if he did not continue to pay these un-necessary premiums, the insurance on his other vehicles, and even his home would be cancelled.  USAA's fraudulent un-necessary premium policy is not only a violation of the terms of USAA's auto policies, but it is an established policy that USAA employs against other policyholders to force policyholders to accept settlement offer they might not otherwise accept, under the threat of having to continue to pay un-necessary premiums.  USAA has coded this un-necessary premium policy into their website, so it was not only effective in the March – May 2020 timeframe against the Plaintiff, but it is still in effective today, three years later as a continuing criminal scheme of extortion.

209.  A further predicate act involving extortion, violation of 18 U.S.C 1951(a), was engaged in by USAA in March - April 2020 timeframe, involving USAA teaming with IBS to threaten the Plaintiff with outrageous storage costs if the Plaintiff did not settled his total loss claim with USAA.  Not only were the storage cost inflated to be a financial threat to the Plaintiff, but at that time USAA had already established the valuation of the Plaintiff's vehicle at a value greater than the repair cost of the Plaintiff's vehicle, making USAA insistence that a total loss claim even existed to be fraud.

210.  In continuation of USAA's conduct of predicate acts, in the May – June 2023 timeframe, USAA engaged in another act of wire fraud (18 U.S.C 1343) by communicating to the Plaintiff via the internet that his total loss claim from 2020, which USAA had closed on March 26, 2020, was actually open. USAA fraudulently reopened this closed claim in a deliberate and fraudulent act to deceive the court and the Plaintiff that USAA was entitled in March 2023 to appraisal arbitration on a claim that USAA had closed three years earlier, and a

claim that USAA knew was fraudulent because since March 31, 2020. USAA had established the valuation of the Plaintiff's vehicle at a value greater than the repair cost, making the vehicle not a total loss and making it a violation of USAA's auto policy for a total loss claim to even exist.

211.  USAA meets the requirements of a pattern under RICO since their predicate acts extend from 2013 (Letot), to 2017 – 2019 (Reyes, Kelley, Vandewalle) to 2020 – 2023 (Sigler).  These time periods extended for more that eleven years based on Letot to Sigler, and even with Sigler alone, the time period for the predicate acts committed by USAA extend for over three years from 2020 to 2023.  USAA also meets the definition of continuing criminal activity under the fact that USAA continues to fraudulently insist that the Plaintiff's vehicle is a total loss when their own numbers prove differently.

212.  All of the predicate acts listed against USAA have a common goal, or are related to defrauding USAA policyholders out of fair settlements through acts involving fraudulent appraisals in one form or another.  USAA's predicate acts of extortion are also fraudulent appraisal related in that they were engaged in to cause or threaten the Plaintiff with financial harm if he did not accept a settlement based upon a fraudulent appraisal.

213.  <u>Defendant Randy Termeer conducted or participated, directly or indirectly in the conduct of the enterprise's affairs through a pattern of the following racketeering activities.</u>  Termeer is the President of USAA Property and Casualty Insurance and holds the topmost authority at USAA in insurance matter. Termeer sets and indirectly controls all of USAA's policies and has overall authority over the actions of USAA's employees who freely engage in, and are directed by USAA management to engage in, the predicate acts of wire fraud (18 U.S.C 1343) as part of their employment with USAA.  USAA's un-necessary premium policy, which was a policy used for the predicate act of extortion (18

U.S.C. 1951(a)) is a coordinated effort between the claims department, the insurance policy department, and USAA's IT department (USAA's Website) and could not be implemented or even exist without support from top level management to provide the coordination.  As president, Termeer also has indirect control over USAA's legal response to lawsuits, and would exercise indirect control over USAA employees committing predicate acts of wire fraud (18 U.S.C 1343), including falsely re-opening closed claims, to support false claims of arbitration clauses.  Termeer also exercises control over USAA's policy of defining total loss vehicles and establishes company guidelines as to USAA's determination of when a total loss claim would exist, and when an employee would commit an act of wire fraud (18 U.S.C 1343) by falsely claiming a vehicle is a total loss when it was not.  Termeer also exercises indirect control over the business agreements with appraisal companies that would control USAA's influencing of these companies to commit acts of wire fraud through the falsifying of appraisal for USAA.

214. Termeer pattern of racketeering conduct is established by the previously listed predicate acts engaged in by USAA under his direction for an extended period of time, as well as that Termeer continues to direct USAA to maintain its un-necessary premium policy that will extend into the future until USAA publicly discloses the policy is in violation of the terms of its auto policies and terminates it.

215. Defendant Imperial Body Shop conducted or participated, directly or indirectly in the conduct of the enterprise's affairs through a pattern of the following racketeering activities defined as predicate acts.

216. On March 11, 2020 Imperial Body Shop directly or indirectly instructed its employee Pablo Galvez to engage in acts of wire fraud (18 U.S.C

1343) by falsifying both appraisal and repair estimate on the Plaintiff's vehicle for USAA.

217. On March 23, 2020, Imperial Body Shop directly or indirectly instructed its employee Greg Taylor to engage in acts of wire fraud (18 U.S.C 1343) by falsifying both an appraisal and repair estimate on the Plaintiff's vehicle for THE EXCHANGE.

218. On or About May 24, 2023 and October 3, 2023 Imperial Body Shop engaged in the predicate acts of witness tampering (18 U.S.C 1512 (c)(1) by attempting to conceal documents to impair their availability for use in an official proceeding.  IBS's actions included falsely stating in a sworn verification of the production of documents that their within the Response on May 24, 2023, Exhibit A contained appraisal documents when it did not.  IBS's actions on October 3, 2023 included violating a judge's order to disclose documents by refusing to disclose rate sheets and other rate related documents that consisted of business agreements with USAA and THE EXCHANGE which the judge order IBS to turn over to the Plaintiff.  IBS's refusal to turn over these rate related documents was a clear act to withhold labor rate related information that would prove IBS and their employees falsified repair estimates on the Plaintiff's vehicle.

219.  The predicate acts directly or indirectly conducted by IBS are related to supporting the efforts of both THE EXCHANGE and USAA to deceive the Plaintiff into believing his vehicle was a total loss when it was not.  IBS's predicate acts extended from March 2020, when IBS first falsified appraisals and repair estimates for USAA and THE EXCHANGE, until October 3, 2023, over three years later, when IBS willfully violated a judge's direct order and concealed business agreements with USAA and THE EXCHANGE consisting of agreed upon labor rate documents from the Plaintiff to impair their availability in an

official proceeding, being the Plaintiff's required deadline of October 9, 2023 to file an amended Complaint.

220. Defendant Kevin Karapogosian conducted or participated, directly or indirectly in the conduct of the enterprise's affairs through a pattern of the following racketeering activities defined as predicate acts committed by IBS where Karapogosian holds the position of president.

221. On March 11, 2020 Karapogosian was part of IBS's management team and directly or indirectly oversaw the conduct of his employee Pablo Galvez who engaged in acts of wire fraud (18 U.S.C 1343) by falsifying both appraisal and repair estimate on the Plaintiff's vehicle for USAA.

222. On March 23, 2020, Karapogosian was part of IBS's management team and directly or indirectly oversaw the conduct of his employee Greg Taylor who engaged in acts of wire fraud (18 U.S.C 1343) by falsifying both an appraisal and repair estimate on the Plaintiff's vehicle for THE EXCHANGE.

223. Karapogosian was in a position to oversee and review Galvez's and Taylor's work, as well as their communications with USAA and THE EXCHANGE, and determine if the appraisals and repair estimates were being falsified at the urging of his customers USAA and THE EXCHANGE.

224. Karapogosian was president of IBS in May 2023 and was the individual who signed the Discovery verification which falsely stated that IBS had included appraisal IBS had performed in their Exhibit A disclosure. Karapogosian was president of IBS in October 2023 and has indirect or direct control of IBS's response to Judge Early's order to production all business agreements and contracts with USAA and THE EXCHANGE. Karapogosian has control over IBS's decision to violate the judge's order and conceal business agreements, in the form of rate sheets with USAA and THE EXCHANGE, from the Plaintiff.

225. All of the predicate acts directly or indirectly controlled or participated in by Karapogosian were related to the falsifying of appraisals and repair estimates sent out via the internet (wire fraud), or the concealing documents from the Plaintiff (witness tampering); with the common goal of all these acts to deceive the Plaintiff into accepting a fraudulent settlement offer by misrepresenting the Plaintiff's vehicle as totaled, or the covering up of their acts to deceive the Plaintiff into accepting a fraudulent settlement offer.

226. Karapogosian exercised direct or indirect control over these predicate acts extending from March 2020, with the falsifying of appraisals and repair estimates by Galvez and Taylor, to October 2023 and the witness tampering acts of conceal document by IBS under Karapogosian's direction.

227. Defendant THE EXCHANGE conducted or participated, directly or indirectly in the conduct of the enterprise's affairs through a pattern of the following racketeering activities which included acts of wire fraud, mail fraud, and Witness tampering.

228. THE EXCHANGE has been engaged in a pattern of racketeering activities that involved wire and mail fraud (18 USC 1341 and 18 U.S.C 1343) in March 2020 in directing the activities of their contractor IBS, and their employee Amber Peterson via the internet, to falsify both appraisals and repair estimate on the Plaintiff's vehicle, and then transmitting the fraudulent appraisals and repair estimate to the Plaintiff via email (wire fraud) in a scheme to falsely classify the Plaintiff's vehicle as a total loss and then deceive the Plaintiff to believe the valuation of his vehicle was a below market value. THE EXCHANGE also directed its contactor IBS, through its employee Amber Peterson, to create a fraudulent appraisal and repair estimate in March 2020 in support of deceiving the Plaintiff into believing that his vehicle was totaled and had the exact same valuation as the fraudulent Glavez-VVR-00 that had been previously provided to

_____87_____

the Plaintiff by USAA.  This was an act of wire fraud in support of THE EXCHANGE's violation of the Clayton Act.  The acts of fraud directed by THE EXCHANGE caused damages to the Plaintiff, including additional "Loss of Use" damages, additional storage cost damages, and damages to Plaintiff's business in having to prosecute this lawsuit relating to these violation of the RICO act.  THE EXCHANGE's scheme of falsifying appraisals and repair estimates to deceive the Plaintiff into believing his vehicle was totaled continued until May 2023 when the Plaintiff obtained evidence during discovery proving that his vehicle was not a total loss, although THE EXCHANGE has continued to persist with this fraud, continuing to claim the Plaintiff's vehicle is totaled.

229.  Two further predicate acts directed by THE EXCHANGE occurred on April 3, 2020 and April 15, 2020 and involved two separate scheme directed by THE EXCHANGE in having their employee Amber Peterson engage in two attempts to deceived the Plaintiff regarding the value of his "Loss of Use" damages by providing unfair and dishonest settlement offers, contrary to THE EXCHANGE March 19, 2020 representation to the Plaintiff that THE EXCHANGE would handle their settlement process in a fair and honest manner; a misrepresentation the Plaintiff relied upon in deciding to participate in a settlement process directly with THE EXCHANGE.  These acts of fraud directed by THE EXCHANGE caused damages to the Plaintiff, including additional "Loss of Use" damages, additional storage cost damages, and damages to Plaintiff's business in having to prosecute this lawsuit relating to these violations of the RICO act.  THE EXCHANGE's scheme of falsifying the value of their "Loss of Use" offers continues to this day, even after THE EXCHANGE was confronted with the fact that their last fraudulent claim as to the fair market rate for a rental car was based upon an unavailable COVID discount rate.

230. A further predicate act that occurred in the April – June 2023 timeframe was for THE EXCHANGE an act of Witness Tampering (18 U.S.C 1512 (c) (1)) involving THE EXCHANGE destroying evidence in the form of a audio recording of a March 19, 2020 phone conversation between THE EXCHANGE employee Amber Peterson and the Plaintiff's son.

231. THE EXCHANGE meets the requirements of a pattern under RICO since their predicate acts extend from 2020 regarding the falsifying of appraisals and repair estimates, to 2023 with the destroying of evidence, and their involvement in funding the Obstruction of Justice incident with their insured Jporge Gonzalez and the filing of a forged Waiver with the court to impede justice and benefit Gonzalez.   THE EXCHANGE's conduct also proves that their criminal activities will extend into the future based on THE EXCHANGE's continuing fraud relating to falsely representing that the Plaintiff' vehicle continues to be a total loss, when THE EXCHANGE knows that its valuation of the Plaintiff's vehicle exceeds the vehicle's repair costs, and the Plaintiff's vehicle is not totaled.   THE EXCHANGE also continues to maintain that its quoted COVID discounted rental car rate represents a rate that was available to the Plaintiff and the general public when it was not, thus continuing this act of wire fraud.

232. All of the predicate acts listed against THE EXCHANGE have a common goal of engaging in acts of fraud, or covering up acts of fraud, relating to settlement offers that THE EXCHANGE knew were dishonest and were created and transmitted to the Plaintiff as part of a global plan to engage in multiple scheme to avoid a fair settlement with the Plaintiff and to falsely claim the Plaintiff's vehicle was a total loss.

233. Defendant John Boyle conducted or participated, directly or indirectly in the conduct of the enterprise's affairs through a pattern of the following

racketeering activities which included acts of wire fraud, mail fraud, and Witness Tampering committed by THE EXCHANGE where Boyle acted as the CEO and had topmost authority in directing his employees to engage in these predicate acts.

234. With the oversight and approval of Boyle, THE EXCHANGE has been engaged in a pattern of racketeering activities that involved wire and mail fraud (18 USC 1341 and 18 U.S.C 1343) in March 2020 in directing the activities of their contractor IBS, and their employee Amber Peterson via the internet, to falsify both appraisals and repair estimate on the Plaintiff's vehicle, and then transmitting the fraudulent appraisals and repair estimate to the Plaintiff via email (wire fraud) in a scheme to falsely classify the Plaintiff's vehicle as a total loss and deceive the Plaintiff to believe the valuation of his vehicle was a below market value.

235. THE EXCHANGE, under the direction of Boyle, also directed its contactor IBS, through its employee Amber Peterson, to create a fraudulent appraisal and repair estimate in March 2020 in support of deceiving the Plaintiff into believing that his vehicle was totaled and had the exact same valuation as the fraudulent Glavez-VVR-00 that had been earlier provided to the Plaintiff by USAA.  This being an act of wire fraud in support of THE EXCHANGE's violation of the Clayton Act.

236. As THE EXCHANGE's CEO, Boyle was knowledgeable about the manner in which his employees handled auto claims and that his employees would purposely engage in predicate acts to deceive claimants like the Plaintiff into believing they were getting a fair settlement.  As CEO, Boyle indirectly conducts and approves THE EXCHANGE's conduct in ongoing acts of fraud involving continuing to claim the Plaintiff's vehicle is non repairable when THE EXCHANGE own records show it is not a total loss, and continuing to use an

unavailable discounted COVID rental car rate to devalue the Plaintiff's "Loss of Use" offer when that rate was not and is not available to the general public.

237.  The acts of fraud directed by Boyle through his management of THE EXCHANGE caused damages to the Plaintiff, including additional "Loss of Use" damages, additional storage cost damages, and damages to Plaintiff's business in having to prosecute this lawsuit relating to these violations of the RICO act.  THE EXCHANGE's scheme of falsifying appraisals and repair estimates to deceive the Plaintiff into believing his vehicle was totaled continued to deceive the Plaintiff until  September 2023 when the Plaintiff reviewed evidence during discovery proving that his vehicle was not a total loss, although THE EXCHANGE has continued to persist with this fraud to this day.

238. A further predicate act engaged in by THE EXCHANGE and indirectly supported by the management of Boyle, occurred in the April – June 2023 timeframe involving THE EXCHANGE's predicate act of Witness Tampering (18 U.S.C 1512 (c) (1)) relating to THE EXCHANGE destroying evidence in the form of a audio recording of a March 19, 2020 phone conversation between THE EXCHANGE employee Amber Peterson and the Plaintiff's son.  As THE EXCHANGE's top manager, Boyle would have indirectly authorized the destruction of this evidence through company policies that he approved with the goal of preventing this evidence from being available at trial.

239.  Boyle's actions meets the requirements of a pattern under RICO since under his direct or indirect control THE EXCHANGE his company engaged in predicate acts extending from 2020, regarding the falsifying of appraisals and repair estimates; to 2023 with the destroying of evidence and funding of an act of Obstruction of Justice.  Boyle continues to directly or indirectly control THE EXCHANGE's continuing conduct that will extend into the future based on THE EXCHANGE's continuing fraud relating to falsely representing that the Plaintiff'

vehicle as a total loss, when THE EXCHANGE knows that its valuation of the Plaintiff's vehicle exceeds the vehicle's repair costs.  Boyle continues to directly or indirectly control THE EXCHANGE's continuing conduct relating to THE EXCHANGE continuing to insist on using its quoted COVID discounted rental car rate that represents a rate Boyle and his company knows was and is not available to the Plaintiff or general public now or at the time of the accident.

240. All of the predicate acts listed against THE EXCHANGE which Boyle had direct or indirect control over have a common goal of engaging in acts of fraud, or covering up acts of fraud, relating to settlement offers that THE EXCHANGE knew were dishonest and were created and transmitted to the Plaintiff as part of a global plan to engage in multiple scheme to avoid a fair settlement with the Plaintiff, and continuing to falsely claim that the Plaintiff's vehicle is a total loss.

## SEVENTH CAUSE OF ACTION
## BY PLAINTIFF AGAINST DEFENDANT PABLO GALVEZ
## (18 U.S.C.1962 (d) – CONSPIRACY TO VIOLATE 1962 (c))

241. Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

242. This cause of action arises under 18 U.S.C 1962(d) and is asserted against Defendant Pablo Galvez.

243. For the purpose of this cause of action, the enterprise is the association in fact enterprise defined in the Sixth Cause of Action, with Galvez conspiring to facilitate / commit the following Predicate Acts.

244. Galvez conspired with USAA, at the direction of his employer IBS, to falsify appraisals and repair estimates in support of the predicate acts of wire fraud

committed with USAA and their employee Danelle Bushnell.  A key element of the Predicate Act of wire fraud, that involved USAA's scheme to defraud the Plaintiff by wrongly classifying his vehicle as a total loss, were the fraudulent Galvez-VVR-00 appraisal, and the "doctored" Galvez Repair Estimate; both prepared by Pablo Galvez.  USAA required the creation and transmission of these two fraudulent documents by Galvez to enable their scheme to deny the Plaintiff his legal right to get his vehicle repaired.  Through the use of these fraudulent documents prepared by Galvez, USAA enabled their scheme to falsely represent to the Plaintiff that his vehicle was a total loss, denying him the opportunity to get it repaired; thus causing the damages to Plaintiff's property and business as listed in the Sixth Cause of Action.

### EIGHTH CAUSE OF ACTION
### BY PLAINTIFF AGAINST DEFENDANT GREG TAYLOR
### (18 U.S.C.1962 (d) – CONSPIRACY TO VIOLATE 1962 (c))

245. Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

246. This cause of action arises under 18 U.S.C 1962(d) and is asserted against Defendant Greg Taylor.

247. For the purpose of this cause of action, the enterprise is the association in fact enterprise defined in the Sixth Cause of Action, with Taylor conspiring to facilitate / commit the following Predicate Acts.

248. Taylor conspired with THE EXCHANGE, at the direction of his employer IBS, to falsify appraisals and repair estimates in support of the predicate acts of wire fraud committed with THE EXCHANGE and their employee Amber Peterson.  A key element of the Predicate Act of wire fraud, that involved THE

EXCHANGE's scheme to defraud the Plaintiff by wrongly classifying his vehicle as a total loss, were the fraudulent Taylor-VVR-00 appraisal, and the "doctored" Taylor Repair Estimate; both prepared by Greg Taylor.   THE EXCHANGE required the creation and transmission of these two fraudulent documents by Taylor to enable their scheme to deny the Plaintiff his legal right to get his vehicle repaired.   Through the use of these fraudulent documents prepared by Taylor, THE EXCHANGE enabled their scheme to falsely represent to the Plaintiff that his vehicle was a total loss, denying him the opportunity to get it repaired; thus causing the damages to Plaintiff's property and business as listed in the Sixth Cause of Action.

## NINTH CAUSE OF ACTION
## BY PLAINTIFF AGAINST DEFENDANT AMBER PETERSON
## (18 U.S.C.1962 (d) – CONSPIRACY TO VIOLATE 1962 (c))

249. Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

250. This cause of action arises under 18 U.S.C 1962(d) and is asserted against Defendant Amber Peterson.

251. For the purpose of this cause of action, the enterprise is the association in fact enterprise defined in the Sixth Cause of Action, with Peterson conspiring to facilitate / commit the following Predicate Acts.

252. Peterson conspired with THE EXCHANGE, to obtain falsified appraisals and repair estimates from IBS in support of the predicate act of wire fraud committed by herself and her employer THE EXCHANGE in a scheme to falsely assert that the Plaintiff's vehicle was non-repairable and a total loss. Peterson solicited and obtained the fraudulent Taylor-VVR-00 appraisal and

fraudulent Taylor Repair Estimate from IBS's employee Greg Taylor, and then transmitted said fraudulent appraisal and repair estimate to the Plaintiff by email to enable two different schemes to defraud the Plaintiff.  The first scheme was as part of her price fixing scheme to fraudulent represent to the Plaintiff that his vehicle was a total loss, and the second scheme was to represent to the Plaintiff that his vehicle was only worth the fraudulent below valuation shown in the Taylor-VVR-00 appraisal, a value identical to the Galvez-VVR-00 previously provided to the Plaintiff by USAA, and known to Peterson to be fraudulent.

253.  In addition to conspiring with scheme to fraudulently undervalue the Plaintiff's vehicle and to falsely represent that the Plaintiff's vehicle was non repairable, Peterson also conspired with her employer THE EXCHANGE in two additional but separate schemes to falsely undervalue the price of an equivalent rental car in order to deceive the Plaintiff into accepting a below market "Loss of Use" settlement offer.  Peterson not only conspired with her employer in these two schemes to defraud by email (wire fraud), but it was Peterson herself that masterminded these two schemes.

## TENTH CAUSE OF ACTION
## BY PLAINTIFF AGAINST DEFENDANT DANELLE BUSHNELL
## (18 U.S.C.1962 (d) – CONSPIRACY TO VIOLATE 1962 (c))

254. Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

255. This cause of action arises under 18 U.S.C 1962(d) and is asserted against Defendant Danelle Bushnell.

256. For the purpose of this cause of action, the enterprise is the association in fact enterprise defined in the SIXTH Cause of Action, with Bushnell conspiring to facilitate / commit the following Predicate Acts.

257. Bushnell conspired with her employer USAA, to obtain falsified appraisals and repair estimates from IBS in support of the predicate act of wire fraud committed by herself and her employer USAA in a scheme to falsely assert that the Plaintiff's vehicle was non-repairable and a total loss.  Bushnell solicited and obtained the fraudulent Galvez-VVR-00 appraisal from IBS's employee Pablo Galvez, and then transmitted said fraudulent appraisal to the Plaintiff by email (wire fraud) with her own false representation that the Plaintiff's vehicle was a total loss in order to deprive the Plaintiff of his opportunity to get his vehicle repaired, and to deceive the Plaintiff to accept a below market value for his vehicle.  Throughout the time period from March 11, 2020 to March 31, 2020, Bushnell sent multiple communications via wire (email) to the Plaintiff in furtherance of her employer's scheme to deceive the Plaintiff about the total loss of his vehicle and / or to attempt to deceive the Plaintiff into accepting a less than fair market valuation of his vehicle.

## ELEVENTH CAUSE OF ACTION
## BY PLAINTIFF AGAINST DEFENDANT MELISSA ORDELL
## (18 U.S.C.1962 (d) – CONSPIRACY TO VIOLATE 1962 (c))

258. Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

259. This cause of action arises under 18 U.S.C 1962(d) and is asserted against Defendant Melissa Ordell.

260. For the purpose of this cause of action, the enterprise is the association in fact enterprise defined in the SIXTH Cause of Action.   The Predicate Acts that Ordell conspired to facilitate included: a) USAA's scheme to misrepresent to the Plaintiff that his vehicle was a "total loss" through the presentation of falsified appraisals to the Plaintiff via email (wire fraud), b) to communicate via phone to the Plaintiff a false narrative to cover-up the fraud in the Galvez-VVR-00 appraisal by claiming the false representations in the Galvez-VVR-00 were due to errors in the Plaintiff's vehicle's VIN report (wire fraud), and c) in 2023 to conspire with her employer USAA's legal counsel to falsely reopen the Plaintiff's total loss claim which Ordell had closed in March 26, 2020, which also included recommitting the scheme to falsely represent that the Plaintiff's vehicle was a total loss.

### TWELFTH CAUSE OF ACTION
### BY PLAINTIFF AGAINST DEFENDANT JORGE GONZALEZ
### (18 U.S.C.1962 (d) – CONSPIRACY TO VIOLATE 1962 (c))

261. Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

262. This cause of action arises under 18 U.S.C 1962(d) and is asserted against Defendant Jorge Gonzalez.

263. For the purpose of this cause of action, the enterprise is the association in fact enterprise defined in the SIXTH Cause of Action.

264. Gonzalez knowing conspired with Eran Forster, the attorney of record for THE EXCHANGE to engage in violation of 18 U.S.C 1503 in an attempt to impede the due administration of justice.  Gonzalez knowing took part in the filing of a forged Waiver of Service of Summons with the Federal court in a deliberate

_____97_____

attempt to deceive the court into believing that Mr. Gonzalez had more time available to him to file his answer to the original complaint in this lawsuit.  Mr. Gonzalez provided a copy of a Waiver of Service of Summons that was mailed to him on March 17, 2023, and allowed his attorney Eran Forster, who is also the attorney for THE EXCHANGE to create a forged copy of said Waiver with the mailing date changed to March 22, 2023.  The filing of the forged Waiver could not have occurred without Mr. Gonzalez's assistance in providing attorney Forster with knowledge of receipt of the original Waiver.  Since Mr. Gonzalez never signed the Waiver, and knew that any Waiver would not be valid since he had not signed the Waiver prior to his attorney being served in-person.  Gonzalez knew the mailing date on the true Waiver was March 17, 2023, and had sufficient knowledge to know that a Waiver filed on April 23, 2023 with any mailing date could not be valid since it was after the 30 day time limit.  The purpose of this predicate act was to impede justice in falsely providing Mr. Gonzalez additional time to file an answer which he was not legally entitled to and cause the Plaintiff additional losses in having to spend time and effort in responding to the filing of a forged document with the court.

## THIRTEENTH CAUSE OF ACTION
## BY PLAINTIFF AGAINST DEFENDANT IMPERIAL BODY SHOP
## (18 U.S.C.1962 (d) – CONSPIRACY TO VIOLATE 1962 (c))

265.  Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

266. This cause of action arises under 18 U.S.C 1962(d) and is asserted against Defendant Imperial Body Shop.

267. For the purpose of this cause of action, the enterprise is the association in fact enterprise defined in the Sixth Cause of Action with Imperial Body Shop conspiring to facilitate / commit the following Predicate Acts..

268. Imperial Body Shop knowing conspired with USAA and THE EXCHANGE to provide fraudulent appraisals and repair estimates created by IBS employees Pablo Galvez and Greg Taylor in support of predicate acts of wire fraud involving USAA's and THE EXCHANGE's schemes to defraud the Plaintiff regarding the status of his vehicle being non repairable and a total loss. The schemes devised by USAA and THE EXCHANGE could not have been successful, and deceived the Plaintiff into believing that his vehicle was non repairable and a total loss if not for the efforts of IBS support, and engaging in these acts of wire fraud.

## FOURTEENTH CAUSE OF ACTION
## BY PLAINTIFF AGAINST DEFENDANT KEVIN KARAPOGOSIAN
## (18 U.S.C.1962 (d) – CONSPIRACY TO VIOLATE 1962 (c))

269.  Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

270. This cause of action arises under 18 U.S.C 1962(d) and is asserted against Defendant Kevin Karapogosian.

271. For the purpose of this cause of action, the enterprise is the association in fact enterprise defined in the Sixth Cause of Action with Kevin Karapogosian conspiring to facilitate / commit the following Predicate Acts..

272. Kevin Karapogosian, as president of Imperial Body Shop, knowing conspired with USAA and THE EXCHANGE to provide fraudulent appraisals and repair estimates created by his employees Pablo Galvez and Greg Taylor in

support of predicate acts of wire fraud involving USAA's and THE EXCHANGE's schemes to defraud the Plaintiff regarding the status of his vehicle being non repairable and a total loss.  The schemes devised by USAA and THE EXCHANGE could not have been successful, and deceived the Plaintiff into believing that his vehicle was non repairable and a total loss if not for the efforts of Kevin Karapogosian providing this support, and having his employees engage in these acts of wire fraud.

## **PRAYER**

PLAINTIFF PRAYS for judgment against Defendants as follows:

1.    Replacement cost for Plaintiff's "totaled" vehicle  = $14,920 against defendant Gonzalez

   a.  Supporting data  -  ($13,430+$1,276+$214 )

   b.  Vehicle valuation per Kelly Blue Book -  $13,430

   c.  * Supporting price for similar car at truecar.com = $13,990

   d.  Sales tax at 9.5% (La Mirada) - $1,276

   e.  License fee (CA) - $214

2.    "Loss of Use" Damages – total = $74,840 apportioned over all defendants

   a.  "Loss of Use" (2/28/20 – 1/30/2022) =  $74,948  (693 days x $108/day)

3.    Storage cost for "totaled" vehicle Damages -   Total = $18,600 – apportioned over all defendants.

   a.  Storage losses (3/30/20 – 10/31/2022) = $18,600  (930 days x $20/day)

   b.  Future storage losses due to fraud (11/1/22 – start of trial) - # days x $20/day

4.    Business Damages  -  Total = $7,425

   a.  Lost time from work - $7,425  (55 hours @ $135/hr)

   b.  Future business losses  - lost hours x $135 / hr

5.  Business damages relating to Interest on postponement of future sales, apportioned over applicable defendants.

   a.  Equal to 1/12% interest per month for total future business profits from future sales that are postponed due to prosecuting violation of RICO Act.

6.  Business damages relating to Interest on postponement of future sales, apportioned over applicable defendants.

   a.  Equal to 1/12% interest per month for total future business profits from future sales that are postponed due to prosecuting violation of Clayton Act.

7.  Punitive Damages pursuant to Calif. Civil code 3294(a)  total = unspecified, over applicable defendants

8.  RICO Damages Total = to be determined at time of trial and apportion over all Defendants

   a.  Threefold damages to Plaintiff's business and property pursuant to 18 U.S.C. 1964 (c)

   b.  Property damages and business damages to be determined at time of trial

9.  the cost of the suit and reasonable attorney's fee provided under 18 USC 1964 (c),

10. For any consequential and incidental damages,

11. For prejudgment interest at the legal rate,

12. For all costs of the suit and attorney fees

13. For such other relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action asserted herein.

_____101_____

Dated: October 9, 2023

JOHN SIGLER
*Plaintiff In Propria Persona*

Plaintiff   John W. Sigler:                                                      8:22-cv-2325-CJC-JDE
FIRST AMENDED COMPLAINT

**Exhibit A**

**Appraisal Arbitration Letter**

Plaintiff   John W. Sigler:                                              8:22-cv-2325-CJC-JDE
FIRST AMENDED COMPLAINT

To: Vivian I. Orlando (SBN 213833)                           October 6, 2023

MAYNARD COOPER & GALE LLP

10100 Santa Monica Boulevard, Suite 550

Los Angeles, CA  90067

Attorney for Defendant USAA Casualty Insurance Co.


Dear Ms. Orlando,

    Due to new evidence I have obtained through discovery, and the fact that USAA
continues to redefine the terms contained within their policy, I find there is no point in attempting
to engage in Appraisal Arbitration as stated by USAA's  auto Policy, Part D – PHYSICAL
DAMAGE COVERAGE, - APPRAISAL, "*If we and you do not agree on the amount of loss,
either may demand an appraisal. In this event, each party will select a competent appraiser. The
two appraisers will select an umpire. The appraisers will state separately the actual cash value
and the amount of loss. If they fail to agree they will submit their differences to the Empire.  A
decision agreed to by any two will be binding. Each party will pay its chosen appraiser and
share the expense of the Empire equally. Neither we nor you waive any rights under this policy
by agreeing to an appraisal.*"

    <u>Since Appraisal Arbitration is triggered by "If we and you do not agree on the amount of
loss", I am no longer going to disagree on the amount of loss stated by USAA.</u>

    The last loss statement that I received from USAA was on March 31, 2020 which stated
a loss amount of $10,090.05, and I will agree on this valuation.  Please verify with your client
that this is the last loss amount that they provided.  If they have a different amount, please
provide the amount, the date they made the offer, and a copy of the offer and I will agree to that
valuation and we can dispense with this Appraisal Arbitration issue.

    Based upon your Judgment on the Pleading filings, the Appraisal Arbitration was the
only issue that USAA claimed was not in compliance.  Now that I am agreeing to the "amount of
loss" I am in full compliance with all the terms of the policy and according to Part E – GENERAL
PROVISIONS, - LEGAL ACTION AGAINST US, Paragraph A.  "*No legal action may be brought
against us until there has been full compliance with all the terms of this policy*", I can move

forward with legal action against USAA, its executives, and USAA's employees.  (Since USAA defines "us" in DEFINITIONS – Paragraph B.  *"We", "us", and "our" refer to the company providing this insurance"*, it is my position that I could take action against USAA executives and employees as individuals with or without settling the Appraisal Arbitration issue.)

Regards,

John Sigler

# EXHIBIT B

## Dallas Moring News Articles

Plaintiff   John W. Sigler:                                      8:22-cv-2325-CJC-JDE
FIRST AMENDED COMPLAINT

ttps://de ton c.c    /news/the_watchdog/t e-watchdog-what-does-a-w istleblower-wh -handled-insurance-claims-for-usaa-admit-under-oath/article_0b44a30b-6732-5ab4-9af8-0c5705575885.html

# The Watchdog: What does a whistleblower who handled insurance claims for USAA admit under oath?

By Dave Lieber The Dallas Morning News
Jun 1, 2020



Dave Lieber



Lawyer lames Willis (left) is representing Larry and Shirley Reyes of Deer Park in a lawsuit against USAA. USAA has refused to pay for most repairs needed after Hurricane Harvey — and Larry Reyes is suing them.

Doug McNee/For the Dallas Morning News

I couldn't figure out why I was hearing complaints from several USAA–insured homeowners about the San Antonio–based company not paying storm damage claims.

This is the company with a reputation for helping active and retired military members and their families. This is the company that advertises in TV commercials that it prides itself on "doing right by our members."

That may not have happened in the case of Larry and Shirley Reyes of Deer Park, according to court records I've studied. What makes this case unusual is that the field adjuster who climbed on the Reyeses' roof after Hurricane Harvey has turned whistleblower against her old bosses in a lawsuit.

Surprise whistleblower Jennifer "Jenny" Posas told the Watchdog that she hopes if the truth comes out, state laws governing homeowners' insurance companies will become stronger to protect consumers.

Despite Posas' initial recommendations in favor of paying the family, a supervisor encouraged her to change her findings, she testified.

USAA declined to pay for most of the Reyeses' losses from Hurricane Harvey, including roof replacement, damage from a fallen front yard tree, interior water damage from roof leaks and incidentals such as a hotel stay.

Shirley Reyes couldn't get into their house because she uses a ramp and the fallen tree blocked the entry, said their lawyer, James Willis of Houston.

Larry Reyes told me, "According to commercials I see on TV and how good they talk, I thought they'd stand behind us. But they didn't. It's not at all what I thought."

## Insurance whistleblowers are rare

This is the third such USAA claims denial I've studied since I reported in November how USAA's Better Business Bureau grade dropped from 'A' to 'F.' Since then, the BBB lifted that grade back up to a B+.

In part one of this new Watchdog series, I focused on a Georgetown couple who won a jury trial against USAA this year for a similar storm claim denial.

In the Reyeses' lawsuit, neither side expected the whistleblower, a former field adjuster for Allcat Claims Service of Boerne, to throw such a wrench into the works. USAA lawyers even listed Posas in court papers as a friendly witness.

USAA has hired Allcat for nearly 20 years to help with major storm claims, according to an Allcat video on YouTube.

Whistleblower Posas worked for Allcat as an independent adjuster for a year, handling 300 homeowners' claims in the field on behalf of USAA, she told me.

In her sworn statement, she testified under oath that the Reyes family deserved to be compensated.

The Reyeses' lawyer argues that USAA should have paid the family $33,000 for a new roof, repairs, hotel and living expenses and tree removal.

But Posas' Allcat supervisor instead helped her write a report that would give the couple only $2,900 for all damages, well under the Reyes' deductible.

The couple sued. The case is scheduled for trial in October in a Harris County court. The whistleblower will be a star witness.

## USAA 'passionately committed'

I asked USAA, its lawyers and Allcat to speak to me about the case, but all declined.

In court papers filed in the case, USAA lawyers deny the Reyeses' claims and argue that the couple didn't prove losses were covered under the family's policy, meaning its obligations were fulfilled.

USAA spokesman Richard Johnson said he couldn't talk about the case because of "privacy restrictions." His company will prove that its decisions were "appropriate," he said.

He added, "We are passionately committed to serving members, settling millions of claims each year and have a nearly 96% member retention rate."

## 'The way he was taught'

Posas, the whistleblower, testified that at first she recommended paying for a new roof, tree removal and interior repairs.

Her Allcat supervisor, Dale Shaffer, told her he believed the tree was cut down before the storm, the roof didn't need replacement and any interior damage came from flooding (not covered by USAA insurance) rather than from a leaky roof.

"He expressed his own opinion to me and asked me to change my estimate," she said. "And I ended up changing my estimate. … I think that he took advantage of the idea that I did not have the extensive experience that he had and assumed that he could convince me that his opinions were more accurate than mine."

Her training for the job lasted under two hours, she said, with most of it in front of a computer.

Shaffer, Allcat's catastrophe claims manager, didn't respond to my phone call and email request for comment.

Posas told me she didn't believe Shaffer purposely did anything wrong.

"That's the way he was taught." she said. "Those were the guidelines he was given, and he was doing the job he was ordered to do."

It was different for her, she said. "I couldn't turn a blind eye, and I surely wasn't going to lie. I had no intention of being a whistleblower. My only intention was then and still is to do what was right. Plain and simple. ... I refuse to stand by when something is utterly wrong."

Willis, the Reyeses' lawyer, introduced evidence of two different incidents of tornadic activity in the neighborhood, along with satellite photos showing the tree was still standing before the August 2017 hurricane.

When I told the whistleblower that three years later there still are buckets collecting rainwater in the Reyes house, she said: "I can't believe that. That is so sad. That's why I'm doing this."

---

ABOUT THIS COLUMN

The Watchdog Desk at *The Dallas Morning News* works for you to shine light on questionable practices in business and government. We welcome your story ideas and tips.

**Contact The Watchdog**

**Email:** watchdog@dallasnews.com

**Call:** 214-977-2952

**Write:** Dave Lieber, P.O. Box 655237, Dallas, TX 75265

THIS IS MEMBER-EXCLUSIVE CONTENT ⓘ

OPINION

# What happened to USAA? Why is it denying some storm claims that should be slam dunks for homeowners?

In the first of a two-part series, The Watchdog digs deeper into the pro-military insurance company.





Granules from failing shingles that collect in roof gutters are an indicator of a roof that may need replacement. A lawsuit raises questions about USAA's promised commitment to its customers. (Kara Dry / Special Contributor)

   

By Dave Lieber
4:00 PM on Jul 9, 2020 CDT

 **We're loading your content, stay tuned!**

Ever since I first wrote about USAA Insurance's mysterious drop in its Better Business Bureau grade from "A" to "F" eight months ago, The Watchdog heard lots of rumors from folks about why the company faced so many unsolved complaints. But the information wasn't solid enough to share here.

It is now.

The good news is that San Antonio-based USAA lifted its rating back up to a B+. Maybe my original story helped push it along.

The bad news is I've found a couple of Texas court cases that help The Watchdog get closer to the truth about what's going on with the homeowners insurance side of this vaunted, century-old company.

---



# Watchdog Alert

Are you a taxpayer in Texas? The Watchdog has your back.

**EMAIL ADDRESS**

| Enter your email address | SUBMIT |

By signing up you agree to our Terms of Service and Privacy Policy

USAA vows to protect active military, veterans and their families. Maybe so, but the outside claims adjuster company USAA hires after severe storms — Allcat Claims Service of Boerne — sometimes allows its office supervisors to overrule field adjusters in what should be slam-dunk homeowner claims for storm damage repairs, according to court records in two active cases I've studied.

Allcat and USAA sometimes come up with silly excuses not to pay, court records show.

Allcat supervisors back in the home office can veto a field adjuster's findings and drastically lower a payout. When customers balk, USAA sometimes spends money on legal fees that cost more than the initial claim.

USAA declined to comment on specifics involving its customers, citing privacy reasons. Allcat officials also didn't respond to my request.

## Roof vandalism?

In this first of a two-part Watchdog series, let's look at the case of Dr. John Kelley and his wife, Sharon. Until now, the retired Navy flight surgeon, who served stateside during the Vietnam War era, and his wife were perfect USAA customers.

For 53 years, Kelley, 80, and his wife, 71, paid their USAA premiums on time. When a 2018 hailstorm rocked their Georgetown neighborhood, the Kelleys filed a roof claim.

Gair Allie, the field adjuster from Allcat working on behalf of USAA, found wind damage on their roof and even wrote the word "Wind" in chalk on shingles, a photo shows. The adjuster told them they'd get a new roof, the Kelleys said.

The field adjuster marked "Wind" in chalk on the Kelley's roof to indicate damage covered by...

The field adjuster marked "Wind" in chalk on the Kelley's roof to indicate damage covered by insurance, but USAA reps later denied the claim. (Courtesy of Kelley versus USAA court records)

Allie, who did not return my call, wrote up a report recommending that USAA pay $19,800 for a new roof. Kelley found a roofer he wanted to hire.

Then something unexpected happened. USAA launched a fraud investigation into the Kelleys, complete with a background check, court records show. USAA also investigated, then cleared the roofing company of fraud.

Dr. John Kelley and his wife, Sharon, sued USAA -- and won. (Courtesy of Shannon Loyd)

The Kelleys' background report showed the family's history, including cars it previously owned, their relatives and other elements found in a typical background check, Kelley told me.

USAA informed the couple that it wouldn't pay the claim because the Kelleys' roof had been damaged not by wind but by what the company called "roof vandalism."

"They're arguing the roofer must have done damage to it," Kelley explains. But
that's not what the adjuster originally concluded.

Yet a follow-up report from Allcat shows that adjuster Allie dropped the
recommended Kelley payment from $19,800 all the way down to $1,200, well
under the Kelleys' deductible.

The couple sued in Williamson County. Their lawyer, Shannon E. Loyd of San
Antonio, argued that even if the damage had come from vandalism and not wind,
the policy covered that, too.

## File police report?

USAA spokesman Richard Johnson said the company cannot comment "due to
privacy restrictions." But litigation shows that the company acted appropriately,
he said.

"We are passionately committed to serving members, settling millions of claims
each year and have a nearly 96% member retention rate," he said.

USAA denied the Kelleys' lawsuit claims in court papers, arguing that it couldn't
pay for a new roof unless Kelley filed a police report for vandalism. Kelley refused
because experts who looked at his roof found hail damage from wind, not
vandalism.

Kelley told me that he knew filing a false police report is a crime under Texas law. Besides, other houses on his street got new roofs after the same storm without these kinds of problems, he said.

As an alternative, USAA told Kelley he could hire an engineer at Kelley's expense to refute their findings.

This case went to a five-day trial. Kelley says the legal fees must have been high for USAA because he sometimes counted what he believed to be as many as five or six USAA attorneys in the courtroom.

"Over a $19,000 roof replacement!" Kelley marveled.

A jury of 12 people, including three USAA members, ruled in favor of the Kelleys. The couple was awarded $143,000 in damages and attorney fees.

The final order by the judge hasn't been signed, so the case is technically still open. Kelley said he expects USAA to appeal. If so, that's throwing more good money after bad.

Lawyer Shannon Loyd won a jury trial against USAA homeowners insurance. (Courtesy of Shannon Loyd)

## USAA cites privacy concerns

Allcat, along with USAA's lawyers, didn't return my requests to speak with them.

Meanwhile, Kelley, tired of waiting, paid $17,000 of his own money to put a new roof on the house.

"I don't know what has changed about USAA," Kelley said. "It's like they decided not to pay a claim and see how far they could take it."

**Coming next**: In part two, I'll introduce you to a whistleblower, a former Allcat Claims Service field adjuster. In a sworn statement, she reveals how Allcat and USAA can unfairly lower payouts to customers who deserve far more.

Read the story about the USAA whistleblower here.

**Become a citizen of Watchdog Nation. Join Dave Lieber and learn to be a super-consumer.**

**Subscribe: PLEASE support The Watchdog's brand of straightforward journalism designed to save you time, money and aggravation.** *Treat yourself to a DallasNews.com full digital subscription for only $2.99 a week and* **NEVER MISS** The Watchdog's **TWO** reports each week. Sign up here.

Read Dave Lieber's series on property taxes.

Read Dave Lieber's story on how to shop for electricity.

Read Dave Lieber's story on how to search for a good builder or roofer.

**Watchdog newsletter:** Sign up for The Watchdog's FREE weekly newsletter to keep up: click here.

**Watchdog story page:** You can't afford to miss The Watchdog. Follow our latest reporting always at **The Watchdog** home page.

**Do you use Facebook?** Connect with The Watchdog on our Facebook group. Search for "Dallas News Watchdog Posse."

*The Dallas Morning News* Watchdog column is the <u>2019 winner</u> of the top prize
for column writing from the National Society of Newspaper Columnists. The
contest judge called his winning entries "models of suspenseful storytelling and
public service."

## Read his winning columns:

<u>\* Helping the widow of Officer J.D. Tippit, the Dallas police officer killed by Lee
Harvey Oswald, get buried beside her late husband</u>

<u>\* Helping a waitress who was harmed by an unscrupulous used car dealer</u>

   

 <u>Dave Lieber</u>, The Watchdog investigative columnist. DAVE LIEBER is "The
Watchdog" investigative columnist for The Dallas Morning News who fights for his
readers and exposes bad practices in business and government.

 <u>davelieber@dallasnews.com</u>   f <u>/dave.lieber</u>    <u>@DaveLieber</u>

in <u>https://www.linkedin.com/in/davelieber1/</u>

OPINION

# Does USAA Insurance knock hailstorm roofing claims down and by doing so, hurt its military members?

The Watchdog looks at how one "independent" insurance adjuster keeps getting overruled by his bosses. He tries to give vets a new roof, but a fight ensues.





By <u>Dave Lieber</u>
5:48 AM on Jul 23, 2021 CDT

USAA Insurance promises to loyally serve its veteran members and their families. But that may not always be so according to a lawsuit, Kraig Vandewalle vs. USAA.

Thousands of lawsuits are filed against insurance companies in Texas every year. The Watchdog examined one to study a process used to deny claims.

Vandewalle is a retired Air Force colonel from San Antonio. According to his lawsuit, USAA declined to pay for a replacement roof after a hailstorm.

Clare P. Rodgers, his lawyer, received during pre-trial discovery a cache of internal emails from USAA and Allcat Claims Service of Boerne, a company of outside independent adjusters who inspect roof claims for USAA.

The emails show that Allcat adjuster Gair Allie inspected Vandewalle's roof and scored it for replacement. But then a vice president of claims at Allcat, Joel Love, worked with USAA to force adjuster Allie to change his decision.

Love then asked that his name be removed from the file to keep his role hidden, a no-no in the insurance industry.

In a deposition, Allie appeared surprised to learn that the opposing side had emails showing these details. Allie said he had never seen them, and no one told him opposing counsel had them.

"It's obvious to me that they are throwing Gair under the bus," Vandewalle lawyer Rodgers told me.

This is the second time I've come across a legal case where adjuster Allie inspects a roof and then has his expert decision overturned by superiors.

Allie declined to talk to me, saying: "Unfortunately, this case is still under litigation and I am not able to discuss at this time. I am sure you understand."

I asked USAA about this plus other cases I wrote about in part one of this series, but USAA communications director Rebekah Nelson would only say: "USAA will not speak to specific issues due to member privacy or pending litigation. However, USAA handles millions of claims every year with a high satisfaction rate and remains committed to serving its membership." There was no further comment.

Joel Love and Allcat officials did not answer my requests for comment.

## Estimate overturned

In the first instance involving adjuster Allie, he inspected the Georgetown home of retired Navy flight surgeon John Kelley, a 53-year client of USAA. He told Kelley he found wind damage and he'd write it up for a new roof.

But that estimate was overturned. Allie dropped the roof payment from $19,800 all the way down to $1,200, well under Kelley's deductible.

Kelley sued and the case went to a 5-day trial, and Kelley won. The jury awarded $143,000 in damages and attorney fees. Before USAA could appeal, the couple reached a confidential settlement with USAA.

## 'Delete the reference'

In the second more recent instance, Allie testified under oath last month in a deposition in the Vandewalle case.

After Vandewalle's lawyer learned that Love, the Allcat claims vice president, in conjunction with USAA, had secretly worked to lower the claim, she amended the

lawsuit to include Allcat and Love. She also added charges of fraud and
conspiracy.

Allie testified that he was told to change his original opinion, which first was for a
smaller estimate, but when he learned that matching clay tiles were no longer
available, he upgraded his recommendation to a full roof replacement.

That didn't fly with his superiors.

Lawyer Rodgers, who questioned Allie, told me, "He was given a word-for-word
statement of what his conclusion should be. ... They were manipulating it to make
it look like he [Allie] was in agreement with the ultimate decision made by
USAA."

Love also wanted his name deleted from the activity log to hide any conversations
he had with management.

"Delete the reference" to him, Love wrote in an email to another Allcat official.

The official had written to Love: "Gair Allie resubmitted the file. The file seems to
follow your directives."

Allie testified that he probably deleted Love's name from the activity log, but he
couldn't recall doing it.

In another email, Love wrote that he reviewed the file with USAA.

A USAA claims adjuster wrote to Love: "We would not owe to replace the entire
roofing system. We can replace a slope and repair the tiles." That would have
been a lot less expensive.

The repair estimates bounced from $10,000 to $70,000 back to $11,000, Rodgers
said.

Meanwhile, the retired colonel's home is still damaged three years after the
storm. There are 200 broken tiles, representing about a third of the entire roof.

Independent insurance adjusters don't have to capitulate, says Mike Martin of
Azle, who worked as an Allcat adjuster until he resigned.

He said: "I've turned in claims where desk reviewers say, 'I need you to take this
off and that off.' And I say, 'No, I'm not going to do it.' I put eyes and hands on
everybody's house, and the thing is, they didn't."

They may call themselves "independent insurance adjusters."

But it appears they're not always independent.

**NOTE:** Read part one of this series.


## Become a citizen of Watchdog Nation.

**Join Dave Lieber and learn to be a super-consumer.**

**Watchdog newsletter:** Sign up for The Watchdog's FREE weekly newsletter to
keep up: click here.

**Watch this free training video from Dave:**
https://youtu.be/uhUEUCNKGjc

**Subscribe: PLEASE support The Watchdog's brand of straightforward
journalism designed to save you time, money and aggravation.** *Treat
yourself to a digital subscription (and make him look good!) by using the special
Watchdog code:* https://www.dallasnews.com/subscribe/watchdog-1

**Watchdog Home Page:** You can't afford to miss The Watchdog's two reports
each week. Follow our latest reporting always at **The Watchdog** home page.

**Do you use Facebook?** Connect with The Watchdog on our Facebook group.
Search for "Dallas News Watchdog Posse."

*The Dallas Morning News* Watchdog column is the 2019 winner of the top prize
for column writing from the National Society of Newspaper Columnists. The

contest judge called his winning entries "models of suspenseful storytelling and public service."

## Read his winning columns:

\* Helping the widow of Officer J.D. Tippit, the Dallas police officer killed by Lee Harvey Oswald, get buried beside her late husband

\* Helping a waitress who was harmed by an unscrupulous used car dealer



 Dave Lieber, The Watchdog investigative columnist. Dave has written a hard-hitting newspaper column in Dallas/Fort Worth since 1993. His work appears twice a week. His goal is to save readers time, money and aggravation. In 2019, Dave won top prize in America's largest column-writing contest. The contest judge called his winning entries "models of suspenseful storytelling and public service."

✉ davelieber@dallasnews.com    f /dave.lieber    🐦 @DaveLieber

1

2

**EXHIBIT C**

3

4

**Kelley Second Amended Complaint and Judgment**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff   John W. Sigler:                                           8:22-cv-2325-CJC-JDE
FIRST AMENDED COMPLAINT

Filed for Record
Lisa David, District Clerk
Williamson County, Texas
Tammy Clinton

CAUSE NO. 19-0314-C26

| | | |
|---|---|---|
| DR. JOHN L. KELLEY AND SHARON K. KELLEY | § § § | IN THE DISTRICT COURT |
| | § | 26th JUDICIAL DISTRICT |
| V. | § § | |
| UNITED SERVICES AUTOMOBILE ASSOCIATION | § § | WILLIAMSON COUNTY, TEXAS |

## PLAINTIFFS' SECOND AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs DR. JOHN L. KELLEY and SHARON K. KELLEY, file this Second Amended Petition against UNITED SERVICES AUTOMOBILE ASSOCIATION, erroneously sued as USAA Casualty Insurance Company f/k/a United Services Automobile Association (referred to herein as "USAA") and in support thereof would show as follows:

## I.
## DISCOVERY CONTROL PLAN LEVEL

Plaintiffs intend for discovery to be conducted under Level 3 of Rule 190 of the Texas Rules of Civil Procedure. This case involves complex issues and will require extensive discovery given Defendant accused Plaintiffs of fraud even in its latest pleading with this Court. Therefore, Plaintiffs will ask the Court to order that discovery be conducted in accordance with a discovery control plan tailored to the particular circumstances of this suit.

## II.
## PARTIES AND SERVICE

Plaintiffs resides in Williamson County, Texas.

USAA is in the business of insurance in the State of Texas. The insurance business done by USAA in Texas includes, but is not limited to, the following:

- The making and issuing of contracts of insurance with the Plaintiffs;

Copy from re:SearchTX

Envelope# 35159849

- The taking or receiving of application for insurance, including the Plaintiffs' application for insurance;

- The receiving or collection of premiums, commissions, membership fees, assessments, dues or other consideration for any insurance or any part thereof, including any such consideration or payments from the Plaintiffs; and

- The issuance or delivery of contracts of insurance to residents of this state or a person authorized to do business in this state, including the Plaintiffs.

Defendant has been served and has filed an Answer.

## III.
## JURISDICTION AND VENUE

Venue is appropriate in Williamson County, Texas because all or part of the conduct giving rise to the causes of action were committed in Williamson County, Texas and Plaintiffs and property which is the subject of this suit are located in Williamson County, Texas. Accordingly, venue is proper pursuant to Texas Civil Practice & Remedies Code §15.002.

## IV.
## BACKGROUND FACTS

Plaintiffs are the owners of an Insurance Policy (hereinafter referred to as "the Policy"), which was issued by USAA. Plaintiffs owned the insured Property which is located at 105 Oak Meadow Drive, Georgetown, Texas 78628 (hereinafter collectively referred to as "the Property") both at the time of the loss and at the time they replaced their roof following the loss. USAA sold the Policy insuring the Property to Plaintiffs.

During the terms of said Policy, Plaintiffs' Property sustained covered losses when hail/wind and resulting water damaged the Property, and Plaintiffs timely reported same to USAA pursuant to the terms of the Policy. Plaintiffs asked that USAA cover the cost of repairs to the Property pursuant to the Policy. USAA and its adjusters failed to conduct a full, fair and reasonable investigation of Plaintiffs' covered damages. Defendant has kept and has in its

2

Copy from re:SearchTX

possession a claim file which details the Plaintiffs' claim and its investigation, adjustment and subsequent underpayment of the claim.

The undersigned originally sent a letter of representation and request for documents on December 3, 2018, for which there is evidence it was received by Lindsay Kelley. Because there was no response, the undersigned sent a second notice letter on December 19, 2018. Through adjuster Kelley, it was requested that Defendant provide, among other things, photos, estimates and reports created as a result of Defendant's claim investigation. However, Defendant refused the request claiming its photos and reports of the condition Plaintiffs' property as a result of an insurance claim investigation are work product. Importantly, Plaintiffs provided the statutorily-required pre-suit notice to Defendant and have evidence Defendant received the notice. Defendant never asked for another inspection or took any other action pre-suit that the statute allows to avoid a lawsuit.

USAA assigned the claim to Gair Allie ("Allie") and despite being given authority and instructions to inspect, adjust and evaluate the claim, Allie on behalf of Defendant failed to properly inspect the property and address all of the covered damages. The acts, representations and omissions of Allie are also attributed to Defendant.

Allie, after inspecting Plaintiffs' roof, assured them that the roof had covered damage, and they would be paid to replace the roof. He represented that he had worked for USAA for 20 years, and it always followed his recommendations. Plaintiffs' roofer witnessed the statements. Later, USAA informed Plaintiffs it would not pay for the damages because the damages were "man-made." Even if the damages were man-made, vandalism is covered by Plaintiffs' policy. USAA has yet to produce any evidence that Plaintiffs caused the damages to their roof; yet, it failed to pay for the covered loss. Plaintiffs even requested that USAA pay for the roof under vandalism if

Copy from re:SearchTX

that was its assessment, but neither Mr. Allie nor anyone from USAA ever responded. Instead, USAA insisted that Plaintiffs file a police report about vandalism even though they had no independent knowledge of any vandalism and their experts agree the damage was caused by hail. Plaintiffs were put in the position by Defendant to either file what they believed was a false police report or have their claim denied. Plaintiff John Kelley, a retired veteran, did not wish to commit a possible crime. By information and belief, falsifying a police report is a violation of Section 37.08 of Texas law, subject to criminal penalties. If convicted, an offender could face up to 180 days in jail and fines up to $2,000.

Plaintiffs were then forced to retain the undersigned. Plaintiffs' experts have determined the roof was damaged by hail, not by vandalism.

As well, based on an estimate USAA sent *after* it received the undersigned's notice of representation, it is clear that Mr. Allie completed his inspection on October 11, 2018 but did not complete an estimate until December 2, 2018. This delay clearly violates Chapter 542.

Mr. Allie, on behalf of USAA, was tasked with the responsibility of conducting a thorough, prompt and reasonable investigation of Plaintiffs' claims, including determining the cause of and then quantifying the damage done to Plaintiffs' Property. Defendant failed to properly adjust Plaintiffs' claim and has made many material representations about coverage and damages.

Defendant also set out to bias its engineer before he ever inspected Plaintiffs' property. USAA made a pretextual opinion about vandalism and then set out to prove that opinion, rather than open-mindedly looking for the cause of the loss.

As well, Defendant has admitted that it believes the adjuster it sent to investigate Plaintiffs' claim, Allie, was not competent, capable or knowlegeable enough to give a causation opinion on which Defendant could rely. Yet Defendant relied on his opinions notwithstanding.

Copy from re:SearchTX

In summary, Allie and USAA failed to adequately investigate the claim, failed to respond to requests for information from Plaintiffs, failed to timely evaluate the claim and communicate with Plaintiffs, and failed to timely estimate the claim.

As detailed in the paragraphs above, USAA failed to fully investigate and adjust all damages associated with the loss, clearly conducted an outcome-oriented investigation and relied on biased experts. USAA wrongfully denied Plaintiffs' claim for full repairs to the Property, even though the Policy provided coverage for losses such as those suffered by Plaintiffs. Furthermore, USAA delayed and continues to delay in the payment for all of the covered damages to the Property.

## V.
## CAUSES OF ACTION

### A.    BREACH OF CONTRACT

Plaintiffs re-allege the foregoing paragraphs. USAA and its agents' conduct constitute a breach of the insurance contract between it and Plaintiffs. USAA's failure and/or refusal, as described above, to pay Plaintiffs adequate compensation as it is obligated to do under the terms of the Policy in question, and under the laws of the State of Texas, constitutes a breach of the insurance contract with Plaintiffs.

USAA failed to perform its contractual duty to adequately compensate Plaintiffs under the terms of its Policy. Specifically, USAA refused to pay the full proceeds of the Policy after delaying and conducting an outcome-oriented investigation, although due demand was made for proceeds to be paid in an amount sufficient to cover the damaged property, and all conditions precedent to recovery under the Policy have been carried out and accomplished by Plaintiffs. USAA's conduct constitutes a breach of the insurance contract between it and Plaintiffs.

Copy from re:SearchTX

**B.      NONCOMPLIANCE WITH TEXAS INSURANCE CODE**

**1.      UNFAIR SETTLEMENT PRACTICES**

Plaintiffs re-allege the foregoing paragraphs. Texas law is clear that insurance companies and anyone engaged in the business of insurance by investigating and adjusting a claim must conduct a reasonable, full and fair claim investigation. USAA violated Chapter 541 of the Texas Insurance Code, in one or more of the following particulars:

**§ 541.051. Misrepresentation regarding Policies.**

- Making, issuing, circulating, or causing to be made, issued or circulated a statement misrepresenting the terms of a policy; and
- Making, issuing, circulating, or causing to be made, issued or circulated a statement misrepresenting the benefits of a policy.

**§ 541.060. Unfair Settlement Practices.**

Insurance Code chapter 541, section 541.060 by, among other things:

- misrepresenting one or more material facts and/or policy provisions relating to coverage;
- making misrepresentations of law;
- failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which their liability has become reasonably clear;
- failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim under one portion of a policy with respect to which liability has become reasonably clear in order to influence Plaintiffs to settle its claim with respect to another portion of the policy;
- failing to promptly provide a reasonable explanation of the basis in law or fact for the denial of Plaintiffs' claim;
- refusing to affirm or deny coverage within a reasonable time;
- refusing to conduct a reasonable investigation;
- ignoring damage known to be covered by the Policies;
- relying on biased experts; and/or
- conducting an outcome-oriented investigation in order to provide a basis to underpay the claim.

**§ 541.061. Misrepresentation of Insurance Policy.**

- Making an untrue statement of material fact;

6

Copy from re:SearchTX

- Failing to state a material fact necessary to make other statements made not misleading;
- Making a misleading statement; and
- Failing to disclose a material matter of law.

## 2.    THE PROMPT PAYMENT OF CLAIMS

Plaintiffs re-allege the foregoing paragraphs. USAA's conduct constitutes multiple violations of the Texas Insurance Code, Prompt Payment of Claims. All violations made under this article are made actionable by TEX. INS. CODE §542.060.

USAA failed to meet its obligations under the Texas Insurance Code regarding timely acknowledging Plaintiffs' claim, beginning an investigation of Plaintiffs' claim, and requesting all information reasonably necessary to investigate Plaintiffs' claim within the statutorily mandated time of receiving notice of Plaintiffs' claim. Its conduct constitutes a violation of the Texas Insurance Code, Prompt Payment of Claims. TEX. INS. CODE §542.055.

Further, USAA failed to accept or deny Plaintiffs' full and entire claim within the statutorily-mandated time of receiving all necessary information. Their conduct constitutes a violation of the Texas Insurance Code, Prompt Payment of Claims. TEX. INS. CODE §542.056.

USAA failed to timely pay the claim. TEX. INS. CODE §542.057.

USAA failed to meet its obligations under the Texas Insurance Code regarding payment of claim without delay. Specifically, they have delayed full payment of Plaintiffs' claim and, to date, Plaintiffs have not received full payment for the covered losses. USAA's conduct constitutes a violation of the Texas Insurance Code, Prompt Payment of Claims. TEX. INS. CODE §542.058.

Because of USAA's wrongful acts and omissions, Plaintiffs were forced to retain the professional services of the attorney and law firm who is representing them with respect to these causes of action.

Copy from re:SearchTX

**C.     BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

Plaintiffs re-allege the foregoing paragraphs. USAA's conduct constitutes a breach of the common law duty of good faith and fair dealing owed to the insureds pursuant to insurance contracts.

From and after the time Plaintiffs' claim was presented to USAA, its liability to pay the full claim in accordance with the terms of the Policy was reasonably clear. However, it has refused to pay Plaintiffs in full, despite there being no basis whatsoever upon which a reasonable insurance company would have relied to deny the full payment. USAA's conduct constitutes a breach of the common law duty of good faith and fair dealing.

Further, USAA's failure, as described above, to adequately and reasonably investigate and evaluate Plaintiffs' claim, although at that time it knew or should have known by the exercise of reasonable diligence that its liability was reasonably clear, constitutes a breach of the duty of good faith and fair dealing.

## VI.
## KNOWLEDGE

Each of the acts described above, together and singularly, was done "knowingly" by Defendant as that term is used in the Texas Insurance Code and was a producing cause of Plaintiffs' damages described herein.

## VII.
## DAMAGES

Plaintiffs would show that all of the aforementioned acts, taken together or singularly, constitute the proximate and producing causes of the damages sustained by Plaintiffs.

As previously mentioned, the damages caused by the covered losses have not been properly addressed or repaired in the months since the loss occurred, causing further damage to the

8

Copy from re:SearchTX

Property, and causing undue hardship and burden to Plaintiffs. These damages are a direct result of Defendant's mishandling of Plaintiffs' claim in violation of the laws set forth above.

For breach of contract, Plaintiffs are entitled to regain the benefit of the bargain, which is the amount of the claim, together with attorney's fees.

For noncompliance with the Texas Insurance Code, Unfair Settlement Practices, Plaintiffs are entitled to actual damages, which include the loss of the benefits that should have been paid pursuant to the policy, court costs, and attorney's fees. For knowing conduct of the acts described above, Plaintiffs ask for three times the actual damages, as well as damages for mental anguish. TEX. INS. CODE §541.152.

For noncompliance with the Texas Insurance Code, Prompt Payment of Claims, Plaintiffs are entitled to the amount of the claim, as well as five percent added to the interest rate determined under Section 304.003, Finance Code, interest calculated per annum, on the amount of such claim as damages, together with attorney's fees if a jury determines the cause of loss is hail/wind. TEX. INS. CODE §542A.060.

In the alternative, if a jury determines that the cause of the damages is vandalism, for noncompliance with the Texas Insurance Code, Prompt Payment of Claims, Plaintiffs are entitled to the amount of the claim, as well as eighteen (18) percent interest per annum on the amount of such claim as damages, together with attorney's fees. TEX. INS. CODE §542.060.

For breach of the common law duty of good faith and fair dealing, Plaintiffs are entitled to compensatory damages, including all forms of loss resulting from the insurer's breach of duty, such as additional costs, economic hardship, losses due to nonpayment of the amount the insurer owed, and exemplary damages.

For the prosecution and collection of this claim, Plaintiffs have been compelled to

Copy from re:SearchTX

engage the services of the attorney whose name is subscribed to this pleading. Therefore, Plaintiffs are entitled to recover a sum for the reasonable and necessary services of Plaintiffs' attorney in the preparation and trial of this action, including any appeals to the Court of Appeals and/or the Supreme Court of Texas.

**VIII.**

In addition, as to any exclusion, condition, or defense pled by Defendant, Plaintiffs would show that:

The clear and unambiguous language of the policy provides coverage for damage to the Property caused by losses made the basis of Plaintiffs' claim, including the cost of access to fix the damages;

In the alternative, any other construction of the language of the policy is void as against public policy;

Any other construction and its use by USAA violate the Texas Insurance Code section 541 et. seq. and is void as against public policy;

Any other construction is otherwise void as against public policy, illegal, and violates state law and administrative rule and regulation.

In the alternative, should the Court find any ambiguity in the policy, the rules of construction of such policies mandate the construction and interpretation urged by Plaintiffs;

In the alternative, Defendant is judicially, administratively, or equitably estopped from denying Plaintiffs' construction of the policy coverage at issue;

In the alternative, to the extent that the wording of such policy does not reflect the true intent of all parties thereto, Plaintiffs plead the doctrine of mutual mistake requiring information.

10

Copy from re:SearchTX

## IX.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that Defendant be cited to appear and answer herein. Plaintiffs further request that, on final hearing, Plaintiffs have judgment against Defendant for an amount, deemed to be just and fair by the jury, which will be a sum within the jurisdictional limits of this Court.  FOR THE COURT:  Plaintiffs are forced to state a range amount of damages sought although Plaintiffs believe that the amount of damages is solely for the jury to determine.  However, because Plaintiffs must state a range of damages, Plaintiffs plead that the damages are $100,000 or less. Plaintiffs further plead for costs of suit; for interest on the judgment; for pre-judgment interest; and, for such other and further relief, in law or in equity, either general or special, including the non-monetary relief of declaratory judgment against the Defendant, to which Plaintiffs may be justly entitled.

Respectfully submitted,

THE LOYD LAW FIRM, P.L.L.C.
12703 Spectrum Drive, Suite 201
San Antonio, Texas 78249
Telephone: (210) 775-1424
Facsimile: (210) 775-1410
Electronic Mail: shannon@theloydlawfirm.com

BY: _____
SHANNON E. LOYD
State Bar No. 24045706

ATTORNEY FOR PLAINTIFFS

11

Copy from re:SearchTX

Filed: 09/01/20          9:02 AM
Lisa David, District Clerk
Williamson County, Texas
By: Allen, Shannon

CAUSE NO. 19-0314-C26

| | | |
|---|---|---|
| DR. JOHN L. KELLEY AND SHARON K. KELLEY | § § § | IN THE DISTRICT COURT |
| | § | 26th JUDICIAL DISTRICT |
| V. | § | |
| | § | |
| UNITED SERVICES AUTOMOBILE ASSOCIATION | § § § | WILLIAMSON COUNTY, TEXAS |

## JUDGMENT

On the 14th day of February, 2020, came on to be heard to the above-entitled and numbered cause and Dr. John L. Kelley and Sharon K. Kelley, the Plaintiffs, appeared in person and by their attorneys of record and announced ready for trial, and United Services Automobile Association, Defendant, appeared in person and by its attorneys of record and announced ready for trial, and a jury of twelve (12) qualified jurors was duly empaneled and the case proceeded to trial.

At the conclusion of the evidence, the Court submitted the questions of fact in the case to the jury. The charge of the Court and the verdict of the jury are incorporated for all purposes by reference. Because it appears to the Court that the verdict of the jury was in favor of the Plaintiffs and against the Defendant by a 10-2 vote of the jury, judgment should be rendered on the verdict in favor of the Plaintiffs and against the Defendant as to Plaintiffs' cause of action for breach of contract and Chapter 542 of the Texas Insurance Code.

IT IS THEREFORE ORDERED that Plaintiffs Dr. John L. Kelley and Sharon K. Kelley, shall recover damages from Defendant in the amount of **$16,082.87**. This amount is calculated as follows: $13,624.80 in actual damages as awarded by the jury for the loss of unpaid policy benefits less the deductible for breach of contract; 10% prompt payment penalty on the $13,624.80 totaling $1,754.43 (one year; 105 days) for violating Section 542.057(a) of the Texas Insurance Code, calculated from December 10, 2018 to the date Judgment is entered; and prejudgment interest of

Copy from re:SearchTX

$703.64. The prejudgment interest is calculated at the rate of 5% from March 12, 2019 to March 24, 2020.

IT IS FURTHER ORDERED THAT Plaintiffs recover from Defendant attorneys' fees in the sum of **$125,000.00** for services rendered up through the trial and entry of judgment as awarded by the jury for Defendant's violation of §542.057(a) of the Texas Insurance Code. The further sum of $30,000.00 is awarded for representation in the event that an appeal to the Court of Appeals is made by Defendant but is unsuccessful. The further sum of $20,000.00 is awarded in the event that a petition for review to the Supreme Court of Texas is filed by Defendant, and the further sum of $10,000.00 is awarded at the merits briefing stage in the Supreme Court of Texas should briefing be requested.

IT IS FURTHER ORDERED that Plaintiffs, Dr. John L. Kelley and Sharon K. Kelley, shall recover from Defendant United Services Automobile Association their incurred court costs in the amount of **$2,481.15** pursuant to Texas Rules of Civil Procedure 131.

IT IS FURTHER ORDERED that the judgment here rendered shall bear interest at the rate of 5.00% from the date of judgment until paid.

All writs and processes for the enforcement and collection of this judgment or the costs of court may issue as necessary. The judgment finally disposes of all parties and claims and is appealable.

All other relief not expressly granted in this judgment is denied.

SIGNED this _____ day of 9/1/2020 _____, 2020.

9/1/2020 8:04:42 AM

_____
HONORABLE JUDGE KING

2

Copy from re:SearchTX

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT D**

**Vandewalle First Amended Complaint.**

Plaintiff    John W. Sigler:                                                8:22-cv-2325-CJC-JDE
FIRST AMENDED COMPLAINT

FILED
6/8/2021 3:04 PM
Mary Angie Garcia
Bexar County District Clerk
Accepted By: Brenda Carrillo

2citcml

**CAUSE NO. 2020CI07408**

| | | |
|---|---|---|
| KRAIG VANDEWALLE | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | 37th JUDICIAL COURT |
| | § | |
| UNITED SERVICES AUTOMOBILE | § | |
| ASSOCIATION, ALLCAT CLAIMS | § | BEXAR COUNTY, |
| SERVICES LLC, and JOEL LOVE | § | TEXAS |

## PLAINTIFF'S FIRST AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW Comes Kraig Vandewalle, Plaintiff herein, who files this, his First Amended Petition against the Defendants, United Services Automobile Association, AllCat Claims Services LLC, and Joel Love, hereby respectfully shows unto the Court and Jury as follows:

## I. DISCOVERY CONTROL PLAN

Plaintiff intends for discovery to be conducted under Level 2 of the Texas Rules of Civil Procedure.

## II. PARTIES

Plaintiff, Kraig Vandewalle, is an individual residing in Bexar County, Texas.

The Court has jurisdiction over Defendant, United Services Automobile Association ("USAA"), because Defendant is a domestic insurance company that operates a headquarters in Texas. Further, Defendant engages in the business of insurance in the State of Texas and Plaintiff' causes of action arise out of Defendant's business activities in the State of Texas. It can be served with citation by serving its attorney of record: Thomas Sanders, Dykema Gossett PLLC, 112 East Pecan Street, Suite 1800, San Antonio, Texas 78205.

Copy from re:SearchTX

The Court has jurisdiction over Defendant, AllCat Claims Services LLC ("AllCat") because Defendant is a domestic company that operates a headquarters in Texas.. It can be served with citation by serving its Registered Agent Phil R. Hall at 16 Cascade Caverns Road, Boerne, TX 78015.

The Court has jurisdiction over Defendant, Joel Love, because Defendant is an individual residing in Texas. He can be served with citation by serving him via registered mail at his home address: 14898 Flatten Road, San Antonio, Texas 78223.

### III. VENUE

Venue is proper in Bexar County, Texas, because all or a substantial part of the events giving rise to the lawsuit occurred in this county (*see* Tex. Civ. Prac. & Rem. Code §15.002) and the insured property that is the basis of this lawsuit is located in Bexar County, Texas. *See* Tex. Ins. Code §2210.552 and Tex. Civ. Prac. & Rem. Code §15.032 (see below). Venue is proper and mandatory in Bexar County against all the potential Defendant in this case because venue is mandatory and/or proper against at least one Defendant and all claims or actions in this case arise out of the same transaction, occurrence, or series of transaction or occurrences. *See* Tex. Civ. Prac. & Rem. Code §15.005.

### IV.  CONDITIONS PRECEDENT

All conditions precedent to recovery has been performed, waived, or have occurred.

### V. FACTS

Plaintiff is the owner of Policy number 003093689/93A issued by Defendant USAA (hereinafter referred to as the "Policy"). Plaintiff owned the insured property (hereinafter

Copy from re:SearchTX

referred to as the "Property"), which is specifically located at 22 Stratton Lane, San Antonio, Texas 78257.

Defendant USAA sold the Policy, insuring the Property that is the subject of this lawsuit, to Plaintiff. Plaintiff suffered a significant loss with respect to the Property at issue as a result of a hailstorm. Plaintiff submitted a claim to Defendant USAA for damages to the Property insured by Defendant USAA. Defendant USAA assigned claim number 003093689 to Plaintiff' claim. USAA assigned the claim to adjusting company Defendant AllCat. Defendant AllCat acted as the independent adjusting firm that evaluated and made determinations as to Plaintiff's loss. However, Defendant AllCat did not act separately from USAA but sought approval in the ultimate decision on Plaintiff's claim.

Defendant AllCat assigned the claim to adjuster Gair Allie. Mr. Allie inspected the property and made the determination, based on the scope of repair and availability of the tile, that a full roof replacement was necessary to properly repair Plaintiff's property. Mr. Allie agreed that Plaintiff's property had been damaged significantly by hail and industry standard dictated that a full replacement was necessary. However, without consulting Mr. Allie, Defendant Joel Love contacted USAA representatives to conspire to reduce Plaintiff's property settlement and lessen USAA's liability in the claim. Defendant Love had to this conversation without the input of AllCat's Adjuster and made these determinations without inspecting the roof himself. Defendant Love then directed adjuster Gair Allie to change his opinions and erase any mention of Mr. Love from the claim record so that the Plaintiff could not readily uncover this information.

Additionally, Mr. Allie has identified that this is a common practice with Defendants Allcat and Joel Love.

Copy from re:SearchTX

USAA, ALLCAT, and Joel Love were involved in a civil conspiracy to commit fraud, violate the Texas Insurance Code §541, and misrepresent the policy terms and proper repair technique to the Plaintiff.

Defendants USAA, AllCat, and Love made, issue, or caused to be made a statement misrepresenting with respect to a policy issued the benefits or advantages promised by the policy. *Texas Unfair Competition and Unfair Practices Act.* TEX. INS. CODE §541.051(1)(B).

Defendants USAA, AllCat, and Love misrepresented to Plaintiff a material fact or policy provision relating to coverage at issue. *Texas Unfair Competition and Unfair Practices Act.* TEX. INS. CODE §541.060(1).

Defendants USAA, AllCat, and Love failed to make an attempt to settle Plaintiff's claim in a fair manner, although it was or should have been aware of its liability to Plaintiff under the Policy. Defendant's conduct constitutes violations of the *Texas Unfair Competition and Unfair Practices Act.* TEX. INS. CODE §541.060(2).

Defendants USAA, AllCat and Love failed to promptly provide to Plaintiff a reasonable explanation of the basis of the policy, in relation to the facts or applicable law, for the Defendant' denial of the claim. Defendant' conduct constitutes violations of the *Texas Unfair Competition and Unfair Practices Act.* TEX. INS. CODE §541.060(3).

Defendant USAA failed to affirm or deny coverage of Plaintiff' claim within a reasonable time. Specifically, Plaintiff did not receive timely indication of acceptance or rejection regarding the full and entire claim in writing from Defendant. Defendant' conduct constitutes violations of the *Texas Unfair Competition and Unfair Practices Act.* TEX. INS. CODE §541.060(4).

Copy from re:SearchTX

Defendant USAA failed within a reasonable time to affirm or deny coverage of a claim to a policyholder; or submit a reservation of rights to a policyholder. *Texas Unfair Competition and Unfair Practices Act.* TEX. INS. CODE §541.060(4).

Defendants USAA, AllCat, and Love refused to fully compensate Plaintiff, under the terms of the Policy, even though Defendant failed to conduct a reasonable investigation. Specifically, Defendant' conduct constitutes violations of the *Texas Unfair Competition and Unfair Practices Act.* TEX. INS. CODE §541.060(7).

Defendants USAA, AllCat, and Love misrepresented an insurance policy by: (1) making an untrue statement of material fact; (2) failing to state a material fact necessary to make other statements made not misleading, considering the circumstances under which the statements were made; (3) making a statement in a manner that would mislead a reasonably produce person to a false conclusion of a material fact; (4) making a material misstatement of law; or (5) failing to disclose a matter required by law to be disclosed, including failing to make a disclosure in accordance with another provision of this code.

Defendant USAA failed to meet its obligations under the Texas Insurance Code regarding acknowledging Plaintiff's claim, beginning investigations to Plaintiff' claim and requesting all information reasonably necessary to investigate Plaintiff' claim within fifteen (15) days of receiving notice of Plaintiff' claim. Defendant's conduct constitutes violations of the *Texas Prompt Payment of Claims Act.* TEX. INS. CODE §542.055.

Defendant USAA failed to accept or deny Plaintiff's full and entire claim within fifteen (15) business days of receiving all required information. Defendant's conduct constitutes a violation of the *Texas Prompt Payment of Claims Act.* TEX. INS. CODE §542.056.

Copy from re:SearchTX

Defendant USAA failed to meet its obligations under the Texas Insurance Code regarding payment of claims without delay. Specifically, Defendant has delayed full payment of Plaintiff' claim longer than allowed and, to date; Plaintiff has not yet received full payment for the claim. Defendant's conduct constitutes a violation of the *Texas Prompt Payment of Claims Act*. TEX. INS. CODE §542.055.

From and after the time Plaintiff' claim was presented to Defendant, the liability of Defendant USAA to pay the full claim in accordance with the terms of the Policy was reasonably clear. However, Defendant has refused to pay Plaintiff in full, despite Defendant having no good faith basis on which a reasonable insurance company would have relied on to deny the full payment. Defendant' conduct constitutes breaches of the common law duty of good faith and fair dealing.

As a result of Defendant' acts and omissions, Plaintiff was forced to retain the attorney who is representing Plaintiff in this cause of action.

## VI. CAUSES OF ACTION

### A. Breach of Contract by Defendant USAA

Defendant's failure and refusal, as described above, to pay the adequate compensation as it is obligated to do under the terms of the Policy in question and under the laws of the State of Texas, constitute material breaches of the insurance contract with Plaintiff. Plaintiff has suffered damages in the form of actual damages, consequential damages and reasonable and necessary attorney's fees.

### B. Cause of Action for Violation of Section 541 by Defendants USAA, AllCat, and Joel Love

Defendants' conduct constitutes multiple violations of the *Texas Unfair Compensation and Unfair Practices Act*. TEX. INS. CODE §541.151.

Copy from re:SearchTX

Defendants' unfair practice, as described above, of misrepresenting to Plaintiff material facts relating to the coverage at issue, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE §541.051, 541.060 and 541.061.

Defendants' unfair settlement practice, as described above, of failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the claim, even though Defendant's liability under the Policy was reasonably clear, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE §541.051, 541.060 and 541.061.

Defendants' unfair settlement practice, as described above, of failing to promptly provide Plaintiff with a reasonable explanation of the basis in the Policy, in relation to the facts or applicable law, for its offer of a compromise settlement of the claim, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE ANN. §541.051, 541.060 and 541.061.

Defendants' unfair settlement practice, as described above, of refusing to pay Plaintiff' claim without conducting a reasonable investigation, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE §541.051, 541.060 and 541.061.

**C. Cause of Action for Violation of Section 542 by Defendant USAA**

Defendant's conduct constitutes multiple violations of the *Texas Prompt Payment of Claims Act*. TEX. INS. CODE §542. All violations made under this article are made actionable by TEX. INS. CODE §542.060

Defendant's failure, as described above, to acknowledge receipt of Plaintiff' claim, commence investigation of the clam, and request from Plaintiff all items,

Copy from re:SearchTX

statements, and forms that it reasonably believed would be required within the applicable time constraints, constitutes a non-payment of the claim. TEX. INS. CODE §542.055-542.060.

**D.  Cause of Action for Unfair Insurance Practices by Defendants USAA, AllCat, and Joel Love**

Defendants' conduct described above constitutes unfair insurance practices.

Plaintiff incorporates all the allegations in this petition for this cause of action against Defendants under the Texas Insurance Code. By its acts, omissions, failures, and conduct, Defendants have engaged in unfair and deceptive acts or practices in the business of insurance in violation of 541 of the Texas Insurance Code.  Such violations include, without limitation, all the conduct described in this petition plus Defendants' unreasonable delays in the investigation, adjustment, and resolution of Plaintiff' claim, Defendants' failure to pay for the proper repair of Plaintiff' real property on which liability had become reasonably clear; engaging in false, misleading and deceptive acts or practices in the business of insurance in this case; and misrepresenting to Plaintiff pertinent facts or policy provisions relating to the coverage at issue.  They further include Defendants' failure to give Plaintiff the benefit of the doubt.  Specifically, Defendants are guilty of the following unfair insurance practices:

A.     Engaging in false, misleading, and deceptive acts or practices in the business of insurance in this case;

B.     Engaging in unfair claims settlement practices;

C.     Misrepresenting to Plaintiff pertinent facts or policy provisions relating to the coverage at issue;

Copy from re:SearchTX

D.      Not attempting in good faith to effectuate a prompt, fair, and equitable

settlement of claims submitted in which liability has become reasonably

clear;

E.      Failing to affirm or deny coverage of Plaintiff's claim within a reasonable

time;

F.      Refusing to pay Plaintiff's claim without conducting a reasonable

investigation with respect to the claim; and

G.      Failing to provide promptly to a policyholder a reasonable explanation of

the basis in the insurance policy in relation to the facts or applicable law

for the denial of a claim or for the offer of a company's settlement.

Defendants have also breached the Texas Insurance Code when it breached its

duty of good faith and fair dealing.  Defendants' conduct as described herein has resulted

in Plaintiff's damages that are described in this petition.

All of the above-described acts, omissions, and failures of Defendants were done

knowingly as that term is used in the Texas Insurance Code.

**E.      Cause of Action for Civil Conspiracy by Defendants USAA, AllCat, and Joel**
**Love**

Defendants USAA, AllCat, and Joel Love conspired to accomplish to defraud the

Plaintiff of his rightful insurance benefits as well as violate the Texas Insurance Code

§541. Defendants orchestrated their conspiracy via electronic mail correspondence.

Defendants conspired to delete references to their conspiracy through internal

correspondence. Plaintiff was denied proper policy benefits and economically injured as a

result.

**F.      Cause of Action for Fraud by Defendants USAA, AllCat, and Joel Love.**

Copy from re:SearchTX

The Defendants misrepresented to Plaintiff the policy terms under Plaintiff's insurance policy, the adequate method of repair pursuant to those policy terms, and that the adjuster Gair Allie agreed with Defendants as to the proper repair of Plaintiff's property. This misrepresentation was material to Plaintiff as it concerned Plaintiff's ability to complete full and adequate repairs at his property. This representation was false at the time it was made and the Defendants knew that the representation was false. Defendants made the misrepresentation with the intent that Plaintiff act on it; Plaintiff relied on that representation and it caused injury to Plaintiff.

Defendants were aware that adjuster Gair Allie had written for a full replacement of Plaintiff's roof from damage caused by a covered storm event. Defendants conspired to misrepresent the findings of Mr. Allie as well as cover up the evidence of their misrepresentation. Defendants sent correspondence that represented to Plaintiff as well as other parties that Mr. Allie was in concert with their opinions and Plaintiff relied on that representation. Plaintiff has been denied full benefits under his policy, his property remains damaged without full repair, and he has incurred attorney's fees and expenses in the pursuit of a fair settlement of his claim.

**G.   Cause of Action for Breach of Duty of Good Faith and Fair Dealing by Defendants USAA, AllCat, and Joel Love**

Defendants' conduct described above constitutes a breach of the common law duty of good faith and fair dealing owed to insureds in insurance contracts.

Defendants' failure, as described above, to adequately and reasonably investigate and evaluate Plaintiff' claim, although at the time Defendants knew or should have known by the exercise of reasonable diligence that its liability was reasonably clear, constitutes a breach of the duty of good faith and fair dealing.

Copy from re:SearchTX

Defendants have also breached this duty by unreasonably delaying payment of Plaintiff' entire claim and by failing to settle Plaintiff' entire claim because Defendants knew or should have known that it was reasonably clear that the claim was covered. These acts, omissions, failures, and conduct of Defendants are a proximate cause of Plaintiff' damages.

### VII. KNOWLEDGE AND INTENT

Each of the acts described above, together and singularly, was done "knowingly" and "intentionally" and was a producing cause of Plaintiff' damages described herein.

### VIII.  WAIVER AND ESTOPPEL

Defendants has waived and is estopped from asserting any coverage defenses, conditions, exclusions, or exceptions to coverage not contained in any reservation of rights letter to Plaintiff.

### IX.  DAMAGES

The above described acts, omissions, failures and conduct of Defendants have caused Plaintiff' damages which include, without limitation, the cost to properly repair Plaintiff' real property, the additional cost of living for Plaintiff' family and any investigative and engineering fees incurred in the claim.  Plaintiff is also entitled to recover consequential damages from Defendants' breach of contract.  Plaintiff is also entitled to recover the amount of their claim plus an 10% per annum penalty on that claim against Defendants as damages under Section 542 of the Texas Insurance Code, plus prejudgment interest and attorneys fees.  All the damages described in this petition are within the jurisdictional limits of the Court. Plaintiff seeks only monetary relief over $200,000 but not more than $1,000,000.

### X.  ADDITIONAL DAMAGES

Copy from re:SearchTX

Defendants have also "knowingly" and "intentionally" committed deceptive trade practices and unfair insurance practices as those terms are defined in the applicable statutes.  Because of Defendants' knowing and intentional misconduct, Plaintiff is further entitled to the additional damages that are authorized by Section 541 of the Texas Insurance Code.

## XI.  EXEMPLARY DAMAGES

Defendants breach of its duty of good faith and fair dealing owed to Plaintiff was done intentionally, with a conscious indifference to the rights and welfare of Plaintiff and with "malice" as that term is defined in Chapter 41 of the Texas Civil Practice and Remedies Code.  These violations by Defendants is the type of conduct which the State of Texas protects its citizen against by the imposition of exemplary damages.  Therefore, Plaintiff seek the recovery of exemplary damages in an amount to be determined by the finder of fact that is sufficient to punish Defendants for their wrongful conduct and to set an example to deter Defendants and others similarly situated from committing similar acts in the future.

## XII.  ATTORNEYS' FEES

As a result of Defendants' conduct that is described in this petition, Plaintiff have been forced to retain the undersigned attorneys to prosecute this action and have agreed to pay reasonable attorneys' fees.  Plaintiff is entitled to recover these attorneys' fees under Chapter 38 of the Texas Civil Practices and Remedies Code, Sections 541 and 542 of the Texas Insurance Code.

## XIII. JURY DEMAND

Plaintiff assert Plaintiff's right to a trial by jury, under Texas Constitution Article 1, Section 15, and make this demand for a jury trial at least 30 days before the date this

Copy from re:SearchTX

case is set for trial, in accordance with Texas Rule of Civil Procedure 216.  Plaintiff

tenders the fee as required by Texas Government Code Section 51.604.

## XIV. REQUEST FOR DISCLOSURE

Pursuant to TEX. R. CIV. P. 194, you are requested to disclose, within fifty (50)

days of the service of this request, the information or material described in 194.2(a)-

194.2(l).

## XV. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be

cited to appear and answer herein, and that upon trial hereof, said Plaintiff have and

recover such sums as would reasonably and justly compensate her in accordance with the

rules of law and procedure, both as to actual damages, consequential damages, treble

damages under the Texas Insurance Code and Texas Deceptive Trade Practices Act, and

all punitive, additional, and exemplary damages as may be found.  In addition, Plaintiff

request the award of attorney's fees for the trial and any appeal of this case, for all costs

of court, for prejudgment and post-judgment interest as allowed by law, and for any other

and further relief, at law or in equity, to which they may show themselves to be justly

entitled.

Respectfully submitted,

PACE RODGERS LAW
310 W. SUNSET, STE. 203
SAN ANTONIO, TEXAS 78209
TELEPHONE: (210) 714-3722
FACSIMILE: (210) 579-6679
Email: crodgers@pacerodgerslaw.com

By: /s/ Clare Rodgers
CLARE P. RODGERS

Copy from re:SearchTX

1

2

### EXHIBIT E

3

**News article: "Class Action Lawsuit takes USAA to Court over Thousands of
Total Loss Claims"**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff   John W. Sigler:                                              8:22-cv-2325-CJC-JDE
FIRST AMENDED COMPLAINT

Home    Categories    About    Events    Contact    Subscribe

 

Enter keywords                    SEARCH





---

« Back                                    « PREV Article  |  NEXT Article »



# Class action lawsuit takes USAA to court over thousands of total loss claims

By Lurah Lowery on February 18, 2022
Collision Repair | Insurance | Legal

Share This:

A lawsuit filed in Texas against USAA will now move forward as a class-action case on behalf of thousands of policyholders whose vehicles were allegedly deemed total losses without their consent and, as a result, their registrations were revoked and the vehicles titled as salvage, or non-repairable, by the state.

While the case could have obvious value to consumers, it's also relevant to repairers as it could mean more vehicles to be repaired rather than salvaged.

The suit stems from a 2009 wreck Sunny Letot was involved in with a USAA policyholder who Letot claims is responsible for the collision. Before filing suit, Letot attempted to have her 1983 Mercedes Benz 300SD repaired. She argued that it was repairable and was worth more because she had been restoring it and was nearly finished.

A USAA employee used CCC Valuescope to appraise the value of the car at $2,728 and that repairing it would cost $8,859 so it was deemed a total loss, according to the suit. Letot disputed the payout and demanded $10,700 for damages. She then found out that USAA had filed an owner retained report with the Texas Department of Transportation two days after she refused to accept the valuation of her car and one day after the checks were tendered by USAA, according to the lawsuit. The report tells the state the vehicle was deemed a total loss, was kept by the owner, and will require a salvage title.

Letot asked USAA to let the DOT know her vehicle was not salvaged. USAA took no action until almost two years later when they asked the DOT if the owner retained report could be corrected "to show that the cost of repairing Letot's vehicle did not exceed its value in order to remove the 'total loss' status," according to the suit.

The trial court and the Court of Appeals for the Fifth District of Texas at Dallas initially ruled in favor of USAA, but in 2017 the appellate court vacated part of its opinion having to do with alleged violations of the state's insurance code and Letot's contract with USAA as well as conversion – that USAA took ownership of Letot's vehicle without her consent, then remanded the case back to District Court for trial. The District Court granted class certification, which the Court of Appeals affirmed on Feb. 10.

"Discovery later revealed that the procedure USAA used to handle Letot's claim was routine at USAA," the opinion states. "USAA's procedure was to file the owner retained reports immediately after it issued check to claimant, regardless of whether the claimant was given an opportunity to accept the check or whether the check was even mailed. Discovery also revealed that USAA files eighty to one hundred owner retained reports per week."

Letot's attorney, Jeffrey Tillotson, told Repairer Driven News on Thursday the opinion was the "last hurdle" that had to be cleared before the case could go to trial.

"We're anxious and prepared to proceed," he said. "They [USAA] just sent people checks for low-dollar amounts without people understanding or knowing what was really going on. This case is about addressing that practice and forcing USAA to comply with the law and ensuring that anyone who's dealing with USAA understands what they're trying to do."

Robert Owen, one of the attorneys representing USAA in the case, told RDN that, "USAA is continuing to review the Court of Appeals' opinion and is considering its further appellate options."

USAA appealed the trial court's class certification to the Fifth District Court on several arguments including that it abused its discretion by certifying an "unascertainable and overly broad" class of members including those that "lack standing." The class fails to meet the numerosity, commonality, and typicality requirements and lacks an injunctive relief claim, according to USAA. USAA also disagreed with Letot being named the class representative and contends she failed to prove that class action benefits outweigh the detriments.

The Court of Appeals overruled all of the issues USAA presented in its opinion issued last week.

"As we have explained, the focus is not on determining whether a vehicle was an actual salvage vehicle but rather on the timing of USAA filing an owner retained report. … At trial, Letot entered into evidence, without objection, nearly 2,000 owner retained reports filed by 'USAA' showing a date of filing three days or less from the 'Date of Claim Payment.' Thus, the record shows that class members are clearly ascertainable."

Auto Claim Specialists Managing Director Robert McDorman said the practice is common with all insurance companies, including USAA.

"It's a tool that they use to penalize the insured and claimants," he said. "They use this as a weapon to force them to enter into settlements."

McDorman provided two USAA total loss examples he helped resolve by having his clients invoke the appraisal clause. Third-party appraisers, one hired by USAA and the other by the policyholders, on both claims agreed that vehicles were undervalued by thousands – a 2006 Jeep Wrangler by $5,967, or 44%, and a 2015 Volkswagen Beetle by $2,346, or 16%. McDorman said both fought USAA's total loss determinations and weren't listened to so they invoked the appraisal clause and were able to have their vehicle repairs paid for by USAA.

USAA's policy, under limit of liability, he added, will deem a vehicle a total loss if the repair cost plus the salvage value is greater than the actual cash value.

"But what happens here is, like the petition says, when they use these data providers such as CCC One, Audatex, and Mitchell, they don't actually define the actual cash value. They use a complex algorithm that always favors the carrier. …If they would've defined the actual cash value, this problem wouldn't have happened."

## More information

### Appraisal experts share why consumers may want to challenge vehicle valuations

 When it comes to insurance claims, policyholders are often met with a "take it or leave it" approach from insurers on valuations of their vehicles … *Continue reading*

 Repairer Driven News

## IMAGES

*Featured image credit: William_Potter/iStock*

Share This:

Tagged with:     ACV          insurance          salvage          total loss          USAA

**EXHIBIT F**


**Seventh Amended Petition from Letot v. USAA.**

Plaintiff    John W. Sigler:                                      8:22-cv-2325-CJC-JDE
FIRST AMENDED COMPLAINT

FILED
10/22/2020 5:04 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Dorothy Strogen DEPUTY

## CAUSE NO. DC-13-00156

| | | |
|---|---|---|
| SUNNY LETOT, Individually and on behalf of all others similarly situated, | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| UNITED SERVICES AUTOMOBILE ASSOCIATION, | § § § | |
| Defendant. | § | 192ND DISTRICT COURT |

### PLAINTIFF'S SEVENTH AMENDED PETITION

Pursuant to the Texas Rules of Civil Procedure, Plaintiff SUNNY LETOT, INDIVIDUALLY and ON BEHALF OF OTHERS SIMILARLY SITUATED ("Plaintiff") files her Seventh Amended Original Petition, as follows:

## I.
## PRELIMINARY STATEMENT

Evan Crosby, as the result of his negligent operation of a motor vehicle, caused extensive damage to the personal property of Plaintiff SUNNY LETOT ("Letot" or "Plaintiff"), a vintage Mercedes Benz automobile that Letot was close to completely restoring at great personal expense. Defendant UNITED SERVICES AUTOMOBILE ASSOCIATION ("USAA"), the insurer of the vehicle Crosby was driving at the time of the collision in question, initiated a claims process it has used for thousands of automobile insurance claimants in Texas by which it knowingly and unjustifiably caused the State of Texas to revoke Letot's ownership rights in her vehicle.

First, USAA unilaterally determined its opinion of the value of Letot's vehicle to be less than the cost of the repairs, an opinion that Letot strenuously disputed. USAA then sent checks to Letot as a purported claim payment over her objections and without her acceptance of or agreement to such

---

**PLAINTIFF'S SEVENTH AMENDED ORIGINAL PETITION**                                        **Page 1**

Copy from re:SearchTX

payment. At the same time USAA issued those checks – which Letot immediately returned to USAA – USAA sent a report to the Texas Department of Transportation representing that it had paid a total loss settlement claim to Letot. This report, sent without Letot's knowledge or agreement, caused the State of Texas to render the registration for her vehicle invalid and required her to apply for a salvage title in order to exercise any further ownership rights over the vehicle. To recover the value of her vehicle, the loss of use of her vehicle, the cost of the restoration, and/or return her vehicle to its condition prior to Defendants' wrongful acts, and to prevent USAA from abusing other vehicle owners and the State of Texas, Plaintiff Letot initiated this litigation on behalf of herself and other similarly situated individuals.

## II.
## DISCOVERY CONTROL STATEMENT

1.      Pursuant to Rule 190 of the Texas Rules of Civil Procedure, Plaintiffs intend to conduct level three discovery.

## III.
## THE PARTIES

**A.**    **Plaintiffs.**

2.      Plaintiff SUNNY LETOT is an individual and a resident of Franklin County, Texas. Upon information and belief, other vehicle owners have suffered similar treatment and damage at the hands of USAA, and Letot seeks to represent that class of similarly situated individuals as described below.

**B.**    **Defendants.**

3.      Defendant UNITED SERVICES AUTOMOBILE ASSOCIATION is, upon information and belief, an association organized and operating under the laws of the State of Texas, and which has its principal office and does business in the State of Texas. Defendant UNITED

---

Copy from re:SearchTX

SERVICES AUTOMOBILE ASSOCIATION has been served and has made an appearance in this action.

## IV.
## JURISDICTION AND VENUE

**A.**    **Jurisdiction.**

4.    The Court has personal jurisdiction over Defendant because it conducts sufficient business in Texas to confer jurisdiction, and because the acts and omissions that form the bases of this lawsuit occurred in Dallas County, Texas. The Court has subject matter jurisdiction because the amount in controversy is within the Court's jurisdictional limits.

**B.**    **Venue.**

5.    Venue is proper in Dallas County because the acts and omissions that form the bases of this lawsuit occurred in Dallas County, Texas.

## V.
## FACTS GIVING RISE TO PLAINTIFF'S CASE

6.    Plaintiff Letot spent part of 2008 carefully restoring her vintage 1983 Mercedes Benz 300SD at great personal expense. On January 2, 2009, shortly before completing the restoration, Letot was driving in Dallas County when Evan Crosby negligently caused his motor vehicle to collide with Letot's Mercedes.

7.    Defendant USAA insured Crosby's vehicle at the time of the collision in question, and Letot filed a claim with USAA for the repair of her vehicle. Using a computer program named "CCC Valuescope" to assign value to her vehicle, USAA's employee Stewart Mayfield appraised Letot's vehicle and sent this valuation to USAA on or about January 15, 2009. The valuation program determined that the value of Letot's vintage Mercedes was $2,728 – well below what Letot knew to be the actual value of the vehicle. Because Mayfield's repair estimate of $8,859 exceeded its

---

Copy from re:SearchTX

appraisal of the vehicle's value, USAA determined the vehicle to be a "total loss." Mayfield submitted his valuation, along with documents that Letot had provided but Mayfield refused to consider in his valuation, to USAA on January 19, 2009.

8.      When Letot first learned of Mayfield's valuation, she immediately disputed it with USAA. Letot again notified USAA that she disagreed with Mayfield's valuation and refused to accept USAA's offer of payment on her claim on January 20, 2009. Nonetheless, USAA identified Letot's vehicle as "forced retained" in its internal documentation, due to its unilateral determination that the vehicle was a total loss. USAA tendered checks to Letot for a total of $2,738.02 over her objections and without her agreement. After receiving these checks, Letot's counsel returned them to USAA, noting that the payment was insufficient, and demanded that USAA pay Letot $10,700.00 in damages.

9.      Meanwhile, unbeknownst to Letot and without notice or her consent, USAA filed an Owner Retained Report with the Texas Department of Transportation ("DOT") on January 22, 2009 – two days after Letot refused to accept its valuation and only one day after USAA tendered the checks to be delivered to Letot. An Owner Retained Report is used by insurers to notify the DOT that it has paid a claim on a "nonrepairable or salvage motor vehicle" that the owner has retained. The DOT then automatically marks "the motor vehicle record on this vehicle . . . accordingly in order to prevent further transfer of title of the motor vehicle until the owner has applied for the appropriate ownership document" as indicated on the form.

10.      On the Owner Retained Report, USAA falsely stated that "a claim was paid to" Letot on January 21, 2009 and indicated that the DOT "should not recognize subsequent transfer of ownership until" a "Salvage Vehicle Title" was issued for Letot's vehicle. USAA knew that such a statement was false and misleading and that such a report would cause the DOT to mark the motor

Copy from re:SearchTX

vehicle record on her vehicle as salvage, preventing the sale or transfer of the vehicle until Letot requested a "salvage title" for the vehicle. Nonetheless, USAA filed the report and the DOT stamped Letot's title "SURRENDERED." Furthermore, USAA caused the DOT to render Letot's vehicle registration invalid, such that she could not "register, operate, or permit operation of the vehicle on public roads." USAA never notified Letot of this filing or its consequences, of which she was unaware until the DOT notified her by letter of USAA's actions on January 30, 2009.

11.    Letot immediately demanded that USAA remedy the situation and inform the DOT that her vehicle was not salvage. Despite Letot's demands and USAA's knowledge of their misrepresentations, USAA took no action. In fact, USAA continued to deem Letot's vehicle a "total loss" for almost two years. USAA's first attempt to correct this came on December 6, 2010, when USAA (again unilaterally) requested that the original Owner Retained Report be corrected to show that the cost of repairing the Letot's vehicle did not exceed its value in order to remove the "total loss" status in place since January 2009.

12.    Lastly, Plaintiff has now learned in a stunning admission from USAA's corporate representative at the October 13, 2020, class certification hearing that USAA continues to make it USAA's standard operating procedure to file Owner Retained Reports at the same time it processes payment to claimants.

13.    Due to USAA's actions and admissions, Letot has filed, on behalf of herself and other similarly situated individuals, claims against USAA for conversion, in addition to claims on her own behalf for tortious interference with contract, and violations of the Deceptive Trade Practices - Consumer Protection Act.  Letot seeks actual damages and a permanent injunctive relief.

Copy from re:SearchTX

## VI.
## CLASS ACTION ALLEGATIONS

14.     Plaintiff Sunny Letot brings this action as a class action pursuant to Texas Rule of Civil Procedure 42(a), and (b)(2) and/or (b)(3) on her own behalf and as a representative of the following class of persons and entities (the "Class"):

> All persons or entities that filed claims under USAA automobile insurance policies, either as first-party or third-party claimants, after which USAA determined the claimant's vehicle to be a "total loss" and filed an Owner Retained Report with the State of Texas stating that USAA made a claim payment to the claimant and such report was filed with the State by USAA or its agents within three days of USAA or its agents sending a check to such person allegedly attempting to pay such claim.

15.     The Class is individually so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiff at this time, information provided by the DOT and/or the Texas Department of Motor Vehicles under a public information request indicates that 1,814 similar Owner Retained Reports were filed by USAA in the two (2) year period preceding the filing of this lawsuit. USAA has undoubtedly filed additional such reports since the inception of this litigation. Plaintiff reasonably believes that there are, at a minimum, a sufficient number of members in the Class to meet the numerosity requirement of Rule 42 and that their identities can be learned from records in the Defendants' possession, custody or control.

16.     Each potential class member would have suffered from the same misconduct by USAA, creating questions of both fact and law that are common to all – the unilateral determination by USAA that the member's vehicle was non-repairable or salvage and the filing of a false report that USAA had paid "a total loss settlement." That false report would have then led to the same

Copy from re:SearchTX

consequences and resulted in the same claims being raised by Plaintiff as the class representative, making those claims typical of the class.

17.     Because the class includes persons for whom USAA filed such a report within three (3) days of sending the person a check, the claim was not "paid" when the owner retention report was filed.

18.     As class representative, Plaintiff Sunny Letot will fairly and adequately protect the interests of the class and has retained counsel competent and experienced in class action litigation. Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other Class members. Ms. Letot is well versed in the procedures related to the registration process utilized by the State of Texas and has knowledge as to the rights of title-holders whose vehicles could be characterized as non-repairable or salvage, and the options that are available to both those title-holders and to insurance carriers.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.

20.     In addition, USAA has now, for the first time, disclosed under oath at the class certification hearing that it continues in the wrongful conduct identified in this Petition. Specifically, USAA's policy continues to be that Owner Retained Reports are filed at the point where payment is processed by USAA, not when the payment is paid to claimants. As a result, Plaintiff now knows that USAA continues to act in a wrongful way, thereby making injunctive relief as to the class appropriate. Specifically, Plaintiff seeks an injunction prohibiting USAA from filing Owner Retained Reports with the Texas Department of Transportation until the claim is "paid" as that term was defined by the Dallas Court of Appeals in this case.

---

Copy from re:SearchTX

21.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedure fairness. There will be no material difficulty in the management of this action as a class action on behalf of the Class.

### VII.
### CAUSES OF ACTION

### CONVERSION
### (On Behalf of All Plaintiffs and the Class)

22.     Plaintiffs incorporate each and every allegation previously set forth herein as if fully set forth herein.

23.     Plaintiffs assert this claim individually, and on behalf of the proposed Class.

24.     The Plaintiffs owned or had legal possession of their vehicles' titles and registrations.

25.     Defendant USAA unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, Plaintiffs' rights as owners. USAA did so by knowingly providing false and misleading information to the Texas Department of Transportation regarding the payment of automobile claims to the Plaintiffs in the form of "Owner Retained Reports." The false information provided to the DOT included a statement by USAA "that a claim was paid," when it had not paid Plaintiffs' claim and/or Plaintiffs had not accepted such payment. That report also included false information generated unilaterally by USAA

---

**PLAINTIFF'S SEVENTH AMENDED ORIGINAL PETITION**                    **Page 8**

Copy from re:SearchTX

that the vehicle was non-repairable, that a salvage title should be issued, and that "the Texas Department of Transportation should not recognize subsequent transfer of ownership" until such a salvage title had been issued. USAA provided no notice to the claimants that acceptance of payment would result in the filing of an Owner Retained Report and the resulting consequences.

26.     USAA's actions caused the DOT to mark the motor vehicle records of these vehicles as nonrepairable or salvage and render the titles to these vehicles "SURRENDERED." USAA also caused the DOT to render Plaintiffs' vehicle registrations invalid. These actions prevented the registration, sale, and transfer of the titles to Plaintiffs' vehicles until the owner obtained a "salvage title," significantly diminishing the value of their vehicles and prohibiting their use.

27.     Plaintiffs were not required to make a demand on USAA for return of their property because that property was not acquired legally by USAA, such a demand would have been useless because USAA had no power to reverse the dominion and control over the property they had exercised to the exclusion of and inconsistent with Plaintiffs' rights as owner, and USAA's acts amounted to a clear repudiation of the Plaintiffs' rights as owners.

28.     Plaintiffs are entitled to recover the value of their property and/or the loss of use as the result of Defendant USAA's conversion of their property.

### DECEPTIVE TRADE PRACTICES
#### (On Behalf of Letot individually)

29.     Plaintiff incorporates each and every allegation previously set forth herein as if fully set forth herein.

30.     Plaintiff Letot asserts this claim and on behalf of the class.

31.     Defendant USAA, as outlined above, has engaged in a deceptive trade practice by engaging in an unconscionable action or course of action. As the result of the negligence of USAA's insured, Letot was forced to acquire services including, but not limited to, towing services and

Copy from re:SearchTX

storage. Letot, as the owner of the vehicle involved, had the absolute right to have her vehicle repaired, and sought an honest, fair, and reasonable estimate for such repairs from USAA. Instead, USAA used an artificially deflated valuation and used dis-similar vehicles as "comparable" valuations - apparently even one vehicle which had suffered flood damage during Hurricane Katrina and which instead probably should have been classified as salvage. USAA even refused to recognize the State of Texas's presumptive value, upon which value a subsequent purchaser (had USAA not prevented Letot from selling her vehicle) would be required to calculate the sale tax due on that transfer. As a third-party beneficiary of Defendant Crosby's insurance policy with USAA, Letot involuntarily acquired the service of an unreasonable estimate for the repairs to her vehicle. In addition, Letot is a consumer as defined by the DTPA as she also acquired her own realistic estimate for such repairs and sought to have her vehicle repaired. Instead, by reporting to the DOT that Letot's vehicle was non-repairable, USAA prevented her from obtaining such repairs, even if she were to pay for such repairs herself. USAA engaged in a false, misleading, or deceptive act regarding the need for replacement or repair services and disparaged the goods of Plaintiff Letot by providing false and misleading information to the DOT. In addition, USAA took advantage of a disparity in the relative position between itself and Plaintiff in contacting the DOT without the knowledge or agreement of Plaintiff. Plaintiff seeks the statutory damages available for violation of the DTPA as well as §541.151(2) of the Texas Insurance Code as a person who has sustained actual damages as the result of USAA's violation of §§17.46(b)(8) and (13) of the DTPA. In addition, USAA has further violated §17.50(a)(3) the DTPA by engaging in unconscionable acts and courses of action (as that term is defined in §17.45(5) of the DTPA) by conduct which constitutes fraud as defined by §32.46(1) of the Texas Penal Code (Securing Execution of Document by Deception). Further, USAA violated §17.45(a)(12) by representing that an agreement confers rights, remedies or

Copy from re:SearchTX

obligations that it does not have or involve. USAA knew that the submission of a false report would harm Letot and affect her property and pecuniary interests and it intended for the DOT to issue a communication to Letot which notified her of the loss of her rights. Furthermore, USAA violated §37.10(1) & (5) of the Texas Penal Code (Tampering With Government Record) by knowingly making a false entry in a government record and making and/or presenting a government record with knowledge of its falsity.

## VIII.
## REQUEST FOR INJUNCTIVE RELIEF

32.     The preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

33.     Plaintiff and other members of the putative class described herein have legally protected rights in their vehicles as a result of their ownership of the same and by taking the actions alleged above (and admitted to under oath by its corporate representative), USAA has and continues to impair those ownership rights in acts of conversion.

34.     Plaintiff has, on behalf of herself and the putative class, a probable right to the relief sought in this action, particularly as Defendant has already admitted to having a policy of committing the acts underlying the conversion claim (asserted both individually and on behalf of the putative class by Plaintiff).

35.     If Defendant's acts as described above and by its corporate representative are not enjoined, Plaintiff and those similarly situated will suffer probably, imminent, and irreparable injury for which damages alone would not be adequate compensation in that their ownership rights in their vehicles will be converted by USAA's policy of filing Owner Retained Reports before the payment is cashed.

---

**PLAINTIFF'S SEVENTH AMENDED ORIGINAL PETITION**                    **Page 11**

Copy from re:SearchTX

36.     Accordingly, Plaintiff requests that, upon trial of this matter, the Court enter a Permanent Injunction pursuant to Tex. R. Civ. P. 42(b)(2) prohibiting Defendant from filing Owner Retained Reports with the Texas Department of Transportation before the claim is paid.  The Dallas Court of Appeals has defined "payment of the claim" as when the claimant receives and accepts the funds.

## IX.
## REQUEST FOR TRIAL BY JURY

37.     Plaintiff demands a trial by jury and will tender the appropriate fee.

## X.
## DAMAGES

38.     The foregoing acts and omissions of the Defendants proximately caused Plaintiff Letot and the Class Plaintiffs to incur damages, which include:

A.     Actual damages from the Defendants, for the costs or repair, restoration, or replacement of their vehicles, the cost of which repairs to Plaintiff Letot's vehicle was estimated to be $8,8842.31, or in the alternative the $16,500.00 value placed on it by a willing buyer, together with pre- and post-judgment interest at the highest rates allowed by law;

B.     The funds which Plaintiff was required to expend in legal fees, costs and expenses to collect the amounts owed to Plaintiff, which as of the date of this filing totals over $50,000.00;

C.     The loss of use and/or value of their vehicles, which continues and which USAA calculated to be $30.00 per day for Plaintiff Letot, which continue to accrue;

D.     The additional obligations incurred by Plaintiff Letot as a result of Defendants' misconduct, including towing charges in the amount of $720.00 and storage charges in the amount of $35.00 per day, for a total cost incurred of $24,360.00;

E.     All such actual damages are subject to being trebled pursuant to both the DTPA and the Insurance Code; and

F.     All damages available pursuant to Texas statute.

---

**PLAINTIFF'S SEVENTH AMENDED ORIGINAL PETITION**                                    **Page 12**

Copy from re:SearchTX

# XI.
## EXEMPLARY DAMAGES

39.     Plaintiffs further allege that by reason of the fact that certain of Defendant USAA's actions were intentional, willful, wanton and with malice toward Plaintiff and because of the nature of USAA's acts, practices, conduct, and misrepresentations as herein above described, Defendant's actions constitute conduct for which the law allows the imposition of exemplary damages. Accordingly, in the alternative to the trebling of the actual damages outlined above, Plaintiffs request that exemplary damages be awarded against Defendant USAA by way of punishment and to deter such flagrant disregard for the rights of others which will not be tolerated. Plaintiffs pray that exemplary damages be awarded in an amount to be determined by this Court.

# XII.
## REQUEST FOR RELIEF

40.     Plaintiff is entitled to judgment against Defendants and prays for other appropriate relief as follows:

A.     Certification of the Class proposed in this Complaint (specifically as to the conversion claim;

B.     Issuance of a permanent injunction per Tex. R. Civ. P. 42(b)(2) prohibiting Defendant from filing Owner Retained Reports with the Texas Department of Transportation before the payment issued to the claimant is cashed;

C.     That judgment in favor of Plaintiff and the Class be entered against Defendants and that Plaintiff and the Class recover actual and/or special damages, as provided by law, that they are determined to have sustained, prejudgment and post judgment interest at the highest rates allowed by law, all statutory damages available under Texas law, and exemplary damages in an amount to be determined at trial; and

D.     That Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

E.     That Plaintiff and the Class be granted such other, further and different relief as the nature of the case may require or as may seem just and proper to this Court.

---

Copy from re:SearchTX

Dated: October 22, 2020                    Respectfully submitted,


                                           */s/ Jeffrey M. Tillotson*
                                           Jeffrey M. Tillotson
                                           State Bar No. 20039200
                                           jtillotson@tillotsonlaw.com
                                           Jonathan R. Patton
                                           State Bar No. 24088198
                                           jpatton@tillotsonlaw.com
                                           Joseph A. Irrobali
                                           State Bar No. 24092564
                                           airrobali@tillotsonlaw.com
                                           TILLOTSON LAW
                                           1807 Ross Avenue, Suite 325
                                           Dallas, Texas 75201
                                           (214) 382-3041 Telephone
                                           (214) 292-6564 Facsimile

                                           **ATTORNEYS FOR PLAINTIFF
                                           SUNNY LETOT AND ALL OTHER SIMILARLY
                                           SITUATED**

                        **CERTIFICATE OF SERVICE**

      I certify that a true and correct copy of the above and foregoing document was served upon
all counsel herein by E-Service on October 22, 2020.


                                           */s/ Jeffrey M. Tillotson*
                                           Jeffrey M. Tillotson

---

**PLAINTIFF'S SEVENTH AMENDED ORIGINAL PETITION**                    **Page 14**

Copy from re:SearchTX

## CERTIFICATE OF SERVICE

**John W. Sigler v. Jorge Gonzalez, USAA Casualty Insurance Company, et al.**
**Case No. 8:22-cv-02325-CJC-JDE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am a citizen of the United States and reside at 13129 Stern Avenue, La Mirada, CA 90638. I am over the age of 18 and not a party to the within actions.

On October 9, 2023, I served the document(s) entitled,

**FIRST AMENDED COMPLAINT FOR DAMAGES**

on the interested parties in this action by placing true copies thereof enclosed in a sealed envelope addressed (see attached Service List) as stated below:

**(BY MAIL):** I deposited such envelope in the mail at La Mirada Post Office, California with postage fully prepaid. I am familiar with the practice of collection and processing correspondence for mailing. Under that practice, it would be placed for mailing, and deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at La Mirada, California, in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States that the above is true and correct and was executed on October 9, 2023.

AnhThu Nguyen

_____1_____

## SERVICE LIST

**John W. Sigler v. Jorge Gonzalez, USAA Casualty Insurance Company, et al.**

**Case No. 8:22-cv-02325-CJC-JDE**

Aparajito Sen, Esq.,
FORD, WALKER, HAGGERTY & BEHAR
One World Trade Center, 27th Floor
Long Beach, CA  90831-2700
Attorney for Defendant Interinsurance Exchange of the Automobile Club
(sued herein as Interinsurance Exchange of the Automobile Club of Southern California)
Attorney for Defendant Jorge Gonzalez

Jeffery Lenkov
MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
801 S. Figueroa St, 15th Floor
Los Angeles, CA  90017-3012
Attorney for Defendant Imperial Body Shop