# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

|  |  |
|---|---|
| JOHN W. SIGLER,<br><br>    Plaintiff,<br><br>  v.<br><br>JORGE GONZALEZ; USAA CASUALTY INSURANCE COMPANY; INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA; IMPERIAL BODY SHOP, INC.; PABLO GALVEZ; GREG TAYLOR; AMBER PETERSON; KEVIN KARAPOGOSIAN; JOHN BOYLE; and DOES 1–99,<br><br>    Defendants. | Case No.: SACV 22-02325-CJC (JDEx)<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART THE EXCHANGE AND GONZALEZ'S MOTION FOR JUDGMENT ON THE PLEADINGS [Dkt. 95]** |

## I.   INTRODUCTION

  This case arises from the alleged mishandling of *pro se* Plaintiff John S. Sigler's insurance claim after his car (the "Vehicle") was damaged in a two-car accident.  (*See*

Dkt. 76 [First Am. Compl., hereinafter "FAC"] ¶¶ 1–6.)  Specifically, Plaintiff asserts claims against Defendants Jorge Gonzalez ("Gonzalez," the driver who rear-ended Plaintiff's Vehicle), Interinsurance Exchange of the Automobile Club of Southern California ("the Exchange," Gonzalez's automobile insurer), USAA Casualty Insurance Company ("USAA," Plaintiff's insurer), Imperial Body Shop, Inc. ("IBS," the body shop that provided an appraisal on Plaintiff's vehicle), Pablo Galvez ("Galvez," an appraiser at IBS), Greg Taylor ("Taylor,"  another appraiser at IBS), Amber Peterson ("Peterson," a claims adjuster at the Exchange), Kevin Karapogosian ("Karapogosian," CEO of IBS), John Boyle ("Boyle," CEO of the Exchange), and unnamed Does stemming from the collision, repair, and insurance coverage of the Vehicle.[1] (*See id.* ¶¶ 7–19.)

Among other claims against other defendants, Plaintiff asserts claims against the Exchange for intentional misrepresentation (fraud), antitrust violations under the Sherman Act and Clayton Act, and violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), and against Gonzalez for negligence and RICO conspiracy. Now before the Court is the Exchange and Gonzalez's motion for judgment on the pleadings.  (Dkt. 95 [hereinafter "Mot."].)  For the following reasons, the motion is **GRANTED IN PART AND DENIED IN PART**.[2]

## II.   BACKGROUND

On February 28, 2020, Gonzalez rear-ended Plaintiff's Vehicle while Plaintiff's son Alexander was driving it in Costa Mesa, California.  (*See* FAC ¶¶ 1, 28.)  Gonzalez was declared 100% at fault.  (*See id.* ¶ 28.)  USAA insured Plaintiff's vehicle, (*see id.*

---

[1] Plaintiff includes as a defendant "James Syring" in his case caption, but Syring is not mentioned elsewhere in the FAC.

[2] Having read and considered the papers the parties presented, the Court finds this matter appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for January 22, 2024, at 1:30 p.m. is hereby vacated and off calendar.

¶ 29), and the Exchange insured Gonzalez. (*see id.* ¶ 2.)  Plaintiff's son Alexander settled personal injury claims with the Exchange and with USAA.  (*See id.* ¶ 2.)  However, to date, Plaintiff alleges the insurer Defendants have not provided reasonable compensation, or have refused to compensate Plaintiff at all, for the value of the Vehicle, for the loss of use of the Vehicle, for storage of the Vehicle, and for damage to his business due to time taken off work to respond to Defendants' alleged RICO and Clayton Act violations.  (*See id.* ¶ 25.)

During the claim-evaluation process, Defendants allegedly engaged in numerous acts of fraud, such as falsifying appraisals of the Vehicle and misrepresenting material facts to fraudulently depress the amount Defendants owe as insurers.  Defendants have also allegedly committed acts of extortion, attempting to induce Plaintiff to accept low compensation for his damages, and have engaged in witness tampering to cover up their fraudulent acts.  (*See id.* ¶ 4.)

For example, in early March 2020, IBS employee Pablo Galvez created a Vehicle Valuation Report of Plaintiff's vehicle (the "Galvez Appraisal").  (*See id.* ¶ 33.)  The Galvez Appraisal "contained misrepresentations regarding the condition of the Plaintiff's vehicle, including falsely stating the vehicle did not have a sunroof or CA Emission equipment.  Both of these misrepresentations were used to artificially depress the appraised value of the Plaintiff's vehicle." (*Id.*)   The next day, Galvez drafted a repair estimate for Plaintiff's vehicle, but this estimate was never provided to Plaintiff.  (*See id.* ¶¶ 35.)  Galvez estimated that repairs to Plaintiff's vehicle exceeded the value of the vehicle by about $500.  (*See id.* ¶¶ 33–35.)  USAA notified Plaintiff that his vehicle was therefore a "total loss," meaning that it "costs more to repair the vehicle than the vehicle is worth."  (*Id.* ¶ 36 [cleaned up].)

Plaintiff disputed the accuracy of the Galvez Appraisal, and on March 31, 2020, USAA employee Melissa Ordell told Plaintiff that the errors arose from similar errors on the Vehicle's official VIN report, which Galvez relied upon in making his appraisal. (*See id.* ¶¶ 45–46.) Within ninety minutes of talking to that USAA employee, however, Plaintiff downloaded a copy of the Vehicle's VIN report and found it contained no such errors. (*See id.* ¶ 46.) USAA eventually updated the Galvez Appraisal to account for the errors and increased the value of Plaintiff's vehicle by approximately $800. (*See id.* ¶ 41.) Plaintiff alleges that USAA's false statement regarding the Vehicle's VIN report was "a deliberate act of fraud to fabricate evidence to claim the Total Loss Claim was still in effect" even though his claim did not actually meet the definition of "total loss," and his car should have been repaired. (*Id.* ¶¶ 45, 71.) Unbeknownst to Plaintiff, USAA then sold his Vehicle to an online auction company. (*See id.* ¶ 43.)

On March 19, 2020, Plaintiff's son contacted the Exchange via a recorded phone call, informed it that USAA used a fraudulent appraisal from IBS, and requested a settlement quote from the Exchange as the at-fault insurer. (*See id.* ¶ 48.) Like USAA, the Exchange had IBS, this time through employee Greg Taylor, create an appraisal (the "Taylor Appraisal") of the Vehicle. (*See id.* ¶ 38.) The Taylor Appraisal included the same alleged false claim as the Galvez Appraisal, that the Vehicle has no sunroof, and the Taylor Appraisal also falsely reported that the Vehicle did not have metallic paint. (*See id.* ¶¶ 51–52.) Despite accounting for labor at the same body shop, IBS, Taylor estimated labor rates at $42–62 per hour, while Galvez estimated labor rates at $50–$95 per hour. (*See id.* ¶ 40.) And although there were significant differences between the two appraisals, the Galvez and Taylor Appraisals both initially (prior to adjustments Plaintiff demanded) arrived at exactly the same below-market base vehicle value of $8,437. (*See id.* ¶ 140.) Through discovery, Plaintiff obtained evidence that just a day after he requested a competitive offer from the Exchange, a USAA employee contacted an Exchange employee to discuss the valuation of Plaintiff's Vehicle, and they agreed to

present similar valuations.  (*See id.* ¶ 49.)  USAA also provided the Exchange with a copy of the Galvez Appraisal prior to the Exchange producing its initial valuation of Plaintiff's Vehicle.  (*See id.* ¶ 50.)  Plaintiff alleges that these facts indicate "falsification of the Taylor [Appraisal]," (*id.* ¶ 76), and that USAA was attempting "to avoid a bidding war and illegally engage in a criminal price fixing scheme to deny the Plaintiff the option of competitive bids," (*id.* ¶ 50.)  While Magistrate Judge John D. Early has ordered IBS to produce all documents relating to the inspection, appraisal, or valuation of Plaintiff's vehicle, including all contracts and agreements it had with USAA and the Exchange, IBS has refused to provide its labor-rate agreements with these insurers to Plaintiff.  (*See id.* ¶ 90.)

For Plaintiff, the common error in both the Taylor Appraisal and the Galvez Appraisal raised doubt that these errors could be accidental or due to negligence, given that it would be unlikely that two licensed appraisers with years of experience both missed observing a major vehicle feature such as a sunroof.  (*See id.* ¶ 53.)  Nor were the common errors due to simple verbatim copying of the Galvez Appraisal since each of those appraisals contained a second distinct significant error, with the Galvez Appraisal failing to include emission equipment and the Taylor Appraisal missing metallic paint. (*See id.* ¶ 52.)  Plaintiff alleges that these observations indicate the errors were the result of intentional fraud.  (*See id.* ¶ 53.)

Over the next three years, Plaintiff relied on USAA's representation that his vehicle was a "total loss" in attempting to resolve this dispute with the insurers.  (*See id.* ¶ 36.)  Plaintiff only discovered that his Vehicle was not actually a total loss (i.e. that the cost of repair was not higher than the value of the Vehicle) when he received copies of repair estimates for his Vehicle in the course of discovery.  (*See id.* ¶¶ 38–41.)  Besides these alleged instances of fraud and price-fixing regarding the valuation of Plaintiff's Vehicle, Plaintiff alleges, in short, that USAA "engaged in multiple acts of extortion,

solely[] and teaming with IBS, to threaten and cause financial harm to the Plaintiff in attempt to force Plaintiff to accept a fraudulent settlement offer." (*Id.* ¶ 61.)

As to the Exchange, Plaintiff alleges that in addition to it "conspire[ing] with USAA and IBS to engage in price-fixing and bid rigging of settlement offers to the Plaintiff in restraint of trade in the form of competitive settlement offers for damage to the Plaintiff's vehicle," (*id.* ¶ 72), and falsifying the Taylor Appraisal to perpetuate the misrepresentation that Plaintiff's vehicle was a total loss, (*see id.* ¶ 75), the Exchange also engaged in "internal acts of fraud to falsify 'Loss of Use' offers to the Plaintiff," (*id.* ¶ 80). On April 3, 2020, the Exchange sent Plaintiff a settlement offer, in which it misrepresented the cost to rent an equivalent vehicle because it intentionally did not include taxes and other mandatory fees, which are components of the cost for any rental car. (*See id.* ¶ 80.) When Plaintiff pointed out the error, the Exchange admitted that these costs should have been included and recalculated Plaintiff's compensation for loss of use to include tax and fees. (*See id.* ¶ 81.) However, even in this second April 15, 2020 offer, the Exchange intentionally depressed the base rate for an equivalent rental car by using a discount rate that did not come into effect until months after Plaintiff's vehicle was totaled. (*See id.*) If Plaintiff had known that the Exchange would engage in fraud to depress the value of his claim, Plaintiff could have sought the help of the attorney who handled his son's personal injury claims and would have handled the property and loss-of-use claims without additional charge. (*See id.* ¶ 84.)

Further, Plaintiff alleges that the Exchange illegally destroyed the recording of the phone call it had with his son on March 19, 2020 and that the Exchange and Gonzalez conspired to submit a forged waiver of service of summons to the Court for the purpose of receiving additional time to respond to complaint. (*See id.* ¶¶ 85–89.)

Finally, Plaintiff alleges that USAA "has a history of influencing appraisal companies to falsify appraisals[] and falsifying total loss claims because these acts of fraud can produce ill-gotten gains of over $15 million per year."  (*See id.* ¶ 56, Ex. B.) Plaintiff describes three cases that "show a pattern of USAA using its influence over appraisal companies to sway appraisers to falsify appraisals to reduce USAA'S liability, the same practice USAA used to influence IBS to falsify the [Galvez Appraisal] and the Galvez Repair Estimate …."  (*Id.* ¶ 57.)  According to Plaintiff, insurers broadly engage in this type of scheme to handle accident vehicles determined to be totaled and "cheat the 'totaled' vehicle's owner out of fair market compensation."  (*Id.*)

Plaintiff estimates that his damages to this point are approximately $115,000 between the value of his Vehicle, loss of use of his Vehicle, storage costs for his damaged Vehicle, and business damages for loss of productivity while dealing with this insurance claim.  (*See id.* ¶¶ 92–96.)  Plaintiff also prays for punitive damages to deter Defendants from future wrongful conduct.  (*See id.* ¶ 99.)

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed— but early enough not to delay trial—a party may move for judgment on the pleadings."  A court should grant a motion for judgment on the pleadings if, "taking all the allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." *McSherry v. City of Long Beach*, 423 F.3d 1015, 1021 (9th Cir. 2005).  For purposes of a Rule 12(c) motion, "the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false."  *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989).  Judgment on the pleadings is proper when the moving party "clearly establishes on the face of the pleadings that no material issue of fact remains to be

resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios*, 896 F.2d at 1550; *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978–79 (9th Cir. 1999). The same standard as a Rule 12(b)(6) motion governs a Rule 12(c) motion. *See Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When evaluating a Rule 12(b)(6) (or a Rule 12(c)) motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012). To survive a motion to dismiss, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Under Rule 9(b), a party alleging a claim sounding in fraud must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1145 (9th Cir. 2009). The party "must set forth what is false or misleading about a statement, and why it is false." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994). In other words, a party must plead the "who, what, when, where, and how" of the alleged misconduct. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997). Rule 9(b) is meant to ensure that fraud allegations are "specific

enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).

## IV.   ANALYSIS

The Exchange and Gonzalez move for judgment on the pleadings on Plaintiff's claims for (1) intentional misrepresentation (Counts Three and Four against the Exchange), (2) antitrust violations (Count Five against the Exchange), and (3) RICO violations (Count Six against the Exchange) and RICO conspiracy (Count Twelve against Gonzalez).

### A.   Intentional Misrepresentation

The Exchange first moves to dismiss Plaintiff's third and fourth causes of action, which allege intentional misrepresentation.  (*See* Mot. at 8–11.)  To allege intentional misrepresentation (fraud), the claimant must allege the following: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) scienter or knowledge of falsity; (3) intent to induce reliance; (4) actual and justifiable reliance; and (5) resulting damage.  *See GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F. Supp. 3d 1007, 1039 (C.D. Cal. 2017), *aff'd sub nom. GemCap Lending I, LLC v. Quarles & Brady, LLP*, 787 F. App'x 369 (9th Cir. 2019); *see also McColgan v. Mut. of Omaha Ins. Co.*, 4 F. Supp. 3d 1228, 1233 (E.D. Cal. 2014).  As claims sounding in fraud, Plaintiff's claims for intentional misrepresentation are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *See Rodriguez v. JP Morgan Chase & Co.*, 809 F. Supp. 2d 1291, 1296 (S.D. Cal. 2011).

### 1.      Claim Three

The Exchange argues that in his third cause of action for intentional misrepresentation, Plaintiff fails to plausibly allege reliance and damages.  Count Three focuses on Exchange employee Peterson's allegedly fraudulent statement that Plaintiff's vehicle was not repairable and the Exchange's related preparation of the Taylor Appraisal.  (*See* FAC ¶ 136.)  Although the Court previously held that Plaintiff had not clearly pled these elements, this time Plaintiff alleges a plausible claim for fraud.

In short, Plaintiff alleges that because of the Exchange's material misrepresentation that his Vehicle was "non repairable," (*see id.*), for three years he pursued only recovering the value of his Vehicle and did not pursue repairing it, (*see id.* ¶ 152).  In addition to changing positions based on Defendants' representations and not pursuing repairs, Plaintiff suffered greater loss-of-use damages from not having the operable Vehicle and from Defendants' longwinded process of undervaluing his claim through their repeated misrepresentations.  (*See id.*)

The Exchange argues that these facts do not support an inference of reliance on its misrepresentation, but taking Plaintiff's allegations as true, he relied on the Exchange's misrepresentations regarding the condition of his vehicle.  "Reliance is proved by showing that the defendant's misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury-producing conduct.  A plaintiff may establish that the defendant's misrepresentation is an 'immediate cause' of the plaintiff's conduct by showing that in its absence the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct."  *In re Tobacco II Cases*, 46 Cal. 4th 298, 326, (2009) (cleaned up).  In the absence of the Exchange's representation, Plaintiff would have repaired his Vehicle and would not have been damaged by having to pay for such extensive storage costs and other costs associated with the loss of use of the Vehicle. This adequately states a claim.

### 2.   Claim Four

Plaintiff's fourth cause of action, also for intentional misrepresentation, focuses on the Exchange's representation that it "would provide a fair and honest settlement of the accident damages …."  (FAC ¶ 161.)  The Exchange is correct that this type of representation is not actionable as fraud.  Because it is a generalized statement of opinion regarding the Exchange's honesty and fairness, it is puffery, which is not actionable.  *See Stewart v. Electrolux Home Prod.*, 2018 WL 1784273, at *11 (E.D. Cal. Apr. 13, 2018) (holding that "statement about transparency, honesty, and fairness is non-actionable"); *see also Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) ("District Courts often resolve whether a statement is puffery when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and we can think of no sound reason why they should not do so.").  To the extent Plaintiff's claim is based on more particularized misrepresentations, such as deliberately presenting inaccurate pricing information regarding rental cars, (*see* FAC ¶¶ 167–171), there is no apparent causal connection between these misrepresentations (as opposed to those misrepresentations addressed in Plaintiff's third cause of action) and Plaintiff's decision not to have a lawyer handle his claim, (*see id.* ¶ 173).   Accordingly, judgment is granted in favor of the Exchange on Plaintiff's fourth cause of action.

### B.   Clayton Act and Sherman Act Violations

Plaintiff's fifth cause of action alleges violations of Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce …."  15 U.S.C. § 1.  "To establish liability under § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016).  "Antitrust standing is a jurisdictional

prerequisite to a Section 1 claim ….."[3]  *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 900 (C.D. Cal. 2012); *see In re ATM Fee Antitrust Litig.,* 686 F.3d 741, 744 (9th Cir.2012) ("Because Plaintiffs lack antitrust standing, we do not address Plaintiffs' appeal regarding the district court's [ ] determination that the rule of reason, and not the per se rule, applies here").  Under Section 4 of the Clayton Act, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue … and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  15 U.S.C. § 15(a).  "However, the Supreme Court has interpreted that section narrowly, thereby constraining the class of parties that have statutory standing to recover damages through antitrust suits."  *Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1120 (9th Cir. 2008).

The Exchange argues that Plaintiff does not have standing to bring this claim because he did not suffer the type of injury that antitrust laws aim to redress.  (*See* Mot. at 10–11.)

---

[3]  This applies to alleged violations under "both the rule of reason and the *per se* rule."  *In re WellPoint*, 903 F. Supp. 2d at 900.

> Typically, the determination of whether a particular agreement in restraint of trade is unreasonable involves a factual inquiry commonly known as the "rule of reason." *Metro Indus., Inc., v. Sammi Corp.*, 82 F.3d 839, 843 (9th Cir. 1996). "The rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1156 (9th Cir. 2003).  The rule of reason inquiry, however, is inapplicable if "the restraint falls into a category of agreements which have been determined to be per se illegal." *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991).  The "per se rule is applied when the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (internal quotation marks omitted).  Such agreements or practices are "conclusively presumed to be unreasonable" because of their "pernicious effect on competition and lack of any redeeming virtue."

*United States v. Joyce*, 895 F.3d 673, 676 (9th Cir. 2018).

The Supreme Court has identified several factors courts are to consider in determining whether a plaintiff, who has suffered an injury which bears a causal connection to the alleged antitrust violation, also satisfies the more demanding standard for antitrust standing. These factors are: (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages.

*Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996), *as amended* (Jan. 15, 1997) (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 (1983)).

Plaintiff's claim is based on a theory of horizontal price fixing and bid rigging. (*See* Dkt. 109 [Opp'n to Mot. to Dismiss, hereinafter "Opp."] at 15.)  Specifically, Plaintiff alleges that he "had the legal right to obtain independent appraisals from USAA and the Exchange without the two businesses and their employees conspiring to eliminate a competitive bid[,] and the defendants' actions were an unreasonable restraint of trade." (FAC ¶ 186 [cleaned up].)  Plaintiff's injury was the "loss of a fair and competitive offer for the valuation of his 'totaled' vehicle and/or loss of the option to have falsely represented 'totaled vehicle repaired[,]" loss of use damages and storage costs, "damages to his business through interference with current business productivity due to the Plaintiff having to sporadically take time off work from March 2020 to May 2023," and since May 2023 "fulltime effort" to prosecute this lawsuit.  (*Id.* ¶ 191.)  "The Supreme Court has held that horizontal price fixing is a per se violation of the Sherman Act."  *United States v. Joyce*, 895 F.3d 673, 677 (9th Cir. 2018) (citing *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 309 (1956) ("It has been held too often to require elaboration … that price fixing is contrary to the policy of competition underlying the Sherman Act ….").

The Exchange argues that Plaintiff does not have standing to bring a Sherman Act claim because: (1) Plaintiff was not injured by receiving a low appraisal, (2) Plaintiff's injuries are not the type of injuries caused by restraint of trade, (3) the Exchange and USAA are not in competition for payment of the claim, and (4) Plaintiff's injuries are too speculative for recovery.  (*See* Mot. at 10–13.)  Yet the Exchange cites no caselaw supporting these arguments in its motion and does not address Plaintiff's antitrust claim in its reply.

With no authority presented to the contrary, the Court finds that Plaintiff has adequately alleged standing to sue for antitrust violations.  According to the FAC, the insurers (and their employees) and IBS got together to make sure they presented similar appraisals on Plaintiff's vehicle.  (*See* FAC ¶¶ 181–89.)  This type of horizontal price fixing among insurers and their collaborators aims at keeping more funds in insurance companies' pockets and minimizes the payouts to policy holders like Plaintiff.  Because of Defendants' agreement, Plaintiff alleges he never received a reasonable appraisal and compensation for the value of his Vehicle or the repairs needed to it.  (*See* FAC ¶ 191.) The damages Plaintiff may recover on this claim may be limited—as the Exchange notes, Plaintiff as a *pro se* litigant would likely not be eligible to recover attorney's fees on this claim, (*see* Mot. at 13)—but the Exchange offers no authority to support judgment in its favor on Plaintiff's claim or to counter Plaintiff's arguments in opposition to its motion.

## C.    RICO

The Exchange moves to dismiss Plaintiff's sixth cause of action for RICO violations, and Gonzalez moves to dismiss Plaintiff's twelfth cause of action for engaging in a RICO conspiracy.  The civil RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which

affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  To state a civil RICO claim, a plaintiff must allege facts showing "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'"  *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).  The Exchange argues that Plaintiff fails to sufficiently plead only the third element, a *pattern* of racketeering activity, (*see* Mot. at 14–17), and the Court agrees.

A "pattern of racketeering activity" requires at least two predicate acts, though two is not always sufficient because "in common parlance two of anything do not generally form a 'pattern.'"  *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191 (9th Cir. 1987) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985)).  The predicate criminal acts must be both "related" and "continuous."  *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1527 (9th Cir. 1995).  Acts are continuous "if the predicate acts posed a threat of continuing activity."  *Sun Sav. & Loan*, 825 F.2d at 193.  These requirements ensure that the RICO statute is not applied "to the perpetrators of isolated or sporadic criminal acts," since "Congress was concerned in RICO with long-term criminal conduct."  *Id.* at 192; *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989).  For this reason, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct" are not enough to state a civil RICO claim.  *H.J. Inc.*, 492 U.S. at 229.

A plaintiff can establish that predicate acts were continuous by pleading either open-ended or closed-ended continuity.  *See Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1526 (9th Cir. 1995).  Open-ended continuity refers to "past conduct that by its nature projects into the future with a threat of repetition."  *H.J., Inc.*, 492 U.S. at 241.  Closed-ended continuity refers to "a series of related predicates extending over a substantial period of time."  *Id.* at 242.  The Supreme Court has cautioned that "whether predicate acts

establish a threat of continued racketeering activity depends on the specific facts of each case[,]" but it has given some examples:

> A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit. Suppose a hoodlum were to sell "insurance" to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the "premium" that would continue their "coverage." Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity. In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. Such associations include, but extend well beyond, those traditionally grouped under the phrase "organized crime." The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise."

*Id.* at 242–43.

This case does not look like these examples. Plaintiff alleges that the Exchange and IBS "created an 'association in fact' (AIF) enterprise for the purpose of engaging in racketeering activities with the goal of minimizing claims payouts to the Plaintiff resulting from the auto accident caused by Jorge Gonzalez. In addition to falsifying [a] settlement offer, these Defendants falsified appraisals and repair estimates in order to falsely classify the Plaintiff's vehicle as totaled. Moving the Plaintiff's vehicle into the 'totaled' category provided the Defendants with more leeway to undercut their liability with fraudulent valuation offers. In addition, once the initial complaint was filed in Nov.

2022, [Defendants] engaged in Predicate Acts of wire fraud, Witness Tampering (in the form of concealing or destroying documents), and Obstruction of Justice to delay or impede the administration of justice, and to conceal or destroy documents so they are not available for use in an official proceeding."  (FAC ¶ 198.)

Previously the Court held that "'[t]his case involve[s] but a single alleged fraud [on the part of each Defendant] with a single victim.  All of [Defendants'] assertions about [the allegedly fraudulent appraisals] … were parts of [a] single effort [by each Defendant] to induce' Plaintiff to accept an offer that did not fully compensate Plaintiff for his losses."  (Dkt. 73 at 11 [quoting *Medallion Television Enterprises, Inc. v. SelecTV of California, Inc.*, 833 F.2d 1360, 1363–64 (9th Cir. 1987)].)  Plaintiff argues that the predicate act of witness tampering that the Exchange allegedly committed in the spring of 2023 supports a claim of long-term criminal conduct under a close-ended continuity theory that was missing from his prior pleading.  The Court remains unpersuaded in this regard.

First, the witness-tampering conduct alleged in the FAC is actually an allegation of "willful spoliation."  *See United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) ("A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.')  Plaintiff's allegation that the alleged spoliation constitutes criminal witness tampering punishable by up to twenty years in prison is not plausible.  *See* 18 U.S.C. § 1512(c).  Indeed, the subsection includes the qualifier that the subject actions must be undertaken "corruptly."  *Id.*  "[C]orrupt" intent exists at least when an obstructive action is independently unlawful — i.e., an independently unlawful act is necessarily 'wrongful' and encompasses a perpetrator's use of 'independently corrupt means' or 'an unlawful method.'"  *United States v. Fischer*, 64 F.4th 329, 340 (D.C. Cir. 2023), *cert. granted*, 2023 WL 8605748 (U.S. Dec. 13, 2023).  Deleting a recording of a

phone call is not independently unlawful in this manner and cannot serve as a predicate act for a RICO claim under 18 U.S.C. § 1961.  Moreover, the alleged spoliation is not related in any meaningful sense to Defendants' alleged scheme to fraudulently reduce the compensation provided to Plaintiff for his Vehicle claim, and predicate acts giving rise to RICO claims must be related.

Additionally, Plaintiff does not brief open-ended continuity, and there are not allegations to support this type of pattern either.  Plaintiff does not allege that the predicate acts were part of the Exchange's regular method of conducting business,[4] and the Exchange's falsified offers of settlement and other documents do not have any specific threat of repetition in the future.

With respect to Plaintiff's twelfth cause of action against Gonzalez for RICO conspiracy, it is implausible for many reasons that Gonzalez, who is involved in this case only as the at-fault driver, knowingly facilitated a RICO conspiracy through assisting his attorney with forging a document to get additional time to respond to Plaintiff's complaint.  A "violation of 18 U.S.C. § 1962(c) is established by proof of (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *United States v. Fernandez*, 388 F.3d 1199, 1221 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005).  "A violation of 18 U.S.C. § 1962(d) requires that the defendant 'knew about and agreed to facilitate the [fraudulent] scheme.'"  *Wolov v. Duel*, 2023 WL 2780369, at *3 (C.D. Cal. Feb. 28, 2023).  And "a Plaintiff 'must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses.'"  *Id.*  Plaintiff does not adequately allege that Gonzalez was aware of the other defendants' alleged conspiracy or how illicitly gaining time to respond to a pleading would support a conspiracy to falsify valuations and

---

[4] Plaintiff does allege that USAA has a history of deceiving its policy holders in a similar manner, but there are no such allegations as to the Exchange.  (*See* FAC ¶ 56.)

underpay Plaintiff for his Vehicle.  Accordingly, judgment is granted to Gonzalez on this claim.

The Federal Rules of Civil Procedure provide that "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, "[l]eave to amend may be denied if the proposed amendment is futile or would be subject to dismissal."  *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1059 (9th Cir. 2018).  Plaintiff already had an opportunity to amend his fraud and RICO-related causes of action and has not been able to fix the deficiencies previously noted by this Court and Defendants.  Moreover, Plaintiff does not give any indication that further amendment would remedy the remaining deficiencies Defendants identify.  Accordingly, further amendment of these claims would be futile, so the Court will not give leave to amend.

## V.    CONCLUSION

For the foregoing reasons, the Exchange and Gonzalez's motion for judgment on the pleadings is **GRANTED** as to Plaintiff's fourth, sixth, and twelfth causes of action and **DENIED** as to Plaintiff's third and fifth causes of action.

DATED:      January 18, 2024

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE