**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

|  |  |
|---|---|
| JOHN W. SIGLER, <br><br>     Plaintiff, <br><br>  v. <br><br> JORGE GONZALEZ; USAA CASUALTY INSURANCE COMPANY; INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA; IMPERIAL BODY SHOP, INC.; PABLO GALVEZ; GREG TAYLOR; AMBER PETERSON; KEVIN KARAPOGOSIAN; JOHN BOYLE; and DOES 1–99, <br><br>     Defendants. | Case No.: SACV 22-02325-CJC (JDEx) <br><br><br> ORDER GRANTING IN PART AND DENYING IN PART USAA'S MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, MOTION TO COMPEL APPRAISAL [Dkt. 111] |

## I.    INTRODUCTION

     This case arises from the alleged mishandling of *pro se* Plaintiff John S. Sigler's insurance claim after his car (the "Vehicle") was damaged in a two-car accident.  (*See*

Dkt. 76 [First Am. Compl., hereinafter "FAC"] ¶¶ 1–6.)  Specifically, Plaintiff asserts claims against Defendants Jorge Gonzalez ("Gonzalez," the driver who rear-ended Plaintiff's Vehicle), Interinsurance Exchange of the Automobile Club of Southern California ("the Exchange," Gonzalez's automobile insurer), USAA Casualty Insurance Company ("USAA," Plaintiff's insurer), Imperial Body Shop, Inc. ("IBS," the body shop that provided an appraisal on Plaintiff's vehicle), Pablo Galvez ("Galvez," an appraiser at IBS), Greg Taylor ("Taylor,"  another appraiser at IBS), Amber Peterson ("Peterson," a claims adjuster at the Exchange), Kevin Karapogosian ("Karapogosian," CEO of IBS), John Boyle ("Boyle," CEO of the Exchange), and unnamed Does stemming from the collision, repair, and insurance coverage of the Vehicle.[1] (*See id.* ¶¶ 7–19.)

The Court recently granted judgment on the pleadings to the Exchange on Plaintiff's fourth and sixth causes of action for intentional misrepresentation and RICO violations, respectively, and to Gonzalez on Plaintiff's twelfth cause of action for RICO conspiracy.  (*See* Dkt. 111.)  Plaintiff asserts some of these claims and others against USAA, including claims for intentional misrepresentation, antitrust violations, and RICO violations.  (*See* FAC.)  Now before the Court is USAA's motion for judgment on the pleadings or in the alternative motion to compel appraisal.  (Dkt. 111 [hereinafter "Mot."].)  The Court recently granted in part a similar motion brought by the Exchange. (*See* Dkt. 112.)  For the following reasons, USAA's motion is also **GRANTED IN PART AND DENIED IN PART**.[2]

---

[1] Plaintiff includes as a defendant "James Syring" in his case caption, but Syring is not mentioned elsewhere in the FAC.

[2] Having read and considered the papers the parties presented, the Court finds this matter appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for February 26, 2024, at 1:30 p.m. is hereby vacated and off calendar.

## II.     BACKGROUND

On February 28, 2020, Gonzalez rear-ended Plaintiff's Vehicle while Plaintiff's son Alexander was driving it in Costa Mesa, California.  (*See* FAC ¶¶ 1, 28.)  Gonzalez was declared 100% at fault.  (*See id.* ¶ 28.)  USAA insured Plaintiff's vehicle, (*see id.* ¶ 29), and the Exchange insured Gonzalez. (*see id.* ¶ 2).  Plaintiff's son Alexander settled personal injury claims with the Exchange and with USAA.  (*See id.* ¶ 2.)  However, to date, Plaintiff alleges the insurer Defendants have not provided reasonable compensation, or have refused to compensate Plaintiff at all, for the value of the Vehicle, for the loss of use of the Vehicle, for storage of the Vehicle, and for damage to his business due to time taken off work to respond to Defendants' alleged RICO and Clayton Act violations.  (*See id.* ¶ 25.)

During the claim-evaluation process, Defendants allegedly engaged in numerous acts of fraud, such as falsifying appraisals of the Vehicle and misrepresenting material facts to fraudulently depress the amount Defendants owe as insurers.  Defendants have also allegedly committed acts of extortion, attempting to induce Plaintiff to accept low compensation for his damages, and have engaged in witness tampering to cover up their fraudulent acts.  (*See id.* ¶ 4.)

For example, in early March 2020, IBS employee Pablo Galvez created a Vehicle Valuation Report of Plaintiff's vehicle (the "Galvez Appraisal").  (*See id.* ¶ 33.)  The Galvez Appraisal "contained misrepresentations regarding the condition of the Plaintiff's vehicle, including falsely stating the vehicle did not have a sunroof or CA Emission equipment.  Both of these misrepresentations were used to artificially depress the appraised value of the Plaintiff's vehicle." (*Id.*)   The next day, Galvez drafted a repair estimate for Plaintiff's vehicle, but this estimate was never provided to Plaintiff.  (*See id.* ¶¶ 35.)  Galvez estimated that repairs to Plaintiff's vehicle exceeded the value of the

vehicle by about $500.  (*See id.* ¶¶ 33–35.)  USAA notified Plaintiff that his vehicle was therefore a "total loss," meaning that it "costs more to repair the vehicle than the vehicle is worth."  (*Id.* ¶ 36 [cleaned up].)

Plaintiff disputed the accuracy of the Galvez Appraisal, and on March 31, 2020, USAA employee Melissa Ordell told Plaintiff that the errors arose from similar errors on the Vehicle's official VIN report, which Galvez relied upon in making his appraisal.  (*See id.* ¶¶ 45–46.)  Within ninety minutes of talking to that USAA employee, however, Plaintiff downloaded a copy of the Vehicle's VIN report and found it contained no such errors.  (*See id.* ¶ 46.)  USAA eventually updated the Galvez Appraisal to account for the errors and increased the value of Plaintiff's vehicle by approximately $800.  (*See id.* ¶ 41.)  Plaintiff alleges that USAA's false statement regarding the Vehicle's VIN report was "a deliberate act of fraud to fabricate evidence to claim the Total Loss Claim was still in effect" even though his claim did not actually meet the definition of "total loss," and his car should have been repaired.  (*Id.* ¶¶ 45, 71.)  Unbeknownst to Plaintiff, USAA then sold his Vehicle to an online auction company.  (*See id.* ¶ 43.)

On March 19, 2020, Plaintiff's son contacted the Exchange via a recorded phone call, informed it that USAA used a fraudulent appraisal from IBS, and requested a settlement quote from the Exchange as the at-fault insurer.  (*See id.* ¶ 48.)  Like USAA, the Exchange had IBS, this time through employee Greg Taylor, create an appraisal (the "Taylor Appraisal") of the Vehicle.  (*See id.* ¶ 38.)  The Taylor Appraisal included the same alleged false claim as the Galvez Appraisal, that the Vehicle has no sunroof, and the Taylor Appraisal also falsely reported that the Vehicle did not have metallic paint.  (*See id.* ¶¶ 51–52.)  Despite accounting for labor at the same body shop, IBS, Taylor estimated labor rates at $42–62 per hour, while Galvez estimated labor rates at $50–$95 per hour.  (*See id.* ¶ 40.)  And although there were significant differences between the two appraisals, the Galvez and Taylor Appraisals both initially (prior to adjustments Plaintiff

demanded) arrived at exactly the same below-market base vehicle value of $8,437. (*See id.* ¶ 140.) Through discovery, Plaintiff obtained evidence that just a day after he requested a competitive offer from the Exchange, a USAA employee contacted an Exchange employee to discuss the valuation of Plaintiff's Vehicle, and they agreed to present similar valuations. (*See id.* ¶ 49.) USAA also provided the Exchange with a copy of the Galvez Appraisal prior to the Exchange producing its initial valuation of Plaintiff's Vehicle. (*See id.* ¶ 50.) Plaintiff alleges that these facts indicate "falsification of the Taylor [Appraisal]," (*id.* ¶ 76), and that USAA was attempting "to avoid a bidding war and illegally engage in a criminal price fixing scheme to deny the Plaintiff the option of competitive bids," (*id.* ¶ 50.) While Magistrate Judge John D. Early has ordered IBS to produce all documents relating to the inspection, appraisal, or valuation of Plaintiff's vehicle, including all contracts and agreements it had with USAA and the Exchange, IBS has refused to provide its labor-rate agreements with these insurers to Plaintiff. (*See id.* ¶ 90.)

For Plaintiff, the common error in both the Taylor Appraisal and the Galvez Appraisal raised doubt that these errors could be accidental or due to negligence, given that it would be unlikely that two licensed appraisers with years of experience both missed observing a major vehicle feature such as a sunroof. (*See id.* ¶ 53.) Nor were the common errors due to simple verbatim copying of the Galvez Appraisal since each of those appraisals contained a second distinct significant error, with the Galvez Appraisal failing to include emission equipment and the Taylor Appraisal missing metallic paint. (*See id.* ¶ 52.) Plaintiff alleges that these observations indicate the errors were the result of intentional fraud. (*See id.* ¶ 53.)

Over the next three years, Plaintiff relied on USAA's representation that his vehicle was a "total loss" in attempting to resolve this dispute with the insurers. (*See id.* ¶ 36.) Plaintiff only discovered that his Vehicle was not actually a total loss (i.e. that the

cost of repair was not higher than the value of the Vehicle) when he received copies of repair estimates for his Vehicle in the course of discovery.  (*See id.* ¶¶ 38–41.)  Besides these alleged instances of fraud and price-fixing regarding the valuation of Plaintiff's Vehicle, Plaintiff alleges, in short, that USAA "engaged in multiple acts of extortion, solely[] and teaming with IBS, to threaten and cause financial harm to the Plaintiff in attempt to force Plaintiff to accept a fraudulent settlement offer."  (*Id.* ¶ 61.)

As to the Exchange, Plaintiff alleges that in addition to it "conspire[ing] with USAA and IBS to engage in price-fixing and bid rigging of settlement offers to the Plaintiff in restraint of trade in the form of competitive settlement offers for damage to the Plaintiff's vehicle," (*id.* ¶ 72), and falsifying the Taylor Appraisal to perpetuate the misrepresentation that Plaintiff's vehicle was a total loss, (*see id.* ¶ 75), the Exchange also engaged in "internal acts of fraud to falsify 'Loss of Use' offers to the Plaintiff," (*id.* ¶ 80).  On April 3, 2020, the Exchange sent Plaintiff a settlement offer, in which it misrepresented the cost to rent an equivalent vehicle because it intentionally did not include taxes and other mandatory fees, which are components of the cost for any rental car.  (*See id.* ¶ 80.)  When Plaintiff pointed out the error, the Exchange admitted that these costs should have been included and recalculated Plaintiff's compensation for loss of use to include tax and fees.  (*See id.* ¶ 81.)  However, even in this second April 15, 2020 offer, the Exchange intentionally depressed the base rate for an equivalent rental car by using a discount rate that did not come into effect until months after Plaintiff's vehicle was totaled.  (*See id.*)  If Plaintiff had known that the Exchange would engage in fraud to depress the value of his claim, Plaintiff could have sought the help of the attorney who handled his son's personal injury claims and would have handled the property and loss-of-use claims without additional charge.  (*See id.* ¶ 84.)

Further, Plaintiff alleges that the Exchange illegally destroyed the recording of the phone call it had with his son on March 19, 2020 and that the Exchange and Gonzalez

conspired to submit a forged waiver of service of summons to the Court for the purpose of receiving additional time to respond to complaint.  (*See id.* ¶¶ 85–89.)

Finally, Plaintiff alleges that USAA "has a history of influencing appraisal companies to falsify appraisals[] and falsifying total loss claims because these acts of fraud can produce ill-gotten gains of over $15 million per year."  (*See id.* ¶ 56, Ex. B.) Plaintiff describes three cases that "show a pattern of USAA using its influence over appraisal companies to sway appraisers to falsify appraisals to reduce USAA'S liability, the same practice USAA used to influence IBS to falsify the [Galvez Appraisal] and the Galvez Repair Estimate …."  (*Id.* ¶ 57.)  According to Plaintiff, insurers broadly engage in this type of scheme to handle accident vehicles determined to be totaled and "cheat the 'totaled' vehicle's owner out of fair market compensation."  (*Id.*)

Plaintiff estimates that his damages to this point are approximately $115,000 between the value of his Vehicle, loss of use of his Vehicle, storage costs for his damaged Vehicle, and business damages for loss of productivity while dealing with this insurance claim.  (*See id.* ¶¶ 92–96.)  Plaintiff also prays for punitive damages to deter Defendants from future wrongful conduct.  (*See id.* ¶ 99.)

The Court previously compelled appraisal and dismissed USAA from this action based on mandatory language in Plaintiff's policy with USAA and Plaintiff's dispute with USAA regarding its valuation of his vehicle.   (*See* Dkt. 52.)  Sigler's insurance policy with USAA CIC states that if the parties "do not agree on the amount of loss, either may demand an appraisal," in which case the parties each select one appraiser who then agree on an umpire to adjudicate disagreements, and the decision of the appraisers and the umpire "will be binding."  (Dkt. 43-1 [Declaration of Melissa Ordell in Support of Defendant USAA Casualty Insurance Company's Motion for Judgment on the Pleadings, or in the Alternative, Motion to Compel Appraisal] Ex. A [Policy] at USAA-

SIGLER_000053.)[3]  The Policy further provides that "[n]o legal action may be brought against [USAA CIC] until there has been full compliance with all the terms of this policy." (Policy at USAA-SIGLER_000056.)  However, when Plaintiff filed his amended complaint, he reasserted claims against USAA, alleging that he "will no longer disagree with USAA['s] last 'amount of loss' figure; since with the discovery of evidence that the Plaintiff's vehicle was not a total loss based upon USAA's final valuation, Appraisal Arbitration is a moot point." (FAC ¶ 27.)  Based on this contrition, Plaintiff alleges that he is "now in full compliance with all the terms of the policy … allowing the Plaintiff to resume legal action against USAA in this amended Complaint." (*Id.*)

## III.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  A court should grant a motion for judgment on the pleadings if, "taking all the allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." *McSherry v. City of Long Beach*, 423 F.3d 1015, 1021 (9th Cir. 2005).  For purposes of a Rule 12(c) motion, "the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989).  Judgment on the pleadings is proper when the moving party "clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios*, 896 F.2d at 1550; *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978–79 (9th Cir. 1999).  The same standard as a Rule 12(b)(6) motion governs a Rule 12(c) motion. *See Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).

---

[3]  The "court may consider evidence outside the pleadings when ruling on . . . a motion to compel arbitration." *Thompson v. Isagenix Int'l LLC*, 849 F. App'x 712, 712 (9th Cir. 2021).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When evaluating a Rule 12(b)(6) (or a Rule 12(c)) motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012). To survive a motion to dismiss, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Under Rule 9(b), a party alleging a claim sounding in fraud must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1145 (9th Cir. 2009). The party "must set forth what is false or misleading about a statement, and why it is false." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994). In other words, a party must plead the "who, what, when, where, and how" of the alleged misconduct. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997). Rule 9(b) is meant to ensure that fraud allegations are "specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).

## IV.   ANALYSIS

USAA moves for a second time for judgment on the pleadings as to all of Plaintiff's claims because Plaintiff has again failed to participate in the appraisal process required under his insurance policy.  (*See* Mot. at 6.)  USAA also moves for judgment on the pleadings on Plaintiff's claims for (1) intentional misrepresentation (Count Two against USAA), (2) antitrust violations (Count Five against USAA), and (3) RICO violations (Count Six against USAA).  The Court addresses each issue in turn.

### A.   Compelling Appraisal

To begin, the Court reiterates that the appraisal provision in Plaintiff's policy constitutes a valid agreement to arbitrate certain claims.  Contractual appraisal is a form of arbitration agreement.  The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, generally governs questions of arbitration in federal court.  *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  "[B]ecause the FAA neither defines arbitration nor spells out whether the term arbitration includes appraisal," courts must "look to state law" to adjudicate such issues.  *Portland Gen. Elec. Co. v. U.S. Bank Tr. Nat'l Ass'n ex rel. Tr. No. 1*, 218 F.3d 1085, 1086 (9th Cir. 2000).  Under California law, an appraisal provision constitutes an agreement to arbitrate.  *See* Cal. Code Civ. P. § 1280(a); *Doan v. State Farm Gen. Ins. Co.*, 125 Cal. Rptr. 3d 793, 801 (Cal. Ct. App. 2011).  Thus, contractual appraisal is subject to the FAA.  *See Portland Gen. Elec.*, 218 F.3d at 1089.

Under the FAA, "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA is "a congressional declaration of a liberal federal

policy favoring arbitration agreements." *Moses H. Cone*, 460 U.S. at 24.  In light of this, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* at 24–25.  The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).  A court's role is limited to determining "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (en banc) (citation omitted); *see also* 9 U.S.C. § 2.

The Court previously determined that the arbitration agreement in the form of the appraisal provision is valid.  (*See* Dkt. 52 at 4.)  And Plaintiff's reading that the Policy establishes a "voluntary" appraisal process is plainly incorrect.  (*See* Dkt. 115 [Opp'n to Mot. to Dismiss, hereinafter "Opp."] at 6–7.)  Although the provision states that "either [party] may demand an appraisal," (Policy at 22), that does not mean that the other party's participation in an appraisal is voluntary even after one party demands it.  That language merely indicates that the parties' participation in an appraisal is not mandated *until* one party makes a demand.  In short, the agreement is valid and mandatory once either party invokes it.  Accordingly, all that remains is to determine whether the provision encompasses the parties' dispute following Plaintiff's amendments to his allegations.

Although USAA has invoked the appraisal process, as the terms of the provision require, (*see* Dkt. 43-2 [Declaration of Vivian I. Orlando in Support of Defendant USAA Casualty Insurance Company's Motion for Judgment on the Pleadings] ¶ 4), the Policy's appraisal provision no longer encompasses the dispute at issue.  Per the FAC, Plaintiff no longer disputes USAA's valuation of his vehicle.  (*See* FAC ¶ 27.)  Rather, Plaintiff now alleges that USAA provided an accurate valuation of his vehicle in terms of the dollar

amount but that USAA then mischaracterized that valuation as indicating his vehicle was a "total loss."  (*See id.*)  USAA's moves to compel appraisal only to the extent Plaintiff disputes his acceptance of USAA's valuation.  (*See* Mot. at 7.)  Since on the face of the FAC the cash value of Plaintiff's vehicle is no longer in dispute, there is no dispute for an appraisal—a process intended to determine "the actual cash value" of a covered vehicle, (*see* Policy at 22)—to address.

## B.    "Total Loss" Issue

USAA next argues that if Plaintiff accepts its valuation of his vehicle as reflected in its March 31, 2020 letter, Plaintiff's claims must be dismissed because the valuation in that letter indicates Plaintiff's vehicle was indeed a "total loss" under the Policy, and Plaintiff's claims related to fraud and misrepresentation cannot prevail if USAA's evaluation of his vehicle was accurate.  (*See* Mot. at 8.)  The Policy defines "total loss" to mean that "the cost to repair [a vehicle] would be greater than its actual cash value minus its salvage value after the loss."  (Policy at 19.)

First and obviously, despite USAA's contention otherwise, Plaintiff does not accept USAA's classification of his vehicle as a total loss.  In the FAC, Plaintiff alleges that he accepts USAA's latest dollar valuation of his vehicle, which totals $10,090.05, as required to avoid appraisal arbitration.  (*See* Dkt. 101-1 Ex. E ["3/31/20 Letter"] at 138.)  That does not mean Plaintiff implicitly accepts USAA's further description of his vehicle as a total loss under the Policy.

Second, USAA maintains that if Plaintiff accepts its valuation from the 3/31/20 Letter, he inherently renders the rest of his claims implausible because calculations using this valuation and repair cost lead to an inevitable conclusion that his vehicle was a total loss, and Plaintiff's claims rise and fall upon the fact that USAA fraudulently represented

that his vehicle was a total loss when it was not.  However, based on the Policy's language, USAA's conclusion is not necessarily correct.  Plaintiff and USAA's disagreement arises from their different interpretations of the phrase "actual cash value." USAA correctly notes that the 3/31/20 Letter states the actual cash value of Plaintiff's vehicle is $8,990, and the Letter goes on to include tax, registration fees, and the cost of fuel on top of that, totaling $10,090.05.  (*See* 3/31/20 Letter at 138.)  Based on Plaintiff's alleged repair costs of $9,223.68, (*see* FAC ¶ 122), his vehicle would therefore have been considered a total loss because the cost of repair exceeds what USAA claims to be the actual cash value.

Meanwhile, Plaintiff considers the "actual cash value" to include these additional costs that cannot be avoided when replacing a vehicle.  (*See* Opp. at 10.)  The Policy's definition of the term—"the amount it would cost to replace the damaged property with new property of like kind and quality …."—renders Plaintiff's allegation plausible. (Policy at 12.)  The Court will not dismiss any of Plaintiff's claims on this basis.

### C.    Intentional Misrepresentation

USAA moves to dismiss Plaintiff's second cause of action, which alleges intentional misrepresentation, on statute of limitations grounds.  (*See* Mot. at 10–11.) USAA argues that because Plaintiff's claims against it were dismissed without prejudice, the three-year statute of limitations, *see* Cal. Code Civ. Pro. § 338(d), expired prior to their refiling in October 2023.  (*See id.*)  USAA's argument misrepresents the law.  For one, USAA cites only opinions regarding cases that were dismissed in their entirety—not cases in which a court dismissed just some causes of action.  *See Georgescu v. Bechtel Const., Inc.*, 15 F.3d 1085 (9th Cir. 1994) (holding that dismissal of entire complaint without prejudice did not toll statute of limitations); *Humphreys v. United States*, 272 F.2d 411, 412 (9th Cir. 1959) (holding that "a suit dismissed without prejudice pursuant

to Rule 41(a)(2) leaves the situation the same as if the suit had never been brought in the first place").  USAA cites no law supporting its argument, the adoption of which would lead to severely unfair results and is clearly foreclosed by established California law. Indeed, "[a]n amended complaint is considered a new action for purposes of the statute of limitations only if the claims do not 'relate back' to an earlier, timely filed complaint. … An amended complaint relates back to an earlier complaint if it is based on the same general set of facts, even if the plaintiff alleges a different legal theory or new cause of action."  *Estrada v. Royalty Carpet Mills, Inc.*, 76 Cal. App. 5th 685, 714–15 (2022), *aff'd*, 15 Cal. 5th 582, 541 P.3d 466 (2024).  Although Plaintiff's claims against USAA were temporarily dismissed without prejudice pending the results of appraisal proceedings, Plaintiff's *case* has never been dismissed.

USAA next challenges Plaintiff's claim for intentional misrepresentation on substantive grounds.  To plead intentional misrepresentation (fraud), the claimant must allege the following: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) scienter or knowledge of falsity; (3) intent to induce reliance; (4) actual and justifiable reliance; and (5) resulting damage.  *See GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F. Supp. 3d 1007, 1039 (C.D. Cal. 2017), *aff'd sub nom. GemCap Lending I, LLC v. Quarles & Brady, LLP*, 787 F. App'x 369 (9th Cir. 2019); *see also McColgan v. Mut. of Omaha Ins. Co.*, 4 F. Supp. 3d 1228, 1233 (E.D. Cal. 2014). As a claim sounding in fraud, Plaintiff's claim for intentional misrepresentation is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *See Rodriguez v. JP Morgan Chase & Co.*, 809 F. Supp. 2d 1291, 1296 (S.D. Cal. 2011). USAA argues that Plaintiff fails to plausibly allege any actionable misrepresentations or reliance.  "The primary act of fraud and intentional misrepresentation involves statements made by USAA in a Total Loss Settlement letter dated and sent March 11, 2020, to the Plaintiff via email, where …. IBS and their employee, Pablo Galvez[,] provided falsified appraisals and repair estimates to support the false representation that the Plaintiff's

vehicle was a total loss." (FAC ¶ 113.) Plaintiff alleges that USAA directed IBS and
Galvez in preparing their repair estimates and that based on Galvez's repair estimate, his
vehicle was not a total loss. (*See id.* ¶¶ 120–23, 128.) However, USAA intentionally
misrepresented the vehicle was a total loss and deliberately withheld Galvez's repair
estimate from Plaintiff. (*See id.* ¶¶ 120–23.)

USAA argues that "the majority of the alleged misrepresentations identified in the
FAC cannot be attributed to USAA … because they were included in the valuation
reports Plaintiff alleges were created by Galvez, an employee of IBS." (Mot. at 12.) This
ignores Plaintiff's allegations that USAA directed Galvez and IBS's preparation of their
"doctored" repair estimate and that USAA represented that his vehicle was a total loss—
i.e., not worth repairing—when it in fact was. (FAC ¶ 39; *see id.* ¶¶ 120–23, 128.)

Next, USAA argues that these facts do not support any inference of reliance on its
misrepresentation. "Reliance is proved by showing that the defendant's
misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury-
producing conduct. A plaintiff may establish that the defendant's misrepresentation is an
'immediate cause' of the plaintiff's conduct by showing that in its absence the plaintiff
'in all reasonable probability' would not have engaged in the injury-producing conduct."
*In re Tobacco II Cases*, 46 Cal. 4th 298, 326, (2009) (cleaned up). Plaintiff alleges that
because of USAA's material misrepresentation that his Vehicle was "totaled"—i.e.,
deemed nonrepairable—for three years he pursued only recovering the value of his
Vehicle and did not pursue repairing it. (*See id.* ¶ 129.) In addition to changing positions
based on USAA's representations and not pursuing repairs, Plaintiff alleges he suffered
greater loss-of-use damages from not having the operable Vehicle and from Defendants'
longwinded process of undervaluing his claim through their repeated misrepresentations.
(*See id.* ¶ 47.) In the absence of USSA's representation, Plaintiff would have repaired his
Vehicle and would not have been damaged by having to pay for such extensive storage

costs and other costs associated with the loss of use of the Vehicle.  Taking these allegations as true, Plaintiff sufficiently alleges he relied on USAA's misrepresentations regarding the condition of his vehicle.

### D.    Clayton Act and Sherman Act Violations

Plaintiff's fifth cause of action alleges violations of Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce …."  15 U.S.C. § 1.  "To establish liability under § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016).  "Antitrust standing is a jurisdictional prerequisite to a Section 1 claim …."[4]  *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 900 (C.D. Cal. 2012); *see In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 744 (9th Cir.2012) ("Because Plaintiffs lack antitrust standing, we do not address Plaintiffs' appeal regarding the district court's [ ] determination that the rule of reason, and not the per se rule, applies here").  Under Section 4 of the Clayton Act, "any

---

[4]    This applies to alleged violations under "both the rule of reason and the *per se* rule."  *In re WellPoint*, 903 F. Supp. 2d at 900.

> Typically, the determination of whether a particular agreement in restraint of trade is unreasonable involves a factual inquiry commonly known as the "rule of reason." *Metro Indus., Inc., v. Sammi Corp.*, 82 F.3d 839, 843 (9th Cir. 1996). "The rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1156 (9th Cir. 2003).  The rule of reason inquiry, however, is inapplicable if "the restraint falls into a category of agreements which have been determined to be per se illegal." *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991).  The "per se rule is applied when the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (internal quotation marks omitted).  Such agreements or practices are "conclusively presumed to be unreasonable" because of their "pernicious effect on competition and lack of any redeeming virtue."

*United States v. Joyce*, 895 F.3d 673, 676 (9th Cir. 2018).

person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue … and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  15 U.S.C. § 15(a). "However, the Supreme Court has interpreted that section narrowly, thereby constraining the class of parties that have statutory standing to recover damages through antitrust suits."  *Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1120 (9th Cir. 2008).

USAA, like the Exchange in its previous motion, argues that Plaintiff does not have standing to bring this claim because he did not suffer the type of injury that antitrust laws aim to redress.  (*See* Mot. at 15–16.)

> The Supreme Court has identified several factors courts are to consider in determining whether a plaintiff, who has suffered an injury which bears a causal connection to the alleged antitrust violation, also satisfies the more demanding standard for antitrust standing. These factors are: (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages.

*Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996), *as amended* (Jan. 15, 1997) (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 (1983)).

Plaintiff's claim is based on a theory of horizontal price fixing and bid rigging. (*See* Opp. at 17.)  Specifically, Plaintiff alleges that he "had the legal right to obtain independent appraisals from USAA and the Exchange without the two businesses and their employees conspiring to eliminate a competitive bid[,] and the defendants' actions were an unreasonable restraint of trade."  (FAC ¶ 186 [cleaned up].)  Plaintiff's injury was the "loss of a fair and competitive offer for the valuation of his 'totaled' vehicle

and/or loss of the option to have falsely represented 'totaled vehicle repaired[,]" loss of use damages and storage costs, "damages to his business through interference with current business productivity due to the Plaintiff having to sporadically take time off work from March 2020 to May 2023," and since May 2023 "fulltime effort" to prosecute this lawsuit. (*Id.* ¶ 191.)  "The Supreme Court has held that horizontal price fixing is a per se violation of the Sherman Act."  *United States v. Joyce*, 895 F.3d 673, 677 (9th Cir. 2018) (citing *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 309 (1956) ("It has been held too often to require elaboration … that price fixing is contrary to the policy of competition underlying the Sherman Act ….").

USAA argues that Plaintiff does not have standing to bring a Sherman Act claim because his injuries do not relate to unfair competition.  (*See* Mot. at 16.)  USAA cites *Sheahan v. State Farm Gen. Ins. Co.*, 442 F. Supp. 3d 1178 (N.D. Cal. 2020) in support of its position, but that case is unlike Plaintiff's case.  In *Sheahan*, the court ruled that the plaintiffs did not have antitrust standing because the alleged agreement to suppress repair estimates was between the insurance company and a non-competing software company that licensed its repair estimate software.  *See id.* at 1194.  Unlike Plaintiff here, the *Sheanhan* plaintiffs "fail[ed] to allege specific facts establishing any agreement among insurance companies …."  *Id.* at 1195.  Here, Plaintiff has adequately alleged standing to sue for antitrust violations.  According to the FAC, the insurers (and their employees) and IBS got together to make sure they presented similar appraisals on Plaintiff's vehicle. (*See* FAC ¶¶ 181–89.)  This type of horizontal price fixing among competing insurers and their collaborators aims at keeping more funds in insurance companies' pockets and minimizes the payouts to policy holders like Plaintiff.  Because of Defendants' agreement, Plaintiff alleges he never received a reasonable appraisal and compensation for the value of his Vehicle or the repairs needed to it—i.e., that his claims were undervalued due to the anticompetitive conduct of USAA and the Exchange.  (*See* FAC ¶ 191.)

USAA is incorrect when it declares at this early stage that the insurance companies' actions here were not inconsistent with their self-interest such that Plaintiff's claim fails as a matter of law.  "Only where the pattern of action undertaken is not consistent with the self-interest of the individual actors, were they acting alone, may an agreement be inferred solely from such parallel action."  *Workman v. State Farm Mut. Auto. Ins. Co.*, 520 F. Supp. 610, 617 (N.D. Cal. 1981).  USAA and the Exchange's alleged actions were not consistent with each company's self-interest.  USAA reached out to the Exchange the day after Plaintiff requested a competitive settlement offer from the Exchange.  (*See* FAC ¶ 49.)  Although USAA could have said nothing to the Exchange and hoped that its repair estimate would be less than USAA's estimate or that its valuation of Plaintiff's vehicle would be higher—which might have resulted in Plaintiff accepting a settlement from the Exchange instead of USAA—USAA called the Exchange to share its valuation of Plaintiff's vehicle and "documented [the Exchange's] agreement to match USAA's" valuation.  (*Id.*)  "[U]nder the liberal standard applicable in antitrust actions," *Workman*, 520 F. Supp. at 617, at this stage Plaintiff's allegations are sufficient.

## E.     RICO

Finally, USAA moves to dismiss Plaintiff's sixth cause of action for RICO violations.  The civil RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  To state a civil RICO claim, a plaintiff must allege facts showing "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'"  *Living Designs, Inc. v. E.I.*

*Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).  USAA argues that Plaintiff fails to sufficiently plead the third element, a *pattern* of racketeering activity, (*see* Mot. at 14–17), and the Court agrees.

A "pattern of racketeering activity" requires at least two predicate acts, though two is not always sufficient because "in common parlance two of anything do not generally form a 'pattern.'"  *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191 (9th Cir. 1987) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985)).  The predicate criminal acts must be both "related" and "continuous."  *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1527 (9th Cir. 1995).  Acts are continuous "if the predicate acts posed a threat of continuing activity."  *Sun Sav. & Loan*, 825 F.2d at 193.  These requirements ensure that the RICO statute is not applied "to the perpetrators of isolated or sporadic criminal acts," since "Congress was concerned in RICO with long-term criminal conduct."  *Id.* at 192; *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989).  For this reason, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct" are not enough to state a civil RICO claim.  *H.J. Inc.*, 492 U.S. at 229.

A plaintiff can establish that predicate acts were continuous by pleading either open-ended or closed-ended continuity.  *See Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1526 (9th Cir. 1995).  Open-ended continuity refers to "past conduct that by its nature projects into the future with a threat of repetition."  *H.J., Inc.*, 492 U.S. at 241.  Closed-ended continuity refers to "a series of related predicates extending over a substantial period of time."  *Id.* at 242.  The Supreme Court has cautioned that "whether predicate acts establish a threat of continued racketeering activity depends on the specific facts of each case[,]" but it has given some examples:

> A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit.  Suppose a hoodlum were to sell

"insurance" to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the "premium" that would continue their "coverage." Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity. In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. Such associations include, but extend well beyond, those traditionally grouped under the phrase "organized crime." The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise."

*Id.* at 242–43.

Although the Court previously held that Plaintiff's claim against the Exchange did not look like these examples, Plaintiff's claim against USAA is a closer call. Plaintiff alleges that USAA, the Exchange, and IBS "created an 'association in fact' (AIF) enterprise for the purpose of engaging in racketeering activities with the goal of minimizing claims payouts to the Plaintiff resulting from the auto accident caused by Jorge Gonzalez. In addition to falsifying [a] settlement offer, these Defendants falsified appraisals and repair estimates in order to falsely classify the Plaintiff's vehicle as totaled. Moving the Plaintiff's vehicle into the 'totaled' category provided the Defendants with more leeway to undercut their liability with fraudulent valuation offers. In addition, once the initial complaint was filed in Nov. 2022, [Defendants] engaged in Predicate Acts of wire fraud, Witness Tampering (in the form of concealing or destroying documents), and Obstruction of Justice to delay or impede the administration of justice,

and to conceal or destroy documents so they are not available for use in an official proceeding." (FAC ¶ 198.)

Previously the Court held that "'[t]his case involve[s] but a single alleged fraud [on the part of each Defendant] with a single victim. All of [Defendants'] assertions about [the allegedly fraudulent appraisals] … were parts of [a] single effort [by each Defendant] to induce' Plaintiff to accept an offer that did not fully compensate Plaintiff for his losses." (Dkt. 73 at 11 [quoting *Medallion Television Enterprises, Inc. v. SelecTV of California, Inc.*, 833 F.2d 1360, 1363–64 (9th Cir. 1987)].) The Court has also already ruled that the alleged spoliation is not related in any meaningful sense to Defendants' alleged scheme to fraudulently reduce the compensation provided to Plaintiff for his Vehicle claim, and predicate acts giving rise to RICO claims must be related. (*See* Dkt. 112 at 18.)

However, the FAC contains additional allegations of USAA's past conduct aimed at fraudulently undervaluing claims of its insureds. According to the FAC, "USAA has a history of influencing appraisal companies to falsify appraisals, and falsifying total loss claims because these acts of fraud can produce ill-gotten gains of over $15 million per year." (FAC ¶ 56.) Plaintiff goes on to cite several other instances between 2017 and 2019 in which USAA took illegal steps to knowingly underpay policyholders for repairs covered under their policies. (*See id.* ¶¶ 56(a–c).) Although none of these instances involve vehicle valuations, they demonstrate similar conduct of falsifying costs of repair and valuations to reduce the amount USAA must pay under its insurance policies. (*See id.* ¶ 56(a) ["USAA … influenced [its agent] to falsely reduce her original damage appraisal on the Reyes' home from $33,000 to a value of $2,900[.]"; ¶ 56(b) ["[A]ppraiser working for USAA[] appraised the Kelley's roof damage at $19,8000 … [but l]ater, under the influence of USAA, [he] … dropped the appraisal to $1,200 …."];

¶ 56(c) [USAA subcontractor "testified that he was told to change his original opinion, stating 'He was given a word-for-word statement of what his conclusion should be.'"].)

USAA cites *Higgins v. Farr Fin. Inc.*, 2009 WL 3517597 (N.D. Cal. Oct. 26, 2009), to support its claim that these allegations are insufficient, but in that case the plaintiff "fail[ed] to identify a single customer other than himself who was subject to Defendants' [conduct and] … assert[ed] conclusory allegations that other, unidentified [customers] were affected by the alleged … scheme." *Id.* at *3. Although Plaintiff does not identify other USAA customers in California whose vehicle appraisals were similarly reduced, Plaintiff's allegations are premised on the broader claim that USAA fraudulently reduces the value of claims across the country and across a range of its coverage areas.

If it were simply a matter of alleging that USAA has a pattern of fraudulent conduct, these allegations would likely be sufficient. But Plaintiff specifically alleges that USAA and other Defendants engaged in an association-in-fact enterprise. "To allege an association-in-fact, the complaint must describe a group of persons associated together for a common purpose of engaging in a course of conduct and must provide both evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." *Doan v. Singh*, 617 F. App'x 684, 686 (9th Cir. 2015) (cleaned up). Though the Court is concerned by USAA's alleged history of deceiving its policyholders, Plaintiff's additional allegations don't support a pattern of racketeering activity among *this* enterprise. Plaintiff simply has not pled the type of ongoing activity among Defendant actors that would support *their* pattern of racketeering activity. *See United States v. Turkette*, 452 U.S. 576, 583 (1981) ("The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. 18 U.S.C. § 1961(1) (1976 ed., Supp. III). The former is proved by evidence of an ongoing organization, formal or

informal, and by evidence that the various associates function as a continuing unit.  The latter is proved by evidence of the requisite number of acts of racketeering *committed by the participants in the enterprise*.") (emphasis added).

The Federal Rules of Civil Procedure provide that "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, "[l]eave to amend may be denied if the proposed amendment is futile or would be subject to dismissal."  *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1059 (9th Cir. 2018).  Plaintiff already had an opportunity to amend his RICO claims and has not been able to fix the deficiencies previously noted by this Court and Defendants in several rounds of briefing.  Nothing in the FAC or Plaintiff's briefing suggests that Plaintiff can show *these Defendants* formed an enterprise to engage in a pattern of fraudulent activity.  Accordingly, the Court declines to give further leave to amend this claim.

# V.    CONCLUSION

For the foregoing reasons, USAA's motion for judgment on the pleadings is **GRANTED** as to Plaintiff's sixth claim for RICO violations and **DENIED** as to the remaining claims against USAA.

DATED:    February 22, 2024

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE